24-1383

CASE NO. 24-1383

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENDURANCE ENVIRONMENTAL SOLUTIONS, LLC,

*PETITIONER,*

v.

NATIONAL LABOR RELATIONS BOARD,

*RESPONDENT.*

---

**ON PETITION FOR REVIEW OF DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD, 373 N.L.R.B. NO. 141, CASE NO. 09-CA-273873**

---

## PETITION FOR REVIEW OF DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD

---

DLA PIPER LLP (US)
JONATHAN BATTEN (DC BAR NO. 473733)
*JONATHAN.BATTEN@DLAPIPER.COM*
500 EIGHTH STREET NW
WASHINGTON, D.C. 20004
PHONE: (202) 799-4329

JOSEPH PIESCO, JR. (APPLICATION TO PRACTICE PENDING)
*JOSEPH.PIESCO@DLAPIPER.COM*
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
PHONE: (212) 335-4537

*Attorneys for Petitioner*
*Endurance Environmental Solutions, LLC*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
DEC 20 2024
RECEIVED

**DLA Piper** LLP (US)
500 Eighth Street, NW
Washington, DC 20004
www.dlapiper.com

Jonathan Batten
jonathan.batten@us.dlapiper.com
**T** 202.799.4329
**F** 202.799.5381

December 20, 2024

**Via Hand Delivery**

Mr. Mark J. Langer, Clerk
Clerk of Court
United States Court of Appeals for the D.C. Circuit
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**Re:** ***Endurance Environmental Solutions, LLC v. National Labor Relations Board*, Petition for Review of an Order of the National Labor Relations Board**

Dear Mr. Langer:

Enclosed please find for filing an original and four copies of the Petition for Review of an Order of the National Labor Relations Board and Corporate Disclosure Statement filed on behalf of Endurance Environmental Solutions, LLC ("Petitioner"). Also enclosed are:

1. A check in the amount of $600.00 for the required docketing fee;

2. Five additional copies of both the Petition for Review and the Corporate Disclosure Statement to be file-stamped and returned to the messenger.

Very truly yours,

**DLA Piper LLP (US)**

*/s/ Jonathan Batten*

Jonathan Batten
Attorney for Endurance Environmental Solutions, LLC

Enclosures

CASE NO. 24-1383

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENDURANCE ENVIRONMENTAL SOLUTIONS, LLC,

*PETITIONER,*

v.

NATIONAL LABOR RELATIONS BOARD,

*RESPONDENT.*

---

**ON PETITION FOR REVIEW OF DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD, 373 N.L.R.B. NO. 141, CASE NO. 09-CA-273873**

---

## PETITION FOR REVIEW OF DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD

---

DLA PIPER LLP (US)
JONATHAN BATTEN (DC BAR NO. 473733)
*JONATHAN.BATTEN@DLAPIPER.COM*
500 EIGHTH STREET NW
WASHINGTON, D.C. 20004
PHONE: (202) 799-4329

JOSEPH PIESCO, JR. (APPLICATION TO PRACTICE PENDING)
*JOSEPH.PIESCO@DLAPIPER.COM*
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
PHONE: (212) 335-4537

*Attorneys for Petitioner*
*Endurance Environmental Solutions, LLC*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
DEC 20 2024
RECEIVED

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, Petitioner Endurance Environmental Solutions, LLC ("Petitioner"), hereby petitions the Court for review of, and respectfully requests that the Court set aside, the Decision and Order of the National Labor Relations Board ("NLRB") entered on December 10, 2024, reversing in part the Administrative Law Judge's dismissal of the Complaint against Petitioner and finding that Petitioner violated Section 8(a)(5) and (1) of the National Labor Relations Act. *Endurance Environmental Solutions, LLC*, 373 N.L.R.B. No. 141 (slip op. at 1, 24) (attached hereto as Attachment A). The NLRB's Decision and Order is not supported by substantial evidence and is contrary to law.

Respectfully Submitted,

DATED: December 20, 2024

**DLA PIPER LLP (US)**
JONATHAN BATTEN
JOSEPH PIESCO, JR.

*/s/ Jonathan Batten*
*Attorneys for Petitioner*
*Endurance Environmental Solutions, LLC*

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Endurance Environmental Solutions, LLC *and* Teamsters Local No. 100, an affiliate of the International Brotherhood of Teamsters, AFL–CIO.** Case 09–CA–273873

December 10, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN, PROUTY, AND WILCOX

In this case, we reconsider the standard to be applied in unfair labor practice cases arising under Section 8(a)(5) and (1) of the National Labor Relations Act (the Act or NLRA) to evaluate an employer's affirmative defense that employees, through their union representative, contractually surrendered the fundamental statutory right "to bargain collectively" with respect to wages, hours, or other terms and conditions of employment.[1] The specific issue presented here is whether the Respondent violated Section 8(a)(5) and (1) of the Act by failing to provide the Union notice and an opportunity to bargain over the Respondent's decision to install cameras to monitor unit employees and by refusing the Union's requests to bargain over the decision. Applying the "contract coverage" test adopted by a divided Board in *MV Transportation, Inc.*, 368 NLRB No. 66 (2019), the judge found that the decision came "within the compass or scope" of contract language granting the Respondent the right to "implement changes in equipment." The judge therefore found that the Respondent was not required to bargain further with the Union, either as to the decision to install the cameras or as to the effects of the decision on unit employees.

As explained in greater detail below, we find that the contract coverage test adopted in *MV Transportation* undermines the Act's central policy of promoting industrial stability by encouraging the practice and procedure of collective bargaining. We therefore overrule *MV Transportation* and restore the rule consistently followed by the Board for more than 70 years and endorsed by the Supreme Court in 1967.[2] Under that standard, the Board will not lightly infer a contractual waiver of the statutory right to bargain and will instead require such a waiver to be "clear and unmistakable."[3] We respectfully disagree with the minority of federal courts of appeals that have rejected the waiver standard in favor of the "contract coverage" standard, which (as we will explain) was developed under the Federal Service Labor-Management Relations Statute and first applied to a Board case in 1993. The Supreme Court has observed that "Congress assigned to the Board the primary task of construing [Sections 8(a)(5) and 8(d) of the Act] in the course of adjudicating charges of unfair refusals to bargain." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495 (1979). In undertaking the Board's assigned task today, we have carefully considered the views of those courts adhering to the contract coverage standard and have explained why we return to the traditional waiver standard.

## I. INTRODUCTION

As discussed more extensively below, absent a valid defense, an employer violates Section 8(a)(5) and (1) of the Act either by making a change to a mandatory subject of bargaining without first providing the union that represents its employees with notice and an opportunity to bargain, or by failing and refusing to bargain over a mandatory subject on request by the union. An employer can defend an allegation that a unilateral change or refusal to bargain violates Section 8(a)(5) of the Act on the basis that the union contractually surrendered the right to bargain.

The Board's clear and unmistakable waiver standard is of longstanding vintage,[4] as explained in *Provena St. Joseph Medical Center*, decided in 2007. In *Provena*, the Board reaffirmed its adherence to "one of the oldest and most familiar of Board doctrines": the clear and unmistakable waiver standard for determining whether a union has contractually surrendered the fundamental statutory right to bargain.[5] Drawing on decades of Supreme Court and Board precedent, the Board explained that the waiver standard "requires bargaining partners to unequivocally and specifically express their mutual intention to permit unilateral employer action with respect to a particular employment term, notwithstanding the statutory duty to bargain that would otherwise apply."[6] The Board further explained that the waiver standard "reflects the Board's policy choice, grounded in the Act, in favor of collective bargaining concerning changes in working conditions that might precipitate labor disputes."[7]

---

[1] On February 8, 2022, Administrative Law Judge Paul Bogas issued the attached decision. The General Counsel filed exceptions and a supporting brief, the Respondent filed an answering brief, and the General Counsel filed a reply brief. The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order.

We have amended the judge's conclusions of law and remedy consistent with our findings herein. We have also modified the judge's recommended Order to conform to our findings and the Board's standard remedial language, and in accordance with *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022), and *Excel Container, Inc.*, 325 NLRB 17 (1997). We have substituted a new notice to conform to the Order as modified.

No party has excepted to the judge's conclusion that the Respondent violated Sec. 8(a)(5) and (1) of the Act by failing to provide the Union with relevant requested information.

[2] See *NLRB v. C & C Plywood*, 385 U.S. 421 (1967).

[3] See *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983); *Provena St. Joseph Medical Center*, 350 NLRB 808, 812 (2007).

[4] See, e.g., *New York Mirror*, 151 NLRB 834, 839–840 (1965); *Tide Water Associated Oil Co.*, 85 NLRB 1096, 1098 (1949).

[5] 350 NLRB at 810-811.

[6] Id. at 811–812 (citing *Tide Water*, 85 NLRB 1096; *Metropolitan Edison*, 460 U.S. 693; *C & C Plywood*, 385 U.S. 421).

[7] Id. at 811.

The *Provena* Board expressly rejected the less exacting contract coverage standard endorsed by the dissent in that case. The Board explained that the contract coverage standard "is a relatively recent judicial innovation" and that, by contrast, the waiver standard "is firmly grounded in the policy of the National Labor Relations Act promoting collective bargaining," has been consistently applied by the Board, and has been approved by the Supreme Court and a majority of appellate courts.[8] The Board also noted that under the framework established by Congress it is the function of the Board, not the courts, to develop federal labor policy.[9]

Twelve years later, in *MV Transportation*, a divided Board overruled *Provena* and rejected the clear and unmistakable waiver standard in favor of a version of the contract coverage test.[10] As described by the *MV Transportation* majority, under the Board's contract coverage test, the Board applies "ordinary principles of contract interpretation" to determine whether a disputed change was "within the compass or scope" of any contractual provision authorizing unilateral action by the employer.[11] If so, the Board will find that the contract "authorized the employer to make the disputed change unilaterally, and the employer will not have violated Section 8(a)(5)."[12] The majority emphasized that an employer's unilateral action may be "covered" by a contract even if the contract does not "specifically mention, refer to or address the employer decision at issue."[13] "On the other hand," the *MV Transportation* majority explained, "if it is determined that the disputed act does *not* come within the compass or scope of a contract provision that grants the employer the right to act unilaterally, the analysis is one of waiver."[14]

We have examined the Board's decision in *MV Transportation* in light of the Act's fundamental policy to promote the practice of collective bargaining and longstanding precedent implementing that policy. For the reasons fully set forth below, we find that the decision undermines those considerations. We therefore overrule *MV Transportation* and return to the Board's traditional waiver standard. In our view, the clear and unmistakable waiver standard to which we return today better serves the purposes of the Act. As explained in greater detail below, the clear and unmistakable waiver standard better accomplishes the Board's statutory mandate to promote industrial peace by "encouraging the practice and procedure of collective bargaining." To that end, it also supports the statutory right of employees "to bargain collectively through representatives of their own choosing," as guaranteed by Section 7 of the Act. Finally, it better achieves consistency with Supreme Court and Board precedent and realigns Board law with the standard applied by the majority of courts of appeals in unilateral-change and refusal-to-bargain cases to evaluate an employer's affirmative defense that a union contractually surrendered the right to bargain.

## II. BACKGROUND

### *A. Facts*

The Respondent hauls trash and other materials to landfills. The Union represents a bargaining unit of drivers, mechanics, and loaders at the Respondent's Florence, Kentucky facility.[15] The Respondent and the Union were parties to a collective-bargaining agreement which was effective from September 24, 2018, through September 26, 2021. The following management-rights language was included in Article III of the agreement:

> The management of the plant and direction of the working force is vested exclusively in the Company, and in furtherance and not in limitation of such authority, shall include the right to assign, to suspend or to terminate employees for just cause, to transfer and relieve employees from duty because of lack of work and for other legitimate reasons, to subcontract bargaining unit work, to make shop rules and regulations, to create new jobs, develop new processes, and implement changes in equipment, changes in the content of jobs or improvements brought about by the Company in the interest of improved methods and product, PROVIDED, that this exercise of management's rights will not violate or supersede any other provisions of this Agreement. The parties acknowledge that, as part of its right to make shop rules and regulations, the Company has the right to issue an employee handbook. The Union acknowledges that the Company provided it with a copy of its most recent draft employee handbook for consideration and bargaining during the collective bargaining negotiations.

In August 2020, the Respondent decided to purchase and install cameras in its entire fleet of 400 trucks, including the 5 or 6 trucks housed at its Florence facility, which are driven by unit employees. The Lytx camera system purchased by the Respondent is mounted on the inside front windshield and consists of two cameras, one directed inward toward the driver, and another directed outward toward the road. The system continuously records video, as

---

[8] Id. at 811 fn. 15.

[9] Id. at 811 (citing *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)).

[10] 368 NLRB No. 66.

[11] Id., slip op. at 11.

[12] Id.

[13] Id. The Board decided to apply the contract coverage standard retroactively in all pending cases. Id., slip op. at 2, 12.

[14] Id., slip op. at 2 (emphasis in original); see also id., slip op. at 12 (explaining that if the agreement does not cover the disputed unilateral change, the Board "will continue to apply its traditional waiver analysis to determine whether some combination of contractual language, bargaining history, and past practice establishes that the union waived its right to bargain") (footnotes omitted).

[15] The Respondent maintains approximately 22 facilities throughout the United States. The Respondent's Florence, Kentucky facility is the only facility involved in this proceeding.

well as audio footage, but it only permanently retains the 10 seconds before and the 5 seconds after a triggering event. Triggering events include collisions, hard braking, hard acceleration, sudden lane changes, speeding, and failure to maintain a safe following distance. After such a triggering event, a third party views the captured footage, looks for driver behaviors such as texting or falling asleep, assigns a score to the event, and alerts the Respondent. The Respondent then reviews the footage and decides whether coaching or discipline is warranted.

As discussed in greater detail below, the Respondent decided to install the Lytx camera system in its entire fleet of company-owned vehicles, purchased the camera system, and announced to unit employees that it had begun the process of installing the cameras, without providing the Union with prior notice or opportunity to bargain over the decision or its effects.[16] The Respondent's Safety Manager Kevin Blackwell testified that the Respondent determined that it was not obligated to bargain with the Union over its decision to install the camera system because it "had the right to do so within our management rights clause within the CBA."

By email on August 11, 2020, Blackwell announced "the pending installation" of the Lytx camera system to the Respondent's regional managers. The email stated that the Respondent would be contacting the regional managers for "installation planning" in the "coming weeks," and that "[i]nstallers . . . will be on site to install the cameras." Attached to the August 11 email was a letter, signed by Blackwell, for the managers to share with the Respondent's employees. The letter stated in part, "We're excited to announce that we're in the early phase of implementing the Lytx® Driver Safety Suite . . . . " The letter then described the Lytx camera system and stated that employees would receive more information soon.

In August and September 2020, the Respondent began installing the cameras. However, due to a supply chain disruption caused by the COVID-19 pandemic, the Respondent was not able to obtain a sufficient number of cameras to install in its entire fleet of 400 trucks. The Respondent was therefore forced to delay the installation of the cameras in approximately 20 percent of its fleet, including in the 5 or 6 trucks driven by unit employees.[17]

In early January 2021, a regional manager visited the Respondent's facilities to inform employees that the Respondent had begun the process of installing cameras in company-owned vehicles and to answer any questions they had. A union steward and unit employee then contacted the Union to report that the Respondent was planning to install cameras in trucks driven by unit employees.

By email dated January 12, 2021, to Safety Manager Blackwell, the Union protested the Respondent's failure to provide the Union with notice and the opportunity to bargain over its decision to install the cameras prior to announcing the decision to unit employees. The Union demanded that the Respondent bargain over the installation and use of the cameras and cease any steps it had taken toward implementation. The Union also requested certain information to prepare for bargaining.[18]

By letter dated February 4, 2021, Blackwell confirmed that the Respondent was "implementing cameras in 100 percent of [its] fleet." He also acknowledged that in August 2020, a memorandum regarding the cameras was distributed "companywide," and that, in January 2021, employees were informed that the Respondent "had begun the process of installing" the cameras. Blackwell stated, however, that "no collective bargaining has been deemed necessary up to this point." He did not otherwise respond to the Union's demand to bargain or to its demand that the Respondent cease any steps it had taken toward implementation.

By letter dated February 12, the Union again protested the Respondent's failure to provide notice or opportunity to bargain prior to announcing its decision to unit employees. The Union also advised the Respondent that the use of cameras and other forms of employee surveillance devices is a mandatory subject of bargaining under well-established Board precedent, and it again demanded that the Respondent bargain over the decision and its effects, rescind any steps it had taken toward implementation, and provide the Union with relevant information.

By letter dated March 1, Blackwell contested the Union's assertion that the installation of the cameras was a mandatory subject of bargaining, and he stated that the Board precedent the Union had cited for that proposition did not apply. As in his previous letter, Blackwell did not specifically respond to the Union's request to bargain or to its demand that the Respondent rescind the decision and cease any steps it had taken toward implementation. And, while Blackwell stated in the closing paragraph of his letter that he "welcomed discussion" and invited the Union to contact him for that purpose, the invitation was preceded by the following sentence, which had a red line

[16] Contrary to our dissenting colleague's suggestion, we do not find that the Respondent was obligated to bargain over its decision to install cameras in vehicles driven by unrepresented employees. As explained below, we find that the Respondent was obligated to bargain over its decision to install cameras in vehicles driven by unit employees prior to announcing the decision to the unit employees and taking concrete steps to implement the decision. We further find that this duty to bargain with the Union over the decision and its effects arose on request by the Union, regardless of whether the Respondent ever implemented any changes to the unit employees' terms and conditions of employment.

[17] At the time of the hearing in this case, the Respondent had not installed the cameras in the trucks driven by unit employees. The Respondent attributed the fact that the cameras had not been installed to a supply chain disruption, and not to the Union's demand to bargain or to the unfair labor practice allegations.

[18] The Union's letter included four numbered paragraphs requesting information about the cameras, "[i]n order to evaluate the issue and to prepare to bargain on it."

through it but was still legible: "In closing, bargaining at the expense of safety cannot be a starting point."

On March 3, 2021, the Union filed a charge alleging that the Respondent violated Section 8(a)(5) and (1) of the Act by unilaterally implementing a program of installing cameras and other employee surveillance devices in trucks driven by unit employees; rejecting the Union's demands to bargain over the matter; and failing to respond fully to the Union's January 12, 2021 request for information. On May 14, 2021, the Regional Director for Region 8 issued a complaint on the refusal-to-provide information allegation. However, he dismissed the portions of the charge relating to the unilateral implementation and refusal-to-bargain allegations. On June 11, 2021, the Acting General Counsel notified the parties that he had received the Union's appeal of the partial dismissal of the charge; on August 5, 2021, the General Counsel notified the parties that she had sustained the Union's appeal; and on August 6, 2021, the General Counsel ordered the Regional Director to issue a complaint on the dismissed portions of the charge. On September 23, 2021, the Regional Director issued the amended complaint alleging that the Respondent violated Section 8(a)(5) and (1) by putting the Union on notice that the Respondent had implemented the Lytx Driver Safety Suite, which would include installing Lytx security cameras and other employee surveillance devices in trucks driven by unit employees, without prior notice to the Union and without affording the Union an opportunity to bargain with respect to that conduct and the effects of that conduct; refusing the Union's requests to bargain over the installation of Lytx security cameras in the vehicles driven by bargaining unit employees; and failing to provide information requested by the Union that is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the unit.

As discussed above, the parties' collective-bargaining agreement expired by its terms on September 26, 2021. The parties stipulated that "[on] September 16, when the parties commenced successor bargaining, the Union proposed a Memorandum of Understanding addressing the topic of . . . the Lytx [camera] system." The Respondent sought an additional stipulation that the parties "thereafter negotiated . . . on the Lytx system and reached a tentative agreement." The stipulation was rejected. However, the Respondent introduced into evidence a tentative agreement, dated November 9, 2021 (8 days before the hearing in this case), addressing the permissible uses of the camera system.

*B. The Judge's Decision and Exceptions*

The judge found that the Respondent's decision to install cameras that monitor unit employees while they work was a mandatory subject of bargaining. The judge further found that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to furnish, or inform the Union that it did not possess, information regarding the decision that was requested by the Union in its January 12, 2021, letter.[19]

The judge additionally found that the Respondent failed to provide the Union with a timely and meaningful opportunity to bargain over the decision. However, the judge concluded that *MV Transportation* compelled dismissal of the complaint allegations. Specifically, the judge found that the Respondent's action was "covered" by the management-rights language in Article III of the parties' collective-bargaining agreement granting the Respondent the right to "implement changes in equipment." Thus, the judge found that the Respondent's trucks are "equipment" and that the installation of cameras in the trucks falls within the compass of the contractual language granting the Respondent the right to "implement changes in equipment."[20]

The judge also found that by agreeing to the management-rights language in Article III, the Union relinquished the right to bargain over the effects of the Respondent's decision to install the cameras. The judge acknowledged the incongruence with Board precedent holding that a contractual waiver of the right to bargain over a particular decision does not constitute a waiver of the right to bargain over the effects of the decision.[21] However, the judge observed that the Board had not yet addressed the issue under the contract coverage standard. Without providing a rationale for departing from Board precedent developed in other contexts, the judge concluded that effects bargaining is precluded when the contract covers the underlying decision. The judge therefore found that the Respondent had no obligation to engage in further bargaining with the Union, either as to the decision or as to the effects of the decision on unit employees. Accordingly, the judge dismissed both the decisional and effects-bargaining allegations.

The General Counsel excepts arguing, among other things, that *MV Transportation* is inconsistent with the

[19] The complaint alleged, and the judge found, that the Respondent unlawfully failed to respond to Request 4 in the Union's January 12, 2021 letter, which sought information regarding whether cameras were in use at any of the Respondent's other facilities; which facilities (if any); and a copy of any applicable policy, collective-bargaining agreement provision, memorandum of understanding, or other document discussing the use of cameras at its other facilities. There are no exceptions to the judge's findings in this regard.

[20] The judge rejected the General Counsel's argument that this right is limited by language in the management-rights clause requiring that changes in equipment be made "in the interest of improved methods and product." In the alternative, the judge found that even assuming the General Counsel is correct that the management-rights clause only authorizes the Respondent to unilaterally implement changes in equipment if such changes are made "in the interest of improved methods and products," the Respondent's actions fell within the scope of that language, because "[f]or a trucking services company, the operation of its trucks *is* [its] product," and the installation of cameras to improve safety and address accidents constitutes an improvement in its methods and product.

[21] See, e.g., *New York University*, 363 NLRB 470, 474 (2015), *Good Samaritan Hospital*, 335 NLRB 901, 902–904 (2001).

express congressional intent to promote and encourage collective bargaining and should be overruled. The General Counsel contends that this case illustrates how the contract coverage standard frustrates the policy that Congress sought to implement. The General Counsel contends that if the judge's interpretation of the management-rights language is correct, the Respondent would never be required to notify and bargain with the Union prior to effectuating changes affecting important terms and conditions of employment, because nearly all such changes arguably fall within the compass or scope of the broad language in Article III of the parties' collective-bargaining agreement granting the Respondent the right to "develop new processes, and implement changes in equipment, changes in the content of jobs or improvements . . . in the interest of improved methods and product." The General Counsel contends that such a reading would effectively nullify the Union's ability to act as the unit employees' bargaining representative. The General Counsel therefore urges the Board to overrule *MV Transportation*, return to the longstanding clear and unmistakable waiver standard, and apply that standard retroactively.

Applying the waiver standard in this case, the General Counsel contends that the Respondent violated Section 8(a)(5) and (1) by failing to notify and bargain with the Union about the decision to install the camera system and its effects on unit employees, and by failing and refusing to bargain collectively with the Union upon request. The General Counsel observes that there is no language in the contract referencing camera systems and no evidence of a mutual intention to permit unilateral employer action with respect to the installation of camera systems that monitor employees and can be used for disciplinary purposes. Accordingly, the General Counsel argues that the Union did not waive its rights to bargain over the decision or its effects.

The Respondent argues that the Board should adhere to the contract coverage standard. Under the contract coverage standard, the Respondent maintains that it did not violate its bargaining obligation, for the reasons found by the judge.

## III. DISCUSSION

### *A. Basic Principles Governing the Duty to Bargain*

The purpose of the National Labor Relations Act, stated clearly in its preamble, is

> to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred *by encouraging the practice and procedure of collective bargaining* and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, *for the purpose of negotiating the terms and conditions of their employment* or other mutual aid or protection.

29 U.S.C. § 151 (emphasis added).

The Supreme Court has long recognized the role collective bargaining plays in the Act's central goal of reducing and eliminating the causes of industrial strife. As the Court has observed:

> One of the primary purposes of the Act is to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation. The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife.

*Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 211 (1964) (citations omitted).[22]

To accomplish these statutory objectives, Section 7 of the Act guarantees the right of employees to "bargain collectively through representatives of their own choosing." 29 U.S.C. § 157; id. § 158(a)(1). And Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Id. § 158(a)(5).[23] Section 8(d) defines the phrase "to bargain collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . . " Id. § 158(d). It is well settled than an employer violates Section 8(a)(5) if it changes terms and conditions of employment that are mandatory subjects of bargaining without providing the union representing its employees with prior notice and the opportunity to bargain. *NLRB v. Katz*, 369 U.S. 736, 743 (1962). The Court in *Katz* declared that such a unilateral change "is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal" to bargain.[24]

Where a specific term and condition of employment is incorporated in a collective-bargaining agreement, the Act creates a different, but related set of rules that also govern an employer's statutory duty to bargain. Under Section 8(d), neither party to a contract shall be required "to discuss or agree to any modification of the terms and

---

[22] See also *Ford Motor Co. v. NLRB*, 441 U.S. 488, 498, 502 (1979) (it "is the assumption of national labor policy" that "more, not less, collective bargaining is the remedy" for disputes "plainly germane to the working environment") (internal quotes and citations omitted).

[23] A violation of Sec. 8(a)(5) is also a violation of Sec. 8(a)(1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." *Bemis Co.*, 370 NLRB No. 7, slip op. at 1 fn. 3 (2020).

[24] 369 U.S. at 743 (footnote omitted); see also id. at 747 (unilateral changes made during contract negotiations "must of necessity obstruct bargaining, contrary to the congressional policy" and "will rarely be justified by any reason of substance").

conditions contained in" a currently effective contract.[25] A party seeking to modify the terms of an existing contract must obtain the other party's consent, and either party may refuse to negotiate over midterm changes to any terms and conditions "contained in" a contract.[26] Where, however, a specific term and condition is *not* "contained in" a contract, the employer's statutory duty to bargain still applies. Thus, the employer remains obligated "to bargain collectively with the representatives of his employees" regarding any term and condition that is not "contained in" an agreement, and the employer can only change such a term and condition after it has bargained in good faith to impasse with the union.[27] Accordingly, the Board distinguishes between (1) unfair labor practice allegations that an employer has made an unlawful mid-term modification of the collective-bargaining agreement and (2) as in the instant case, allegations that an employer has failed and refused to bargain on request or made a unilateral change.[28]

### *B. Development of the Clear and Unmistakable Waiver Standard*

The Board developed the waiver standard to address employers' contractual defenses to unilateral-change and refusal-to-bargain allegations. The standard was first articulated shortly after the enactment of the Taft-Hartley amendments, in *Tide Water Associated Oil Co.*, 85 NLRB 1096 (1949). The complaint in *Tide Water* alleged that the employer violated Section 8(a)(5) by unilaterally changing the retirement plan for unit employees. The employer argued that its conduct was privileged by a management-rights clause which included the "retiring of employees" as an exclusive management function and provided, in a separate paragraph, that the collective-bargaining agreement "shall in no way affect" the operation of the retirement plan or the status of any employee with respect to the plan. The Board rejected this defense, stating "[w]e are reluctant to deprive employees of any of the rights guaranteed them by the Act in the absence of a clear and unmistakable showing of a waiver of such rights."[29]

The Supreme Court approved the Board's clear and unmistakable waiver standard in *NLRB v. C & C Plywood Corp.*, 385 U.S. 421 (1967). In *C & C Plywood,* the General Counsel alleged that the employer violated Section 8(a)(5) by implementing a premium pay schedule for a classification of employees, without prior notice to, or bargaining with, the union.[30] The employer argued that its action was authorized by language in the parties' collective-bargaining agreement reserving to the employer the right "to pay a premium rate over and above the contractual classified wage rate to reward any particular employee for some special fitness, skill, aptitude, or the like."[31] The trial examiner (the equivalent of today's administrative law judge) dismissed the complaint on the ground that the dispute involved only a matter of contract interpretation and that the employer's implementation of the premium pay plan according to its interpretation of the contract was not a violation of Section 8(a)(5). The Board reversed, explaining that the "[u]nion was complaining not of a violation of its contract with [the employer], but of the invasion of its statutory right as collective-bargaining representative of employees . . . to bargain about any change in the terms and conditions of employment . . . ."[32] The Board observed that the "statutory right . . . to bargain . . . may be waived by the union,"[33] but to be effective, the waiver must be "'clear and unmistakable,'" and an "intent" to permit unilateral employer action "should not be inferred unless the language of the contract . . . clearly demonstrates this to be a fact."[34] The Board saw "nothing in . . . [the] contract to establish that the [u]nion intended to waive its statutory right to bargain over the matter in dispute," and so found a violation of Section 8(a)(5).[35]

---

[25] Sec. 8(d) provides in relevant part that the duty to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." 29 U.S.C. § 158(d).

[26] *C & S Industries, Inc.*, 158 NLRB 454, 457 (1966); *Jacobs Mfg. Co.*, 94 NLRB 1214, 1217–1218 (1951), enfd. 196 F.2d 680 (2d Cir. 1952).

Before the Act was amended by the Taft-Hartley Act in 1947, employers and unions were under a continuous duty to bargain as to unit employees' terms and conditions of employment, even if the subject matter to be discussed was already incorporated in a collective-bargaining agreement. See *NLRB v. Jacobs Mfg.*, 196 F.2d at 683 (citing *NLRB v. Sands Mfg. Co.*, 306 U.S. 332, 342 (1939)). Sec. 8(d), added to the Act in the Taft-Hartley amendments, was intended to foster industrial peace by stabilizing agreed-upon conditions of employment. *Allied Chemical & Alkali Workers Local 1 v. Pittsburgh Plate Glass*, 404 U.S. 157, 186–187 (1971); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 fn. 3 (1960).

[27] *NLRB v. Jacobs Mfg.*, 196 F.2d at 684 (holding that Sec. 8(d) does not relieve an employer of the duty to bargain "as to subjects which were neither discussed nor embodied in any of the terms and conditions of the contract"); *Milwaukee Spring Division*, 268 NLRB 601, 602 (1984), affd. sub nom. *Auto Workers Local 547 v. NLRB,* 765 F.2d 175 (D.C. Cir. 1985).

[28] See, e.g., *Bath Iron Works Corp.*, 345 NLRB 499, 501 (2005), affd. 475 F.3d 14 (1st Cir. 2007).

[29] Id. at 1098.

Our dissenting colleague contends that *Tide Water* provides no support for our view because the contract there was silent as to the disputed issue. As discussed above, however, the employer in *Tide Water*, like the Respondent in this case, argued that its unilateral conduct was privileged by a management-rights clause. The Board in *Tide Water* therefore interpreted the contractual language, relying on both the "vagueness" of the management-rights clause and the absence of any other specific reference to the matter in dispute in the contract, to determine that the union had not waived its statutory right to bargain. Id. *Tide Water* thus represents an early example of the Board's analysis that ripened into the clear and unmistakable waiver standard.

[30] *C & C Plywood Corp.*, 148 NLRB 414 (1964), enf. denied 351 F.2d 224 (9th Cir. 1965).

[31] Id. at 414.

[32] Id. at 415.

[33] Id. at 415–416.

[34] Id. at 416.

[35] Id. at 417.

The Ninth Circuit reversed. Agreeing with the trial examiner, the court held that the Board lacked jurisdiction to decide the case, because the dispute turned on the interpretation of the collective-bargaining agreement, which is a matter for the state or federal courts under Section 301 of the Act.[36]

The Supreme Court reversed the Ninth Circuit, directing it to enforce the Board's order. The Court rejected the argument that "since the contract contained a provision which might have allowed" the employer to act unilaterally, the Board was "powerless to determine whether that provision did authorize the [employer's] action, because the question was one for a state or federal court under § 301 of the Act."[37] The Court explained that the Board had "not construed a labor agreement to determine the extent of the contractual rights which were given the union by the employer" nor "imposed its own view of what the terms and conditions of the labor agreement should be."[38] Rather, it "enforce[d] a statutory right which Congress considered necessary to allow labor and management to get on with the process of reaching fair terms and conditions of employment," and its "interpretation went only so far as was necessary to determine that the union did not agree to give up . . . statutory safeguards" against unilateral employer action.[39]

The Court also upheld the Board's determination that the contractual language did not give the employer the right to unilaterally institute its premium pay plan. In doing so, the Court expressly approved the Board's waiver analysis, stating:

> [T]he Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free collective bargaining. We cannot disapprove of the Board's approach. For the law of labor agreements cannot be based upon abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying the context.[40]

In *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 433 (1967), decided the same day as *C & C Plywood*, the Court "deal[t] with another" aspect of "an employer's duty to bargain during the term of a collective bargaining agreement," namely, "the obligation to furnish information that allows a union to decide whether to process a grievance." There, the Court similarly rejected an argument that the authority of the Board to adjudicate unfair labor practices is supplanted where there is a provision for binding arbitration of differences concerning the meaning and application of a collective-bargaining agreement.[41] The Court emphasized that while courts are required to defer to an arbitrator when construction and application of a labor agreement are in issue, "[t]he relationship of the Board to the arbitration process is of a quite different order."[42] The Court in *Acme* also expressly affirmed the principle that "the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement."[43]

The Court reaffirmed its approval of the Board's waiver analysis in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983). There, the Court held that a union could waive in a collective-bargaining agreement its officers' statutory right under Section 8(a)(3) of the Act to be free

[36] 351 F.2d at 227–228 (citing *NLRB v. American National Insurance Co.*, 343 U.S. 395, 404 (1952)). In relevant part, Sec. 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties . . . . " 29 U.S.C. § 185. But refusal-to-bargain and unilateral-change allegations under Sec. 8(a)(5) of the Act do not involve a claim that the collective-bargaining agreement has been violated, but rather that the employer has violated its statutory duty to bargain. As mentioned above, unfair labor practice charges must be brought to the Board, which is solely responsible for administering the Act. See id. § 160. Notably, Sec. 10(a) of the Act provides that the Board's "power [to redress unfair labor practices] shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." Id. § 160(a).

[37] 385 U.S. at 425–426. The Court acknowledged that "Congress determined that the Board should not have general jurisdiction over all alleged violations of collective bargaining agreements and that such matters should be placed within the jurisdiction of the courts," observing that this determination was based both on freedom-of-contract principles and on Congress' "concern[] with the possibility of conflicting decisions that would result from placing all questions of contract interpretations before both the Board and the courts." Id. at 427 & 428 fn. 13 (citing 93 Cong. Rec. 4033, 2 Legis. History of LMRA 1539). However, the Court observed that the possibility of conflict "does not arise in a case like the present one, since courts have no jurisdiction to enforce the union's statutory rights under [Sec.] 8(a)(5) and (1)." Id. at 428 fn. 13.

[38] Id. at 428.

[39] Id.

[40] Id. at 430.

We disagree with our colleague's apparent suggestion that the Court, by citing Archibald Cox, *The Legal Nature of Collective Bargaining Agreements*, 57 Mich. L. Rev. 1 (1958), was somehow obliquely signaling its support of a contract coverage approach rather than the Board's waiver analysis. Nothing in the Court's opinion supports such a suggestion, nor does the article itself anticipate the contract coverage approach. The article, written after the passage of § 301, poses the following questions: "Where . . . is the judge or arbitrator to turn in deciding [an issue] on which the contract is silent? I have no answer . . . only a conviction that the search is one which ought to be pursued more consciously in general terms, even though the answer is the pot of gold at the end of the rainbow." Id. at 34. The article then suggests possible answers, including that an arbitrator, if authorized by the contract, should fill in the gaps, but adds "[t]he suggestions made here are hardly a beginning." Id. at 35–36.

[41] Id. at 435–437 (citing *C & C Plywood*, supra, and *NLRB v. F. W. Woolworth Co.*, 352 U.S. 938 (1964)).

[42] Id. at 436. The Court observed that in assessing the Board's power to deal with unfair labor practices, "provisions of the . . . Act which do not apply to the power of the courts under [Sec.] 301 must be considered." Id. Sec. 8(a)(5) and 8(d) make it an unfair labor practice for an employer to fail or refuse to bargain in good faith, while Sec. 10(a) provides that the Board's power "'to prevent any person from engaging in any unfair labor practice . . . . shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . . '" Id. 436–437.

[43] Id. at 436.

from antiunion discrimination. However, the Court stated, "we will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable."[44] In support of the requirement that contractual waivers of statutory rights must be "clear and unmistakable," the Court cited its earlier decision in *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270 (1956).[45] In *Mastro Plastics*, the question before the Court was whether a general no-strike provision in the parties' collective-bargaining agreement waived employees' right to strike over an unfair labor practice. While reserving the question whether a union might waive this right if it were "explicitly stated," the Court in *Mastro Plastics* held that "there is no adequate basis for implying [the] existence [of waiver] without a more compelling expression of it than appears in . . . this contract."[46]

Since *Metropolitan Edison*, the Supreme Court has repeatedly affirmed, in a variety of contexts, the principle that a contractual waiver of a statutorily protected right must be "explicitly stated" and "clear and unmistakable." See, e.g., *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009) (holding that provision in a collective-bargaining agreement that "clearly and unmistakably" required union members to arbitrate Age Discrimination in Employment Act claims is enforceable); *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 79–80, 82 (1998) (reiterating requirement that contractual waivers of statutory rights must be "explicitly stated" and "clear and unmistakable," and finding that collective-bargaining agreement did not waive employees' right to a judicial forum for federal claims of employment discrimination) (citing *Metropolitan Edison*, 460 U.S. at 708; *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) (stating in dictum that a union's waiver in collective-bargaining agreement of employees' individual state-law rights would have to be "clear and unmistakable"); *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 409 fn. 9 (1988) (same)). In each of these cases, the Supreme Court relied on the principle that statutorily protected rights are too important to be surrendered through less-than-explicit waivers in a collective-bargaining agreement.[47]

### *C. Subsequent Judicial Decisions*

Following the Supreme Court's lead, the majority of Courts of Appeals—the Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits—have consistently deferred to the Board's clear and unmistakable waiver standard as a rational and permissible interpretation of the Act. See *Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 697 (10th Cir. 1996); *Bonnell/Tredegar Industry v. NLRB*, 46 F.3d 339, 346 fn. 6 (4th Cir. 1995); *Ciba-Geigy Pharmaceuticals Division v. NLRB*, 722 F.2d 1120, 1127 (3d Cir. 1983); *American Distributing Co. v. NLRB*, 715 F.2d 446, 449–450 (9th Cir. 1983), cert. denied 466 U.S. 958 (1984); *Tocco Division v. NLRB*, 702 F.2d 624, 626-627 (6th Cir. 1983); *American Oil Co. v. NLRB*, 602 F.2d 184, 188–189 (8th Cir. 1979). Notably, the Sixth Circuit, where the events at issue in this case arose, continues to embrace the clear and unmistakable waiver standard. See *Beverly Health and Rehabilitation Services v. NLRB*, 297 F.3d 468, 480 (6th Cir. 2002).[48]

Despite widespread judicial approval of the Board's clear and unmistakable waiver standard and the standard's grounding in Supreme Court precedent, several Courts of Appeals have criticized the Board's approach. Although initially endorsing the Board's approach,[49] the District of Columbia Circuit and the Seventh Circuit have since parted ways with the Board. Beginning in the late 1980s and early 1990s, the District of Columbia Circuit developed its contract coverage approach when considering unilateral-change allegations in cases arising under both the Act and the Federal Service Labor-Management Relations Statute (FSLMRS).[50] See, e.g., *NLRB v. Postal Service*, 8 F.3d 832 (D.C. Cir. 1993); *Department of the Navy v. FLRA*, 962 F.2d 48 (D.C. Cir. 1992). In *Postal Service*, the District of Columbia Circuit, applying a contract coverage analysis to a case arising under the Act for the first time, found that a management-rights clause granting the employer "the exclusive right" to "transfer and assign employees," "determine the methods, means and personnel

[44] Id. at 708. The Court stated that "[t]he Courts of Appeals have agreed that the waiver of a protected right must be expressed clearly and unmistakably." Id., fn. 12.

[45] 460 U.S. at 708.

[46] 350 U.S. at 283.

[47] We disagree with our colleague's view that these cases are of limited relevance because they did not involve waivers of the statutory right to bargain. They reflect the Court's view that waivers of statutory rights can be effected only through clear and unmistakable language. The dissent offers no persuasive explanation why the statutory right to engage in collective bargaining should be given short shrift compared with the statutory rights at issue in the cases cited above.

[48] Recognizing this wealth of precedent validating the Board's clear and unmistakable standard, arbitrators have also applied the clear and unmistakable waiver standard. See, e.g., [Grievant 1] v. [Respondent 1], 2020 WL 1820561 (2020) (redacted) (applying clear and unmistakable waiver standard); *Bakery Confectionary Tobacco Workers & Grain Millers International Union Local 366-G v. Nestle Purina Petcare Co.*, 2016 WL 10649399 (W.D. Okla. 2016) (same); *International Brotherhood of Teamsters v. Rock Island Integrated Services*, 2004 WL 5841301 (C.D. Ill. 2004) (Stanton, Arb.) (same); In re *Russell*, FMCS Case No. 99/12641-A, 2000 WL 36177202 (2000) (Solomon, Arb.) (same).

[49] See *Murphy Diesel Co. v. NLRB*, 454 F.2d 303, 307 (7th Cir. 1971); *International Union, UAW v. NLRB*, 381 F.2d 265, 267 (D.C. Cir. 1967), cert. denied 389 U.S. 857 (1967).

[50] Congress established the FLRA in 1978 in Title VII of the Civil Service Reform Act of 1978. See 5 U.S.C. § 7101–7135. Unlike the NLRA, the FSLMRS specifically excludes certain "management rights" from the statutory duty to bargain, including hiring decisions, the assignment of work, and the establishment of performance standards. Id. § 7106(a)(2). The District of Columbia Circuit has never substantially addressed this foundational distinction between the NLRA and the FSLMRS. As explained here, we would not import a standard developed under the FSLMRS to evaluate an employer's defense that it failed to satisfy its bargaining obligation under the NLRA, a markedly different statute.

by which [its] operations are to be conducted," and "maintain the efficiency of the operations entrusted to it" privileged the employer's unilateral reduction of employees' hours because it demonstrated that "the parties had already bargained over the relevant issues and memorialized the terms of that bargain in their contract." 8 F.3d at 833–834 & 838. The District of Columbia Circuit continues to adhere to the contract coverage approach. See, e.g., *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16, 18 (D.C. Cir. 2016); *Enloe Medical Center v. NLRB*, 433 F.3d 834 (D.C. Cir. 2005).

The First and Seventh Circuits have also departed from the Board's traditional clear and unmistakable waiver standard.[51] The Seventh Circuit has declared that a waiver analysis is inapposite "when the parties have an express written contract" and the relevant issue is "what it means." *Chicago Tribune Co.*, 974 F.2d at 936–937.[52]

The Second Circuit has taken yet another approach in analyzing Board decisions dealing with employers' contractual defenses to unilateral-change allegations. The Second Circuit initially joined the majority of circuits in deferring to the Board's application of the clear and unmistakable waiver standard. See, e.g., *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 187 (2d Cir. 1991), cert. denied 502 U.S. 856 (1991). Thereafter, the Second Circuit began applying a hybrid test incorporating aspects of the waiver and contract coverage standards. See *Electrical Workers Local 36 v. NLRB*, 706 F.3d 73, 83–84 (2d Cir. 2013) (setting forth a "two-step framework" that analyzes "whether the issue is clearly and unmistakably resolved (or 'covered') by the contract" and, if not, "whether the union has clearly and unmistakably *waived* its right to bargain") (emphasis in original), cert. denied 573 U.S. 958 (2014). Eventually, informed both by deference to the Board's decision in *MV Transportation*, supra, and its own experience applying the hybrid standard, the Second Circuit adopted the contract coverage approach. See *Electrical Workers Local 43 v. NLRB*, 9 F.4th 63, 72–73 (2d Cir. 2021).

None of these circuit decisions, however, addressed the Supreme Court's approval of the clear and unmistakable waiver standard in *C & C Plywood* or explained how their rejection of that standard is consistent with the Court's holding.[53] Nor have these courts grappled with the Court's admonition that the Board's choice of standard was entitled to considerable deference.

*D. The Board's Decision in MV Transportation*

As described above, in *MV Transportation*, 368 NLRB No. 66, the Board adopted a version of the contract coverage standard for the first time. Under that standard, the Board announced that it would "examine the plain language of the collective-bargaining agreement to determine whether action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally."[54] If "the agreement does not cover the employer's disputed act, and that act has materially, substantially, and significantly changed a term or condition of employment constituting a mandatory subject of bargaining, the employer will have violated Section 8(a)(5) and (1) unless it demonstrates that the union clearly and unmistakably waived its right to bargain over the change or that its unilateral action was privileged for some other reason."[55]

Echoing the criticism of the District of Columbia Circuit, a Board majority in *MV Transportation* claimed that the waiver standard alters the parties' bargain and undermines contractual stability and repose by directing heightened scrutiny exclusively to those parts of the collective-bargaining agreement that allegedly authorize unilateral employer action, leads to conflicting contract interpretations by the Board and the courts, undermines grievance arbitration, and is indefensible and unenforceable.

As explained in greater detail below, the *MV Transportation* Board's decision to overrule *Provena* and adopt the contract coverage standard was based on a series of erroneous assumptions. Accordingly, we find merit in the General Counsel's argument, on exception, that the Board should overrule *MV Transportation* and return to its traditional clear and unmistakable waiver standard.

## IV. RESTORING THE CLEAR AND UNMISTAKABLE WAIVER STANDARD

*A. The Board's Authority to Interpret and Apply the Act*

As the Supreme Court has often emphasized, "the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990). "'[E]ffectuat[ing] national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.'" *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501 (1978) (quoting *NLRB v. Truck Drivers*, 353 U.S. 87, 96 (1957)). The Board has "special

[51] *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14, 25 (1st Cir. 2007); *Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 936-937 (7th Cir. 1992).

[52] In *Chicago Tribune*, the court also questioned "what the exact force of the 'clear and unmistakable' principle can be . . . now that the Supreme Court has held that even a waiver of precious constitutional rights need not be proved by clear and convincing evidence." Id. at 936–937 (citing *Colorado v. Connelly*, 479 U.S. 157, 167–169 (1986)). As discussed above, however, the Supreme Court has since repeatedly affirmed that a contractual waiver of statutory rights must be clear and unmistakable.

[53] They also failed to address the Supreme Court's other decisions affirming the principle that a contractual waiver of a statutorily protected right must be "explicitly stated" and "clear and unmistakable." See, e.g., *14 Penn Plaza LLC*, 556 U.S. at 258, 274; *Wright v. Universal Maritime Service Corp.*, 525 U.S. at 79–80, 82; *Livadas v. Bradshaw*, 512 U.S. at 125; *Norge Division of Magic Chef, Inc.*, 486 U.S. at 409 fn. 9; *Metropolitan Edison*, 460 U.S. at 708; *Mastro Plastics*, 350 U.S. at 283, 287.

[54] Id., slip op. at 2.

[55] Id.

competence" in the field of labor relations that justifies "the deference accorded its determination" of issues pertaining to federal labor policy. *NLRB v. J. Weingarten*, 420 U.S. at 266. In particular, the Court has recognized that "Congress assigned to the Board the primary task of construing [Section 8(a)(5) and 8(d) of the Act] in the course of adjudicating charges of unfair refusals to bargain." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495 (1979). The Board's traditional clear and unmistakable waiver standard, which is a product of the Board's expertise in the field of labor relations and arose in the course of adjudicating allegedly unlawful unilateral changes, represents a permissible effort by the Board to fulfill its duty to faithfully interpret the relevant provisions of the Act.[56] Indeed, the Court has already deferred to the Board's expertise on precisely the same issue involved here. See *C & C Plywood*, 385 U.S. at 430 ("We cannot disapprove of the Board's approach" in adopting the clear and unmistakable waiver standard as "the Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free collective bargaining.").

*B. MV Transportation Rests on Mistaken Premises*

1.

The heart of the Board majority's rationale in *MV Transportation* (rearticulated by our dissenting colleague) is that the waiver standard interferes with the parties' bargained-for exchange. First, the Board majority explained, "[t]he terms of the agreement represent the parties' bargained-for deal, arrived at through the give-and-take of negotiations, and the parties are entitled to the benefit of their bargain based on the language they agreed to include in their contract."[57] And quoting the Supreme Court's decision in *NLRB v. American National Insurance Co.*, 343 U.S. at 404, the Board majority stated that it "'may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.'"[58] The Board majority reasoned that under the clear and unmistakable waiver standard, "the Board will refuse to give effect to contract provisions granting rights of unilateral action to the employer unless those provisions meet the exacting standards imposed by the Board," thereby "effectively writ[ing] out of the contract language the parties agreed to put into it."[59]

In *C & C Plywood*, however, the Supreme Court rejected these arguments. The Court explained that the Board had "not construed a labor agreement to determine the extent of the contractual rights which were given the union by the employer. It has not imposed its own view of what the terms and conditions of the labor agreement should be. It has done no more than merely enforce a statutory right which Congress considered necessary." 385 U.S. at 428. The Court therefore rejected the notion that general freedom-of-contract principles foreclose the Board's authority to evaluate contract language raised as a defense to an alleged statutory bargaining obligation. In addition, the Court recognized that the Board had the authority to interpret the terms of a collective-bargaining agreement in the course of determining whether an unfair labor practice has been committed, rejecting the argument that "since the contract contained a provision which *might* have allowed" the employer to act unilaterally, the Board was "powerless to determine whether that provision *did* authorize the [employer's] action, because the question was one for a state or federal court under § 301 of the Act." Id. at 425–426 (emphasis in original).

Indeed, this characterization of the clear and unmistakable waiver standard reveals the *MV Transportation* majority's (and our dissenting colleague's) fundamental misconception of the task before the Board when it addresses the interpretation of contractual provisions that implicate the statutory right to bargain. Under the traditional waiver standard, the Board evaluated whether an employer successfully carried its burden of proving, as an affirmative defense, that "a contract provision authorized its unilateral change in working conditions." *Provena*, 350 NLRB at 812. Like the *Provena* Board, we find it appropriate to hold an employer seeking to establish, as an affirmative defense to an allegation of unlawful unilateral action or refusal to bargain, that a union waived its statutory right to bargain, to the same standard as we hold a party seeking to establish any other affirmative defense to an alleged unfair labor practice.[60]

[56] Contrary to our dissenting colleague, we are not impermissibly expanding the statutory duty to bargain by holding that a contractual waiver of the right to bargain will not be lightly inferred. Rather, we conclude that such a standard properly reflects the existence of that statutory duty and that collective-bargaining agreements are properly interpreted in light of the Act and its pro-bargaining policies.

Nor are we adopting an interpretation of the statutory duty to bargain that conflicts with the language in Sec. 8(d)(4) of the Act, which states that the duty to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." As the Second Circuit in *Jacobs Mfg.* acknowledged, while Sec. 8(d) was intended to "give stability to agreements governing industrial relations," the "general purpose of the Act . . . is to require employers to bargain as to employee demands whenever made to the end that industrial disputes may be resolved peacefully . . . , and the general purpose should be given effect to the extent there is no contrary provision." 196 F.2d at 684. The court stressed that Sec. 8(d) used "precise and explicit" language to limit the scope of the bargaining obligation but was not meant to "relieve[] an employer of the duty to bargain as to subjects which were neither discussed nor embodied in any of the terms and conditions of the contract." Id.

[57] 368 NLRB No. 66, slip op. at 1.

[58] Id., slip op. at 4.

[59] Id.

[60] It is well settled that an employer's contention that a contract provision authorized it to make a disputed unilateral change without bargaining is an affirmative defense. *Metro Health, Inc. d/b/a Hosp. Metropolitano Rio Piedras & Unidad Laboral De Enfermeras(Os)*, 372 NLRB No. 149, slip op. at 4 (2023) (citing *DuPont Specialty Products USA, LLC*, 369 NLRB No. 117, slip op. at 16 (2020) (discussing

In addition, as discussed above, the waiver standard was settled Board law for 70 years and was approved by the Supreme Court and a majority of appellate courts. It is therefore reasonable to assume that collective-bargaining agreements negotiated during that period were reached with the waiver standard in mind, and any attempt to give effect to the intentions of the parties or respect contractual repose therefore would entail continuing to analyze those agreements under the waiver standard.[61] The immediate imposition of the contract coverage standard, in contrast, unquestionably upset the settled expectations of unions who previously thought they were assured of the right to bargain collectively over matters that were not explicitly waived.[62]

2.

Relatedly, the *MV Transportation* Board argued that the waiver standard unfairly "tilts [the] decision in the union's favor" by directing extra scrutiny exclusively to the provisions in a collective-bargaining agreement in which the union allegedly relinquished its statutory right to bargain. As discussed above, however, the Supreme Court has repeatedly affirmed that contractual waivers of statutory rights must be explicitly stated and clear and unmistakable, and courts (including those that apply the contract coverage standard) routinely apply the clear and unmistakable waiver standard when interpreting collectively bargained language that is alleged to waive or surrender rights arising under other statutes.[63] Neither the *MV Transportation* Board nor courts that have adopted the contract coverage test have ever adequately explained why contract language that allegedly waives or surrenders the fundamental statutory right to bargain should be subject to a lower level of scrutiny than alleged contractual waivers of other statutory rights. Similarly, neither the *MV Transportation* Board nor the courts that have criticized the waiver standard have set forth a convincing argument as to why the Board should evaluate an employer's contractual defense to conduct that would otherwise violate the Act less rigorously than other defenses to alleged violations of the Act or defenses asserting waiver of other statutory rights.[64]

In this respect, we emphasize that the Board, with court approval, has consistently recognized that contract proposals granting an employer discretionary control over terms and conditions of employment, while generally lawful, can be evidence of bad-faith bargaining when evaluating whether an employer has bargained in good faith

"contract-coverage defense"), enfd. 2021 WL 3579384 (3d Cir. 2021); *Exxon Research & Engineering Co.*, 317 NLRB 675, 682 (1995) (waiver is an affirmative defense), enf. denied other grounds 89 F.3d 228 (5th Cir. 1996)). It is also well-settled that the party asserting an affirmative defense of waiver of a statutory right has a heavy burden to prove it. See, e.g., *Local Joint Executive Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1079 (9th Cir. 2008) ("The standard for waiving statutory rights . . . is high. Proof of a contractual waiver is an affirmative defense and it is the employer's burden to show that the contractual waiver is 'explicitly stated, clear and unmistakable.'") (quoting *Silver State Disposal Service Inc.*, 326 NLRB 84, 86 (1998)). By contrast, in contract-modification cases, the General Counsel bears the burden of proof. See, e.g., *ABF Freight System, Inc.*, 369 NLRB No. 107, slip op. at 3 fn. 8 (2020) (citing *Bath Iron Works Corp.*, 345 NLRB 499, 502-503 (2005), affd. sub nom. *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14 (1st Cir. 2007)). This is fitting, because the remedy in a contract-modification case is an order requiring compliance with or adherence to the contract, while in a unilateral-change case, the remedy requires the parties to bargain. We express no view regarding whether the "sound arguable basis" standard applied by the majority in *Bath Iron Works* is the correct standard for an allegation of an 8(d) contract modification.

[61] *Provena*, 350 NLRB at 813.

[62] Id. at 813 & fn. 27.

[63] Neither the Board and nor the courts of appeals that have adopted the contract coverage standard have ever seriously questioned the principle that a waiver of statutory rights must be clear and unmistakable. Moreover, since they adopted the contract coverage standard, both the District of Columbia Circuit and the Seventh Circuit have continued to cite the Supreme Court's decision in *Metropolitan Edison* for the proposition that a waiver of the right to bargain must be clear and unmistakable. *Wilkes-Barre Hospital Co., LLC v. NLRB*, 857 F.3d 364, 377 (D.C. Cir. 2017); *National Steel Corp. v. NLRB*, 324 F.3d 928, 933–934 (7th Cir. 2003) ("A party to collective bargaining . . . waives its right to bargain over an issue only by clearly and unmistakably expressing its intent to do so."); *Honeywell International v. NLRB*, 253 F.3d 125, 133 (D.C. Cir. 2001).

The Board in *MV Transportation* sought to distinguish *Metropolitan Edison* on the basis that the Court's decision "did not even involve interpretation of collectively bargained language" (368 NLRB No. 66, slip op. at 9). Our dissenting colleague similarly seeks to distinguish *Metropolitan Edison* on the basis that it concerned a waiver of the statutory right to be free from discrimination under Sec. 8(a)(3), and not a waiver of the statutory right to bargain under Sec. 8(a)(5). The expansive language of the Court's decision speaks for itself. See 460 U.S. at 708 ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable."). Given the clarity of the Court's statement and the Court's repeated reliance on it in subsequent cases arising under multiple statutes, it must be regarded as authoritative, even if it is technically dicta. *800 River Road Operating Co.*, 369 NLRB No. 109, slip op. at 5-6 fn.16 (2020) ("Even if properly characterized as dicta, the meaning of the [Supreme] Court's language is clear, and we have serious doubts whether the Board has the authority to 'change its mind' in contravention of the Court's own mindset."), enfd. mem. 848 Fed.Appx. 443 (D.C. Cir. 2021). See also *United Nurses & Allied Professionals v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) (quoting *United States v. Santana*, 6 F.3d 1, 9 (1st Cir. 1993) ("Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when, as in this instance, badges of reliability abound."); *McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13, 19 (1st Cir. 1991) ("[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings . . . . ")).

[64] For this reason, we respectfully disagree with the characterization of the District of Columbia Circuit of the waiver standard as "impos[ing] an artificially high burden on an employer." *Enloe Medical Center*, 433 F.3d at 837. Similarly, even assuming, arguendo, that the Seventh Circuit's statement that the waiver standard "tilts [the] decision in the union's favor," *Chicago Tribune*, 974 F.2d at 937, is accurate, it would be at most a true but unremarkable aspect of the waiver standard's status as an affirmative defense. See, e.g., *Local Joint Executive Bd. of Las Vegas v. NLRB*, 540 F.3d at 1079 ("The standard for waiving statutory rights . . . is high. Proof of a contractual waiver is an affirmative defense and it is the employer's burden to show that the contractual waiver is 'explicitly stated, clear and unmistakable.'") (quoting *Silver State Disposal Service*, 326 NLRB at 86).

*before* an agreement is reached. See, e.g., *Altura Communication Solutions, LLC*, 369 NLRB No. 85 (2020) (proposals granting employer unilateral control over wide range of employment terms are evidence of bad-faith bargaining), enfd. 848 Fed.Appx. 344 (9th Cir. 2021). Likewise, an employer is normally entitled to unilaterally implement its final offer after reaching lawful impasse, but proposals granting an employer discretionary control over terms and conditions of employment are treated differently from other proposals for this purpose as well. See, e.g., *KSM Industries,* 336 NLRB 133, 134-135 (2001) (employer unlawfully implemented discretionary benefit proposal despite bargaining to lawful impasse); *McClatchy Newspapers, Inc.,* 321 NLRB 1386, 1390–1391 (1996) (recognizing that granting employer the right to unilaterally implement discretionary merit pay proposal after bargaining to impasse would be "*inherently* destructive of the fundamental principles of collective bargaining") (emphasis in original, footnotes and citations omitted), enfd. in pertinent part 131 F.3d 1026 (D.C. Cir. 1997), cert. denied 524 U.S. 937 (1998). And provisions granting an employer discretionary control over terms and conditions of employment are also treated differently from other contract terms *after* the agreement has expired. See, e.g., *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 369 NLRB No. 61, slip op. at 2–3 (2020) (unlike other terms and conditions of employment, "contractual rights of unilateral action" do not extend "beyond the contract's agreed-upon expiration date absent an explicit agreement"), enfd. 4 F.4th 801, 811 (9th Cir. 2021) (under "[o]rdinary contract principles" management's claimed rights under a collective-bargaining agreement do not survive the agreement's expiration "unless express contractual language so provides"); *E. I. du Pont de Nemours*, 364 NLRB 1648 (2016) (same), overruled on other grounds after remand 367 NLRB No. 12 (2018). The *MV Transportation* Board's assumption that contract provisions granting an employer discretionary control over terms and conditions of employment should be treated the same as other contract provisions *during* the term of a collective-bargaining agreement cannot be reconciled with these settled principles. Finally, the waiver standard creates no unfair tilt in favor of unions insofar as it makes unilateral employer action more difficult. The standard instead effectuates the Act's fundamental policy of encouraging the practice and procedure of collective bargaining to reduce industrial strife. As the Supreme Court has explained, federal labor policy assumes that "more, not less, collective bargaining" is the answer to labor disputes. *Ford Motor Co.*, 441 U.S. at 502. In requiring clear and unmistakable language to authorize unilateral employer action, the waiver standard appropriately requires the contracting parties to recognize and accommodate the Act's pro-bargaining orientation.

3.

In this regard, we also reject the *MV Transportation* Board's claim that the waiver standard should be abandoned on the grounds that it "is, in practice, all but impossible to meet."[65] The Board's experience applying the clear and unmistakable waiver standard for more than 70 years proves the contrary, as the Board has often found that the standard was satisfied.[66] As the Board's cases demonstrate, negotiators—who must be presumed to be aware of the Act—know how to draft language that clearly and unmistakably waives the statutory right to bargain over particular employment terms.

4.

An additional reason advanced by the *MV Transportation* Board for abandoning the clear and unmistakable

[65] 368 NLRB No. 66, slip op. at 9.

[66] See, e.g., *The Academy of Magical Arts, Inc.*, 365 NLRB 1006, 1006 1 fn. 2 (2017) (union waived right to bargain over changes to work shifts by agreeing to contract language granting the employer authority to "schedule and change working hours, shifts and days off"); *Chemical Solvents, Inc.*, 362 NLRB 1469, 1474 (2015) (union waived right to bargain over subcontracting unit work by agreeing to contract language providing that the employer had the right to "transfer any or all of its . . . work . . . to any other entity"); *Omaha World-Herald*, 357 NLRB 1870, 1870 (2011) (finding waiver of right to bargain over changes to pension plan); *Cincinnati Paperboard*, 339 NLRB 1079, 1079 fn. 2 (2003) (union waived right to bargain over employees' practice of swapping shifts by agreeing to contract language granting the employer "sole responsibility" over matters including the rights "to hire, schedule, and assign work"); *California Pacific Medical Center*, 337 NLRB 910, 910 fn. 1, 914 (2002) (union waived right to bargain over layoffs by agreeing to contract language permitting the employer "to determine its staffing (including the number of jobs, the hours assigned to such jobs, and the changes to be made, if any)"); *Good Samaritan Hospital*, 335 NLRB 901, 901–902 (2001) (union waived right to bargain over the implementation of staffing matrix changes by agreeing to contract language allowing the employer "to decide the number of employees to be assigned to any shift or job . . . or to determine appropriate staffing levels"); *Allison Corp.*, 330 NLRB 1363, 1365 (2000) (union waived right to bargain over subcontracting by agreeing to contract language granting the employer the right "to subcontract"); *United Technologies Corp.*, 300 NLRB 902, 902 (1990) (union waived right to bargain over changes to overtime schedule by agreeing to contract language permitting the employer to unilaterally determine "shift schedules and hours of work"); *United Technologies*, 287 NLRB 198, 198 (1987), enfd. 884 F.2d 1569 (2d Cir. 1989) (union waived right to bargain over changes to the progressive disciplinary procedure by agreeing to contract language granting the employer the "sole right and responsibility to direct the operations of the company," including the "right to make and apply rules and regulations for productions, discipline, efficiency, and safety"); *American Stores Packing Co.*, 277 NLRB 1656, 1658 (1986) (union waived right to bargain over plant closure and ensuing loss of bargaining unit work by agreeing to contract language granting the employer the right "to decide the number and location of plants" and "whether and to what extent the work required in its business shall be performed" by unit employees); *Emery Industries*, 268 NLRB 824, 824, 827–828 (1984) (union waived its right to bargain over changes to the absenteeism policy by agreeing to contract language granting the employer the unilateral right to discipline employees for "neglect of duty"); *Cauthorne Trucking*, 256 NLRB 721, 722 (1981) (union waived right to bargain over the cessation of pension fund contributions by agreeing to language authorizing the employer to cease making contributions after contract expiration until and unless a new contract required contributions), enf. granted in part, denied in part 691 F.2d 1023 (D.C. Cir. 1982).

waiver standard is that the standard undermines grievance arbitration. The majority reasoned that unions are more likely to receive a favorable determination from the Board than from an arbitrator because arbitrators do not apply the clear and unmistakable waiver standard, and therefore unions will naturally prefer to have the Board determine the lawfulness of an employer's disputed unilateral action. As the Board explained in *Provena*, this concern is misplaced. The Act makes clear that the Board is not prevented from returning to the traditional waiver standard because it might conflict with the practice of arbitrators or undermine grievance arbitration. In Section 10(a) and (c) of the Act, Congress committed to the Board the exclusive power to decide whether unfair labor practices have been committed and Section 10(a) explicitly provides that the Board's power in this regard "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise." 29 U.S.C. §160(a). Thus, there is no question that the authority of the Board to decide unfair labor practice charges is not displaced by the presence of an arbitration provision within the parties' agreement.[67] Moreover, the Board will decide cases involving contract interpretation—including unilateral change cases—only where there is no basis for deferral to the parties' grievance-arbitration process.[68] And if other standards for deferral are met, the Board will defer to an arbitration award even if the arbitrator does not apply the clear and unmistakable waiver standard.[69]

5.

The *MV Transportation* Board also defended its adoption of the contract coverage standard on the basis that the clear and unmistakable waiver standard had become indefensible and unenforceable.[70] However, as an administrative agency charged by Congress with the uniform and effective administration of a national labor policy, the Board is not bound to acquiesce in the views of the circuit courts that conflict with those of the Board, even in cases arising in those circuits (which could be reviewed elsewhere).[71] To do so would cut short the development of federal labor law and policy, based on the decision of the first court of appeals (of 12) to disagree with the Board. Indeed, the District of Columbia Circuit has itself acknowledged that the Board is not required to acquiesce in its contract coverage analysis and is free to seek en banc review or certiorari review in the Supreme Court to resolve the circuit conflict. *Enloe Medical Center v. NLRB*, 433 F.3d at 838. See also *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d at 21 (recognizing that "nonacquiescence allows for an issue's 'percolation' among the circuits; generating a circuit split that can improve the likelihood of *certiorari* being granted"); *Yellow Taxi Co. v. NLRB*, 721 F.2d 366, 385 (D.C. Cir. 1983) (Wright, J., concurring) (observing that it would be "unwise" to oppose nonacquiescence, "particularly in light of the instances in which positions taken by the Board were first repeatedly rejected by a large number of circuits, then accepted by others, and

[67] See *NLRB v. Acme Industrial Co.*, 385 U.S. at 436–437 (rejecting the argument that the authority of the Board to adjudicate unfair labor practices is supplanted where there is a provision for binding arbitration of differences concerning the meaning and application of a collective-bargaining agreement, and observing that in assessing the Board's power to deal with unfair labor practices, "provisions of the . . . Act which do not apply to the power of the courts under [Sec.] 301 must be considered"; specifically, Sec. 8(a)(5) and 8(d) make it an unfair labor practice for an employer to fail or refuse to bargain in good faith, while Sec. 10(a) provides that the Board's power "'to prevent any person from engaging in any unfair labor practice . . . . shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . . '").

[68] 350 NLRB at 815. Neither party has sought deferral in this case.

[69] Id. (citing *Smurfit-Stone Container Corp.*, 344 NLRB 658, 660 (2005); Robert A. Gorman & Matthew W. Finkin, *Basic Text on Labor Law* Sec. 31.5 at 1039–1042 (2d ed. 2004)). See also *Weavexx, LLC*, 364 NLRB 1864, 1865 (2016); *Southern California Edison Co.*, 310 NLRB 1229, 1231 (1993) (arbitral award "can be susceptible to the interpretation that the arbitrator found a waiver even if the arbitral award does not speak in [terms of clear and unmistakable waiver]"), affd. sub nom. *Utility Workers Local 246 v. NLRB*, 39 F.3d 1210 (D.C. Cir. 1994); *Olin Corp.*, 268 NLRB 573, 576 (1984) ("The question of waiver . . . is also a question of contract interpretation. An arbitrator's interpretation of the contract is what the parties here have bargained for and, we might add, what national labor policy promotes.").

Additionally, as mentioned, arbitrators themselves have applied the waiver standard, even if not uniformly. See supra, fn. 48.

[70] Our dissenting colleague professes great concern about the fate that the Board's return to the longstanding clear and unmistakable waiver standard will face if presented to a circuit court that has rejected the standard. Our decision today acknowledges this disagreement and is intended to respectfully respond to the criticism of those circuits. It is our hope that this effort will be of value to these courts and will contribute to the resolution of the current split among the circuits. Even in the face of some contrary circuit court authority, the Board's Congressionally assigned task remains to develop and apply the policies of the Act, to engage in reasoned decision making, and to follow the Supreme Court's precedents. We carry out that task today in returning to a standard that was Board precedent for many decades, was endorsed by the Supreme Court, and was applied by a majority of circuit courts during that time.

The Board has certainly faced difficult circumstances with contrasting circuit court views before. Aggrieved parties can and do seek review in various circuits, and the Board, too, is not limited to a single circuit in seeking enforcement. The Board thus cannot render its decisions with an eye only to one particular circuit court's views.

[71] *Provena*, 350 NLRB at 814. See also *D.L. Baker, Inc.*, 351 NLRB 515, 529 fn. 42 (2007) ("The Board generally applies its 'nonacquiescence policy' . . . and instructs its administrative law judges to follow Board precedent, not court of appeals precedent, unless overruled by the United States Supreme Court."); Samuel Estreicher & Richard Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679, 706–710 (1989) (describing rationale behind the Board's nonacquiescence policy). As the Seventh Circuit has observed:

> The Supreme Court, not this circuit or even all twelve circuits that have jurisdiction to review orders of the Labor Board, is the supreme arbiter of the meaning of the laws enforced by the Board—a precept especially apt given the extraordinarily broad venue for proceedings to review Board orders . . . . This circuit is not authorized to interpret the labor laws with binding effect throughout the whole country, and the Board therefore is not obliged to accept our interpretation.

*Nielsen Lithographing Co. v. NLRB*, 854 F.2d 1063, 1066–1067 (7th Cir. 1988).

later accepted by the Supreme Court"); *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (explaining that relitigation across circuits ensures that a "final decision rendered" by one circuit does not "freeze[]" "important questions of law").

Although a divided panel of the District of Columbia Circuit imposed sanctions on the Board in *Heartland*, it did so because the Board repeatedly sought to enforce its waiver decisions in the face of adverse circuit precedent without actively seeking en banc or Supreme Court review on the disputed legal question. *Heartland*, 838 F.3d at 20 ("While our Court previously recognized the Board's right of nonacquiescence, we did so with a certain end in mind. Namely, we presumed the Board would recognize a stalemate with our case law, one resolvable by seeking *certiorari* to the Supreme Court.") (citations omitted). The court also faulted the Board for failing to be forthright about its nonacquiescence and instead "pretend[ing] there is no conflict between its Order and our law." Id. at 26.[72] The court emphasized that the Board had several "legitimate options," including submitting to an entry of judgment, seeking certiorari or en banc reconsideration, or seeking a transfer to the Sixth Circuit, where the case arose, and which embraces the clear and unmistakable waiver standard. Id. at 20. Nothing in the court's decision suggested, however, that the Board is required to abandon what it believes to be the correct interpretation of the Act. Rather, the Board's mistake, in the court's view, was not being candid about its nonacquiescence and failing to seek en banc reconsideration, certiorari, or a transfer of the proceedings.[73]

6.

Finally, we disagree with the view expressed by the *MV Transportation* Board and several appellate courts that the Board's evaluation of an employer's contractual defense to conduct that would otherwise violate the Act is not entitled to deference because the issue is strictly one of contract interpretation. Likewise, we reject as misplaced the contention that the Supreme Court has held that the Federal courts—which have jurisdiction over labor-contract disputes under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185—owe the Board no deference in contract interpretation when the interpretation of a contract is inextricably intertwined with a statutory issue, i.e., whether the employer's unilateral change in terms and conditions of employment violates the duty to bargain.[74] Section 301(a) authorizes federal courts to fashion a body of federal law for the enforcement of collective-bargaining agreements. *Textile Workers of America v. Lincoln Mills*, 353 U.S. 448 (1957). However, as discussed previously, "Congress assigned to the Board the primary task of construing [Sections 8(a)(5) and 8(d) of the Act] in the course of adjudicating charges of unfair refusals to bargain." *Ford Motor Co. v. NLRB*, 441 U.S. at 495. Because the Board has "the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain," its construction of these provisions is "entitled to considerable deference." Id. at 495–496. And this, of course, is what the Supreme Court held in *C & C Plywood*, as already explained.[75]

---

[72] Notably, there appears to be conflict within the District of Columbia Circuit's own precedent. In 1979, the court rebuked the Board for *not* applying the waiver standard to determine whether a contractual provision relinquished a union's statutory rights under Sec. 8(a)(5). See *Road Sprinkler Fitters Local 669, United Assn. of Journeymen v. NLRB*, 600 F.2d 918, 921–923 (D.C. Cir. 1979). In doing so, the court cited three of its earlier decisions in which it had "applied the 'clear and unmistakable' test to situation in which contract terms arguably affected the parties' obligations under [S]ec[.] 8(a)(5)." See id. at 922. It does not appear that the court has explicitly overruled any of these decisions, including in any of its subsequent decisions adopting the contract coverage test. Under the court's precedent, a panel decision may not be overruled by a later panel decision, but only by the full court. See *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

[73] As Judge Millett explained in her dissent in *Heartland*, however, the availability of Supreme Court review is not a matter solely within the Board's control. As Judge Millett argued, "the questions of whether and when Supreme Court review should be sought to eliminate the conflict and establish a single, uniform federal rule rest *exclusively* with the Solicitor General in the Department of Justice and not with the Board." 838 F.3d at 31 (Millett, J., dissenting) (emphasis in original), citing 28 U.S.C. § 518(a); 28 C.F.R. § 0.20(a) (Solicitor General is assigned duty of "[c]onducting, or assigning and supervising, all Supreme Court cases, including . . . petitions for and in opposition to certiorari").

[74] See, e.g., *Postal Service*, 8 F.3d at 837; *Chicago Tribune*, 974 F.2d at 937–938 (citing *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 202–203 (1991)).

[75] Our dissenting colleague contends that *C & C Plywood* "cannot bear the weight" that our decision places on it, because the Court's sole task was to determine whether the Board has the authority to interpret collective-bargaining agreements, not how the Board should do so, and the Court's examination of the contract language at issue indicates that the Court has not required the level of specificity that the clear and unmistakable waiver standard requires. A careful reading of the Court's decision refutes our colleague's contentions. As discussed above, the Board in *C & C Plywood* rejected the employer's argument that the union agreed to give it broad authority to alter wage rates, observing that "[s]uch an intent is so contrary to labor relations experience that it should not be inferred unless the language of the contract or the history of negotiations clearly demonstrates this to be a fact." 148 NLRB at 417. The Court expressly endorsed the Board's conclusion that the contract language at issue did not grant the employer the authority to act unilaterally. In doing so, the Court explained:

> [T]he Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free of collective bargaining. We cannot disapprove of the Board's approach. For the law of labor agreements cannot be based upon abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying the context.

385 U.S. at 430. Moreover, *C & C Plywood* alone does not "bear the weight" of our decision. As discussed above, the Supreme Court has repeatedly affirmed that contractual waivers of statutory rights must be clear and unmistakable. See, e.g., *14 Penn Plaza LLC*, 556 U.S. at 258, 274; *Wright v. Universal Maritime Service Corp.*, 525 U.S. at 79–80, 82; *Livadas v. Bradshaw*, 512 U.S. at 125; *Norge Division of Magic Chef, Inc.*, 486 U.S. at 409 fn. 9; *Metropolitan Edison*, 460 U.S. at 708. Our colleague does not seriously dispute the applicability of these cases, arguing instead that they are distinguishable because they did not involve

We have determined that the policies underlying the Act in general, and Section 8(a)(5) and 8(d) in particular, strongly support the application of the clear and unmistakable waiver standard in cases where an employer asserts a contractual defense to a charge of unlawful unilateral action. As the Supreme Court explained in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981), "[a] fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and channeling conflict between labor and management." Id at 674 (citations omitted). Because of the essential role played by collective bargaining in achieving the goals of the Act, "[e]nforcement of the obligation to bargain collectively is crucial to the statutory scheme." *American National Insurance Co.*, 343 U.S. at 402. As the Board explained in *Provena*,

> The waiver standard . . . does not involve merely a question of contract interpretation, in the sense of determining what the contract means and whether it has been breached. Rather, the waiver standard reflects the Board's interpretation of the statutory duty to bargain during the term of an existing agreement . . . . Stated somewhat differently, while the Board's interpretation of a collective-bargaining agreement may not be entitled to judicial deference, the Board's interpretation of the Act and the duty to bargain is.

350 NLRB at 814.

### C. *The Provena Standard*

In summary, none of the *MV Transportation* Board's reasons for abandoning the waiver standard withstands scrutiny. In our view, moreover, the waiver standard better promotes the purposes and policies of the Act. The waiver standard simplifies the bargaining process by encouraging the parties to focus on matters of immediate importance. It also reduces litigation by assuring that the parties know the scope of their respective rights and obligations. As the Board explained in *Provena*,

> The waiver standard . . . effectively requires the parties to focus on particular subjects over which the employer seeks the right to act unilaterally. Such a narrow focus has two clear benefits. First, it encourages the parties to bargain only over subjects of importance at the time and to leave other subjects to future bargaining. Second, if a waiver is won—in clear and unmistakable language—the employer's right to take future unilateral action should be apparent to all concerned.

350 NLRB at 813. Additionally, the clear and unmistakable waiver standard properly balances the Act's competing goals of encouraging collective bargaining and providing stability to collective-bargaining relationships by providing consistency and a respite from change to *both* parties. It protects employers, during the term of a collective-bargaining agreement, from the disruption of continuous bargaining over terms and conditions "contained in" the agreement, while also protecting employees' fundamental statutory right to bargain over mandatory subjects as to which no mutual understanding was reached.

In contrast, as described by then-Member McFerran in her *MV Transportation* dissent, the contract coverage standard

> makes it easier for employers to unilaterally change employees' terms and conditions of employment—wages, hours, benefits, job duties, safety practices, disciplinary rules, and more—in a manner that will frustrate the bargaining process, inject uncertainty into labor-management relationships, and ultimately increase the prospect for labor unrest . . . . [76]

Stated more succinctly, the contract coverage standard creates an escape hatch for employers to avoid their bargaining obligations during the term of a collective-bargaining agreement without actually securing contract language that make it plain—including plain to the union and the employees it represents—that the employer has the authority to act unilaterally with respect to a particular term and condition of employment. The contract coverage standard also exacerbates the difficulties associated with negotiating collective-bargaining agreements by encouraging employers to insist on the broadest possible language, while unions necessarily feel constrained to insist on exacting specificity lest they be held to have bargained away their statutory rights. By encouraging employers to seek broad and ambiguous language, instead of bargaining over unforeseen and unanticipated events as they arise and as their importance becomes apparent, a needless impediment is placed in the way of successful collective bargaining.[77] It is inevitable, moreover, that disputes

the precise question of how waivers of the statutory right to bargain in a collective-bargaining agreement must be phrased. We see no reason to treat the duty to bargain under the Act as less important, or as warranting less protection from unintentional waiver, than the other statutory rights the Court considered in those cases.

[76] 368 NLRB No. 66, slip op. at 26. We find then-Member McFerran's dissent persuasive, and our analysis reiterates many of its points.

[77] Eliminating this impediment to successful collective bargaining is especially urgent in the case of first-contract negotiations. As one detailed study of 22,382 organizing drives that filed election petitions has shown, 34 percent of union election victories had not resulted in a first contract after 2 or 3 years of bargaining. John-Paul Ferguson, *The Eyes of the Needles: A Sequential Model of Union Organizing Drives, 1999-2004*, 62 Indus. & Lab. Rel. Rev. 5, 6 (2008). Recent analysis by Bloomberg Law confirms that the trend toward lengthy first-contract bargaining has only worsened in the past several years. In 2022, the mean number of days from an NLRB election to contract ratification was 465 days. See Robert Combs, *ANALYSIS: Now It Takes 465 Days to Sign a Union's First Contract*, BLOOMBERG LAW (Aug. 2, 2022), available at https://www.bloomberglaw.com/bloomberglawnews/bloomberg-law-analysis/X9QO2RK4000000?bna_news_filter=bloomberg-law-analysis#jcite.

as to the meaning of ambiguous and broadly worded management-rights language will proliferate.

Finally, permitting employers to make discretionary unilateral changes, without a clear manifestation of the union's agreement, destabilizes relations not only between labor and management, but also between a union and the employees it represents. As the Supreme Court has explained, the "refusal of an employer to bargain collectively with the employees' chosen representative disrupts the employees' morale, defers their organizational activities and discourages their membership in unions." *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944). This result is plainly contrary to the goals and policies of the Act. We therefore overrule *MV Transportation* and return to the rule traditionally followed by the Board and endorsed by the Supreme Court: contractual waivers statutory rights, including the fundamental right of employees "to bargain collectively through representatives of their own choosing," which lies at the heart of the Act, will not be lightly inferred and must be "clear and unmistakable." *Metropolitan Edison*, 460 U.S. at 708; *C & C Plywood,* 385 U.S. at 430; *Provena*, 350 NLRB at 812.

*D. Retroactivity*

We turn now to the question of whether to apply the standard we restore today retroactively (i.e., in all pending cases) or only prospectively (in future cases). In *MV Transportation*, the Board overturned a 70-year-old doctrine that had been approved by the majority of Courts of Appeals and the Supreme Court, without a sound overriding reason. For the reasons fully explained above, we conclude that the Board's decision was error, and that the standard we restore today better advances the fundamental policies of the Act. For the reasons explained below, we find retroactive application in this case to be appropriate, but we do not decide whether to apply the new standard retroactively in all pending cases, leaving resolution of that question to future determination.[78]

"The Board's usual practice is to apply new policies and standards retroactively 'to all pending cases in whatever stage.'" *SNE Enterprises*, 344 NLRB at 673 (quoting *Deluxe Metal Furniture*, 121 NLRB at 1006–1007). The Supreme Court has indicated that "the propriety of retroactive application is determined by balancing any ill effects of retroactivity against 'the mischief of producing a

[78] Members Prouty and Wilcox would adhere to the Board's usual practice and apply the restored waiver standard retroactively 'to all pending cases in whatever stage,'" *SNE Enterprises*, 344 NLRB 673, 673 (2005) (quoting *Deluxe Metal Furniture Co.*, 121 NLRB 995, 1006–1007 (1958)), including those that arose while *MV Transportation* was in effect. In their view, this will not work a "manifest injustice," especially when balanced against "'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.'" Id. at 673 (quoting *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). To begin, because *MV Transportation* was decided just over 4 years ago, they find that the potential reliance of interest of other employers on that decision is relatively weak. Although an agency's substitution of new law for old law that is reasonably clear may justify refraining from applying a rule retroactively to "'protect the settled expectations of those who had relied on the preexisting rule,'" *Epilepsy Foundation v. NLRB*, 268 F.3d 1095, 1102 (D.C. Cir. 2001) (quoting *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993)), they find that *MV Transportation* upended settled law and departed from long-established, Supreme Court-endorsed principles. As a result, they find that *MV Transportation* could not reasonably have supported any "settled expectations" requiring application of today's holding prospectively only, which does not announce a new standard but instead restores the Board's traditional approach in this area of law.

Next, Members Prouty and Wilcox believe that today's decision supports the Act's fundamental policy favoring the practice and procedure of collective bargaining to avoid industrial strife, meaning that retroactive application of the restored standard would advance the accomplishment of the purposes of the Act. Unlike the "contract coverage" standard, which grants employers broader discretionary control over employees' terms and conditions of employment, the waiver standard better promotes the practice of collective bargaining. *MV Transportation* also frustrated the advancement of the longstanding and well-established policy disfavoring unilateral changes advanced by the Supreme Court in *Katz*, supra. Given the Board's recent decisions to apply its decisions in *Wendt Corp.*, 372 NLRB No. 135 (2023), and *Tecnocap LLC*, 372 NLRB No. 136 (2023), retroactively, Members Prouty and Wilcox find it especially important to apply today's decision retroactively to ensure the consistent implementation of the policy disfavoring discretionary unilateral actions set forth in *Katz*.

Accordingly, when balancing "any ill effects of retroactivity" against "'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles,'" *SNE Enterprises*, 344 NLRB at 673, Members Prouty and Wilcox find that applying today's holding retroactively in all pending cases would avoid the potential for inconsistency in pending cases, restore judicially approved standards to this area of law, diminish the risk of inconsistency in cases that also implicate the Board's recent decisions in *Wendt* and *Tecnocap*, more efficiently restore clarity to this area of law, and more effectively advance the goal of "encouraging the practice and procedure of collective bargaining" (consistent with the design of the statute). As a result, they would find that application of our new standard in both this and other pending cases will not work a "manifest injustice." *SNE Enterprises*, id. at 673.

For all these reasons, and contrary to their colleague, Members Prouty and Wilcox believe that the issue of retroactivity of the restored waiver standard should be resolved uniformly for all pending and future cases. Our failure to do so here encourages instability in labor relations, unnecessarily promotes future litigation, and risks incentivizing exaggerated assertions of reliance as a legal stratagem.

Chairman McFerran joins her colleagues in applying the waiver standard to the Respondent in this case, where the parties negotiated the collective-bargaining agreement at a time when the Board's traditional waiver standard (to which the Board returns today) applied. She sees no need to decide at this time whether the waiver standard should apply retroactively in all pending cases, regardless of their circumstances. As Chairman McFerran stated in her dissent in *MV Transportation*, analyzing whether retroactive application is manifestly unjust to particular parties requires the consideration of whether in negotiating a collective-bargaining agreement, those parties relied on the Board's then-governing standard for determining the employer's authority to act unilaterally. 368 NLRB No. 66, slip op. at 37. See generally *Mastro Plastics,* 350 U.S. at 279 (in deciding whether collective-bargaining agreement waived employees' right to engage in unfair labor practice strike, agreement *"must be* read as a whole and in the light of the law relating to it when made") (emphasis added). She believes that the Board should not lightly disturb "the settled expectations of parties to existing collective-bargaining agreements." *Provena,* 350 NLRB at 813. Accordingly, Chairman McFerran believes that in future cases, the Board should be open to considering evidence that parties actually relied on *MV Transportation* in negotiating a collective-bargaining agreement, such that retroactive application of the waiver standard would be manifestly unjust.

result which is contrary to a statutory design or to legal and equitable principles.'" Id. (quoting *SEC v. Chenery Corp.*, 332 U.S. at 203). Pursuant to this principle, the Board will apply a policy change retroactively unless retroactive application would work a "manifest injustice." Id. In making that determination, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Id.

In balancing "any ill effects of retroactivity" against "'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles,'" id., we find that retroactive application of this decision imposes no particular injustice on the Respondent. We note that when the parties negotiated the collective-bargaining agreement at issue, the governing standard was the same standard we return to today—the clear and unmistakable waiver standard. Indeed, the clear and unmistakable waiver standard was and remains the law in the Sixth Circuit, where the agreement was entered and ratified.[79] The Respondent can thus claim no meaningful reliance on *MV Transportation.*

As for the effect of retroactivity on the accomplishment of the purposes of the Act, we have extensively addressed how today's decision supports the Act's fundamental policy favoring the practice and procedure of collective bargaining to avoid industrial strife. We have rejected the *MV Transportation* majority's view that the "contract coverage" standard, which grants employers broader discretionary control over employees' terms and conditions of employment, somehow better promotes the practice of collective bargaining. We have also emphasized how *MV Transportation* frustrates the advancement of the longstanding and well-established policy disfavoring unilateral changes advanced by the Supreme Court in *Katz*, supra. In sum, we find that application of our new standard in this case will not work a "manifest injustice." *SNE Enterprises*, 344 NLRB at 673.

*E. Application of the Restored Standard*

1. Decisional bargaining

Applying the traditional clear and unmistakable waiver standard reinstated in our decision today, we find that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to provide the Union notice and an opportunity to bargain over the decision to install cameras to monitor unit employees and by refusing the Union's request for bargaining over the decision and its effects.[80] The Board has repeatedly affirmed that the use of cameras to observe employees at work is a mandatory subject of bargaining, especially where, as here, such observation may be used to discipline employees.[81] Accordingly, the Respondent was required to bargain over the installation of the cameras unless the Union waived, contractually or otherwise, its right to bargain over the change. We find no such waiver.

In evaluating whether there has been a clear and unmistakable waiver by contract, the Board looks to the precise

[79] See *Beverly Health & Rehabilitation Services v. NLRB*, 297 F.3d at 480; see also *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d at 20 (recognizing that "the Sixth Circuit embraces the Board's 'clear and unmistakable' standard").

[80] Contrary to our dissenting colleague, we do not hold that the Respondent was obligated to provide the Union notice and an opportunity to bargain over its decision to install cameras in vehicles driven by its *unrepresented* employees. Nothing in our decision affects the right of employers to unilaterally change the terms and conditions of employment of unrepresented employees.

We affirm the judge's findings, for the reasons he states in his decision, that the complaint is not time-barred under Sec. 10(b) and that the Respondent failed to provide the Union with notice and a meaningful opportunity to bargain over the decision to install the cameras.

[81] See, e.g., *Anheuser-Busch, Inc.*, 342 NLRB 560, 560–561 (2004), enfd. in pertinent part sub nom. *Brewers & Maltsters Local 6 v. NLRB*, 414 F.3d 36 (D.C. Cir. 2005); *Nortech Waste*, 336 NLRB 554, 568 (2001); *National Steel Corp.*, 335 NLRB 747, 747 (2001), enfd. 324 F.3d 928 (7th Cir. 2003); *Colgate-Palmolive Co.*, 323 NLRB 515, 515–516 (1997). In *Colgate-Palmolive*, the Board held that the installation and use of hidden surveillance cameras in the working environment is a mandatory subject of bargaining because it "has the potential to affect the continued employment of employees whose actions are being monitored." Id. at 515–516. On that basis, the Board analogized hidden cameras to physical examinations, drug and alcohol testing, and polygraph testing, which had previously been found to be mandatory subjects of bargaining because they are "investigatory tools or methods used by an employer to ascertain whether any of its employees has engaged in misconduct" and have "serious implications for . . . employees' job security[.]" Id. at 515–516 & fns. 6–8 (citing, e.g., *Johnson-Bateman Co.*, 295 NLRB 180 (1989) (drug and alcohol testing) and *Medicenter, Mid-South Hospital*, 221 NLRB 670 (1975) (polygraph testing)). See also *Anheuser-Busch*, 342 NLRB at 560–561; *National Steel*, 335 NLRB at 747. Although the cameras at issue in this case are not hidden, it is undisputed that they continually record unit employees in the working environment and that the recordings captured after a triggering event may be used as a basis for coaching and discipline. As noted above, the Board has long held that the use of cameras as a basis for imposing discipline on employees is a mandatory subject of bargaining. See *Roemer Industries*, 367 NLRB No. 133, slip op. at 8 (2019), enfd. 824 Fed.Appx. 396 (6th Cir. 2020); *National Steel*, 335 NLRB at 747–748; *Genesee Family Restaurant*, 322 NLRB 219, 225 (1996). Thus, like the cameras in *Colgate-Palmolive*, *Anheuser-Busch*, and *National Steel*, the camera system purchased by the Respondent can be used as an investigatory tool to ascertain whether employees have engaged in misconduct, and it has "the potential to affect the continued employment of employees whose actions are being monitored." *Colgate-Palmolive*, 323 NLRB at 515. See also *Brewers & Maltsters, Local 6 v. NLRB*, 414 F.3d at 43 (observing that the privacy implications of the use of hidden surveillance cameras in *Colgate-Palmolive* "was secondary to whether the surveillance occurred in 'the working environment'" and that, in any event, "the potential for constant monitoring in 'the working environment,' cannot be said to be free of privacy concerns").

We note, moreover, that emails exchanged between the Respondent's Director of Safety Blackwell and its General Manager Steve Ruckert suggest that the Respondent recognized that the installation of cameras in vehicles driven by unit employees was a mandatory subject of bargaining. Thus, in an August 4, 2020 email to Ruckert, Blackwell asked, "Is there any kind of notification that we need to give the union to let them know we will be putting cameras in trucks at some point?" Ruckert replied the same day, "Yes we will have to run this by all of our union divisions. . . . This was a very hot topic last go around for [the Respondent's competitors]."

wording of the relevant contract provisions. Management-rights clauses that are couched in general terms and make no reference to any particular subject area will not be construed as waivers of the statutory right to bargain over a specific subject. *Provena*, 350 NLRB at 815 fn. 34. The management-rights clause at issue in this case, which reserves to the Respondent the right to "implement changes in equipment," does not refer in any way to video and audio monitoring or the surveillance of employees. It also makes no specific reference to the use of video or audio recordings as a basis for disciplining or coaching employees.[82] Nor does the management-rights clause otherwise confer unilateral authority on the employer to impose discipline on employees.[83] Accordingly, we find that it lacks the degree of specificity required to constitute a clear and unmistakable waiver of the Union's right to bargain over the installation and use of cameras to monitor and potentially discipline unit employees. See, e.g., *Johnson-Bateman*, 295 NLRB at 184 (holding management-rights clause granting employer the right to issue, enforce, and change company rules did not constitute a waiver of the union's right to bargain about the implementation of drug and alcohol testing of current employees).

A waiver of bargaining rights may also be evidenced by bargaining history, but the evidence must show that the specific issue was "fully discussed and consciously explored" during negotiations and that "the union consciously yielded or clearly and unmistakably waived its interest in the matter." *E. I. du Pont de Nemours & Co.*, 368 NLRB No. 48, slip op. at 8 (2019) (citing *American Diamond Tool*, 306 NLRB 570, 570 (1992); *Johnson-Bateman*, 295 NLRB at 185). The Respondent has not pointed to anything in the bargaining history of the parties' 2018–2021 collective-bargaining agreement to show that the parties discussed the possibility that the Respondent would install cameras in vehicles driven by unit employees, that the Respondent would capture audio and video recordings of employees, or that the Respondent would use such recordings as a basis for disciplining employees. Indeed, there is nothing in the record to show that these subjects were mentioned, much less discussed, during the negotiations that preceded the parties' agreement. The Union thus could not have "consciously yielded or clearly and unmistakably waived its interest" in bargaining about these matters. Relatedly, when the Union objected to the Respondent's decision and demanded bargaining, the Respondent did not assert that the contract authorized it to implement its decision without bargaining with the Union. Rather, the Respondent merely asserted that "no collective bargaining has been deemed necessary up to this point." Thus, the Respondent's contemporaneous communications with the Union do not lend support to the contention that the parties understood the collective-bargaining agreement to grant the Respondent a right of unilateral action. Finally, there is no evidence of a past practice that would warrant a finding that the parties understood that the Respondent had the unilateral right to monitor or surveil unit employees.

Given the absence of clear contractual language and relevant extrinsic evidence, the Respondent cannot meet its burden of proving that the contract authorized its unilateral decision to use cameras to monitor or surveil unit employees with an eye toward potential future discipline. We therefore find that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to provide the Union with notice and an opportunity to bargain over the decision and by failing and refusing to bargain with the Union on request.

Our dissenting colleague mistakenly contends that the General Counsel failed to establish a violation, even under the clear and unmistakable waiver standard, because the Respondent had not actually *installed* the camera system in the vehicles driven by unit employees as of the hearing in this case—even though it had demonstrably decided to do so, without first bargaining with the Union. Because our colleague offers a markedly different account of the facts at issue in the case and their bearing on the disposition of the complaint allegations, we explain the timeline of events as they unfolded and their significance to the legal issues before us below.

The inquiry here, of course, is properly focused on the Respondent's decision and the duty to bargain over it. Safety Manager Blackwell testified that by August 2020, the installation of the camera system was "a done deal . . . , the decision had been made," and "[t]he system was going live." He attributed the fact that the cameras had not yet been installed in the vehicles driven by unit employees as of the hearing to a supply chain disruption caused by the COVID-19 pandemic, and not to the Union's demand to bargain or to the unfair labor practice allegations. Blackwell's February 4, 2021 letter to the Union reinforces the conclusion that the Respondent's

---

[82] As discussed above, when the parties negotiated the 2018–2021 collective-bargaining agreement, it was well settled that contractual waivers of the statutory right to bargain must be clear and unmistakable. *Metropolitan Edison*, supra; *Provena*, supra. The clear and unmistakable waiver standard was and remains the law in the Sixth Circuit, where the agreement was entered and ratified. *Beverly Health & Rehabilitation Services, Inc. v. NLRB*, 297 F.3d at 480. The Respondent and the Union therefore presumably knew that unambiguous contractual language would be necessary to reserve for the Respondent a right of unilateral action with regard to an otherwise mandatory term and condition of employment, and the parties surely would have used more precise language if their intent was to grant the Respondent the right to monitor or surveil unit employees with video cameras, to capture audio and visual recordings, and to discipline employees based on the recordings. *Mastro Plastics*, 350 U.S. at 279 (collective-bargaining agreement "must be read as a whole and in the light of the law relating to it when made").

[83] Compare with *United Technologies*, 287 NLRB at 198, where the Board found that a union waived its right to bargain over matters affecting employee discipline by agreeing to contract language granting the employer the "sole right and responsibility to direct the operations of the company," including the "right to make and apply rules and regulations for productions, discipline, efficiency, and safety."

decision to install cameras in unit employees' vehicles was final. Blackwell confirmed that the Respondent was "implementing cameras in 100 percent of [its] fleet," and the Respondent never rescinded or retracted that decision.[84]

The Respondent also took several concrete steps toward implementing its decision. As discussed above, in August 2020, the Respondent purchased the cameras, announced "companywide" that it was installing the cameras in its entire fleet, and informed regional managers that it would be contacting them for "installation planning" in the "coming weeks." Then, in January 2021, the Respondent's regional managers visited the Respondent's facilities to inform employees that it "had begun the process of installing" the cameras and to answer any questions the employees had. Indeed, as the Respondent's Safety Manager Blackwell testified, the delay in installing the cameras was caused by circumstances beyond the Respondent's control (the supply chain disruption caused by the pandemic). Record evidence therefore suggests that, but for those circumstances, the Respondent would have installed the cameras long before the Union learned of the Respondent's decision. Although the Respondent was forced to delay the final step in the implementation of its decision, the damage to the bargaining relationship was accomplished simply by the message to the employees that the Respondent was taking it on itself to set an important term and condition of employment, thereby emphasizing that there is no necessity for a collective-bargaining agent.[85] In these circumstances, the Union was under no obligation to await further developments before filing its charge.[86]

Moreover, as discussed above, the use of cameras to observe employees at work is a mandatory subject of bargaining.[87] The Respondent was therefore obligated to bargain with the Union on request over that subject—regardless of whether the Respondent ultimately installed the cameras.[88] Here, the evidence shows that the Union demanded decisional and effects bargaining on January 12, 2021, and again on March 1, 2021, and there is no evidence that the Respondent agreed to bargain before the parties began negotiations for a successor collective-bargaining agreement on September 16, 2021.

Contrary to our dissenting colleague, we find no merit in the Respondent's defense that the Union waived the right to bargain by failing to request it after the Respondent offered to "discuss" its decision. An employer cannot satisfy its statutory duty to bargain by expressing a willingness to "discuss" a mandatory subject while at the same time maintaining that it has no duty to bargain. That is precisely what occurred here. The Respondent, without giving the Union advance notice or an opportunity to bargain, announced to unit employees that it was in the process of installing cameras in company-owned vehicles. The Union objected to the unilateral change, requested bargaining, and demanded that the Respondent cease any steps it had taken toward implementation. The Union also requested certain information "[i]n order to evaluate the issue and to prepare to bargain on it." Instead of offering to bargain, the Respondent informed the Union that "no collective bargaining has been deemed necessary," while confirming that it was irrevocably committed to following its declared intention ("we are implementing cameras in 100 percent of our fleet"). Although Blackwell subsequently expressed a willingness to "discuss" the matter in his March 1 letter to the Union, he simultaneously contested the Union's assertion that the installation of the cameras was a mandatory subject of bargaining and advised the Union that "bargaining at the expense of safety cannot be a starting point." Moreover, the Respondent never rescinded or retracted its previously announced decision to install the cameras in unit employees' vehicles or responded to the Union's demand to cease implementation of the decision. The Respondent also unlawfully failed to fully respond to the Union's request for information that was both relevant and necessary for the Union to engage in decisional and effects bargaining. In these circumstances, the Union was fully justified in believing that further requests to bargain would have been futile.[89]

Finally, the evidence does not support the Respondent's and our dissenting colleague's assertion that the

---

[84] Indeed, unlike our dissenting colleague, who effectively argues that the Union's March 3, 2021 unfair labor practice charge was premature, the Respondent took the position in its answer to the amended complaint that the Union's charge was untimely under Sec. 10(b) of the Act because "[t]he Respondent notified the Char[g]ing Party on August 10, 2020, of its intention to install the Lytx systems in all trucks operated by the bargaining unit members" and "[t]he Charging Party did not file a Charge challenging the Respondent's decision to install the Lytx systems until March 3, 2021, more than 180 days after being on notice[.]" As noted above, we agree with the judge's finding that the complaint allegation was not time-barred by Sec. 10(b).

[85] See *Troy Grove*, 372 NLRB No. 94, slip op. at 6 (2023) (collecting cases).

[86] As mentioned above, far from arguing that its decision was insufficiently final or concrete by the time the Union filed its charge, the Respondent instead contended that the Union's filing of the charge was already untimely by March 2021 because the August 2020 announcement should have put the Union on notice of the decision to install the Lytx system.

Our colleague extensively details his view that he can permissibly rely on a position not taken by the Respondent in his dissent. For the reasons expressed in *Quickway Transportation, Inc.*, 372 NLRB No. 127, slip op. at 18 (2023), enfd. 117 F.4th 789 (6th Cir. 2024), we respectfully disagree with our colleague's view of the Board's Rules and Regulations on this point. In any event, we see no record basis for looking behind the Respondent's representations regarding the finality of its decision and reject our colleague's speculative version of the relevant events.

[87] See cases cited at fn. 81, supra.

[88] Our dissenting colleague's suggestion that the Act imposes no duty on an employer to bargain unless and until it implements changes in unit employees' terms and conditions of employment is contrary to the statute and well-established Board and court precedent. See, e.g., *NLRB v. Jacobs Mfg.*, 196 F.2d at 684 (holding that Sec. 8(d) does not relieve an employer of the duty to bargain during the term of an existing contract "as to subjects which were neither discussed nor embodied in any of the terms and conditions of the contract").

[89] Accordingly, any suggestion by our colleague that the initial refusal to bargain was somehow mooted by later events is unavailing.

Respondent fulfilled its duty to bargain during negotiations for a successor collective-bargaining agreement. As discussed above, the parties' collective-bargaining agreement expired by its terms on September 26, 2021. The parties stipulated that "[o]n September 16, 2021, when the parties commenced successor bargaining, the Union proposed a Memorandum of Understanding addressing the topic of the . . . Lytx [camera] system," and the Respondent introduced into evidence a "tentative agreement" on the Memorandum of Understanding. As an initial matter, we note that the tentative agreement is dated November 9, 2021, a mere 8 days before the hearing in this case. Moreover, the tentative agreement only addresses the permissible uses of the camera and audio recordings. It does not purport to cover the decision to install the cameras. Thus, the first sentence of the agreement provides that the Respondent "has stated its intention to install cameras in its trucks driven by Local 100-represented drivers." The tentative agreement is therefore consistent with Blackwell's testimony that the decision to install the cameras had already been made and was "a done deal" before the negotiations for a successor agreement began.

Even assuming, however, that the evidence established that the parties bargained in good faith over the decision to install the cameras during the negotiations for a successor agreement, we would find, in agreement with the judge, that such bargaining is not relevant to the refusal-to-bargain allegations in this case or to the appropriate remedy for the violations found. In determining whether the Act has been violated, the Board considers circumstances as they existed at the time of the alleged violation.[90] Thus, any bargaining that took place in the context of the negotiations for a successor collective-bargaining agreement does not negate the Respondent's failure to bargain with the Union on request 8 months earlier.[91] Our dissenting colleague's argument to the contrary elides the chronology of events in this case.[92] Our colleague also conflates two distinct obligations: (1) the obligation to bargain on request during the term of an existing contract regarding discrete mandatory subjects that are not "contained in" the contract; and (2) the obligation to bargain in good faith for a successor collective-bargaining agreement as a whole. As discussed above, Blackwell testified that the Respondent had determined that the management-rights provision in the parties' expiring agreement privileged it to install the cameras without bargaining with the Union. It is well established, however, that contractual rights of unilateral action do not extend beyond the contract's expiration date absent an explicit agreement to do so.[93] The provision in question in this case, Article III of the expired agreement, does not specify, either implicitly or explicitly, that it would survive the agreement's expiration. The Respondent was therefore obligated to bargain on request over the installation of the cameras during the negotiations for a successor agreement, even assuming, arguendo, that it had a right to act unilaterally during the term of the expired agreement. Accordingly, the Respondent's subsequent bargaining has no bearing on the relevant question in this case: whether it satisfied its duty to bargain with the Union under the predecessor agreement.

2. Effects bargaining

Given our finding that the Respondent unlawfully failed to bargain over its decision to install cameras in vehicles

[90] *ADT, LLC d/b/a ADT Security Services*, 371 NLRB No. 110, slip op. at 1 (2022) (citing *Bellkey Maintenance Co.*, 270 NLRB 1049, 1056 (1984) (holding that cessation of violative actions does not make a case moot)).

[91] *Windsor Redding Care Center, LLC*, 366 NLRB No. 127, slip op. at 4 (2018) (citing *Mid-Wilshire Health Care Center*, 337 NLRB 72, 73 (2001)), enfd. in relevant part 944 F.3d 294 (D.C. Cir. 2019), cert. denied 2020 WL 13120614 (2020). Our colleague attempts to distinguish *Windsor Redding* and *Mid-Wilshire* on the basis that the employers in those cases "actually implemented disputed unilateral changes before rescinding them and engaging in bargaining." We are not persuaded. In *Mid-Wilshire*, the Board explained that the "violation was not rendered moot because the Respondent, having *previously* ignored its bargaining obligation, *subsequently* discussed the matter with the Union[.]" 332 NLRB at 73 (emphasis in original). Inasmuch as our colleague views the subsequent bargaining between the parties in this case as rendering the Respondent's earlier refusal to bargain moot, we cannot agree.

[92] We reject our dissenting colleague's argument that the Respondent "reasonably assumed that . . . it did not have any affirmative duty to bargain over the implementation" of its decision based on the Regional Director's April 29, 2021 partial dismissal of the Union's unfair labor practice charge, and that the Respondent timely bargained after the General Counsel's office ordered the Regional Director to issue a complaint on the unilateral implementation and failure to bargain portions of the charge on August 6, 2021. First, the Respondent decided to install the cameras in August 2020, and it took several concrete steps to implement the decision, including notifying unit employees in January 2021 that it had begun the process of installing the cameras, without providing the Union with notice or the opportunity to bargain. Second, the Union demanded bargaining on January 12, 2021, 10 weeks before the Regional Director partially dismissed the charge. Third, the General Counsel's office informed the parties on June 11, 2021, that it had received the Union's appeal of the Regional Director's decision, and the Respondent was therefore on notice that the decision was not final and was under review. It is well settled that an unfair labor practice charge remains a proper basis for further proceedings if a party timely appeals a Regional Director's dismissal. See, e.g., *Klain, Sam & Sons*, 127 NLRB 776, 778 (1960) ("[T]he original charge was not voided by the Regional Director's initial refusal to issue a complaint. The Union effectively preserved its original charge by appealing from the Regional Director's decision to the General Counsel, and this charge remained as the proper basis for further proceeding when the Regional Director thereafter rescinded his refusal and proceeded to issue complaint."). Finally, our colleague cites no evidence that the Respondent actually relied on the Regional Director's decision in determining that it had no duty to bargain with the Union. Blackwell testified, rather, that the Respondent determined that it had no duty to bargain based on the management-rights clause in the parties' collective-bargaining agreement, and the Respondent has maintained that position throughout the litigation of this case.

[93] *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 369 NLRB No. 61, slip op. at 2–3 (2020) (holding that "provisions in an expired collective-bargaining agreement do not cover post-expiration unilateral changes unless the agreement contained language explicitly providing that the relevant provision would survive contract expiration"), enfd. 4 F.4th 801 (9th Cir. 2021); see also *Buck Creek Coal*, 310 NLRB 1240, 1240 fn. 1 (1993) ("[W]e note that a waiver of bargaining rights contained in a contractual management-rights provision normally is limited to the time during which the contract that contains it is in effect.").

driven by unit employees, it is unnecessary to pass on whether the Respondent unlawfully failed to bargain over the effects of the decision on unit employees' terms and conditions of employment. See, e.g., *Northstar Memorial Group, LLC d/b/a Skylawn Funeral Home, Crematory & Memorial Park*, 369 NLRB No. 145, slip op. at 2 fn. 7 (2020); *Grondorf, Field, Black & Co.*, 318 NLRB 996, 997 (1995), enfd. in part 107 F.3d 882 (D.C. Cir. 1997). However, even assuming, arguendo, that the Union contractually waived the right to bargain over the installation of the cameras or that the Respondent's decision to install the cameras was covered by the parties' contract, we would find that the Respondent was obligated to bargain over the effects of that decision.[94]

As Supreme Court, judicial, and Board precedent have long recognized, an employer has a statutory duty to bargain over the effects of a decision on employees even if it is not subject to an obligation to bargain over the decision itself. See *First National Maintenance*, 452 U.S. at 679–682; *NLRB v. Litton Financial Printing Division*, 893 F.2d 1128, 1133–1134 (9th Cir. 1990), revd. in part on other grounds 501 U.S. 190 (1991); *NLRB v. Challenge-Cook Bros. of Ohio, Inc.*, 843 F.2d 230, 233 (6th Cir. 1988); *Ladies Garment Workers Union v. NLRB*, 463 F.2d 907, 917 (D.C. Cir. 1972); *KIRO, Inc.*, 317 NLRB 1325, 1327 (1995).

As the Board has explained, in most such situations, alternatives involving the effects of the employer's underlying decision may exist that the employer and union can explore to avoid or reduce the impact of the change without calling the decision itself into question. *Good Samaritan Hospital*, 335 NLRB 901, 903–904 (2001); *Fresno Bee*, 339 NLRB 1214 (2003); *Bridon Cordage*, 329 NLRB 258, 259 (1999). To ensure that effects bargaining serves its intended role, the Supreme Court has instructed that "bargaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time." *First National Maintenance*, 452 U.S. at 681–682. An employer is generally under a "duty to give pre-implementation notice to the union" to facilitate meaningful effects bargaining. *Metropolitan Teletronics*, 279 NLRB 957, 959 fn. 14 (1986), enfd. mem. 819 F.2d 1130 (2d Cir. 1987).

The Board has traditionally applied the clear and unmistakable waiver standard in cases involving alleged violations of the duty to engage in bargaining over the effects of a decision, even when the employer is not obligated to bargain over the decision itself. See, e.g., *Good Samaritan Hospital*, 335 NLRB at 902; *Allison Corp.*, 330 NLRB at 1365-1366. The Board has reasoned, "[w]hile a contract clause may constitute a waiver of a bargaining right, it does not automatically follow that the same contract clause waives a party's right to bargain over the effects of the matter in issue." Id. at 1365. *MV Transportation* did not extend the "contract coverage" standard to the effects-bargaining context or otherwise disturb extant Board precedent applying the clear and unmistakable waiver standard to alleged effects-bargaining violations.

In a number of cases, the District of Columbia Circuit and the Seventh Circuit have expressed their disagreement with the Board's application of the clear and unmistakable waiver standard when analyzing alleged effects-bargaining violations. Instead, these courts have held that if an employer has no decisional-bargaining obligation pursuant to the contract coverage standard, it has no duty to bargain over the effects of that decision unless the collective-bargaining agreement or the parties' bargaining history evinces the parties' intention to treat effects bargaining separately from decisional bargaining. See, e.g., *Columbia College Chicago v. NLRB*, 847 F.3d 547 (7th Cir. 2017); *Enloe Medical Center*, 433 F.3d at 838–839; *Chicago Tribune Co.*, 974 F.2d at 937. The District of Columbia Circuit has reasoned that where "the parties to the collective bargaining agreement . . . never contemplated a dichotomy between the management rights granted [the employer] and the effects of those rights," the employer's refusal to engage in effects bargaining was also "sanctioned by its collective bargaining agreement." *Enloe Medical Center*, 433 F.3d at 839. The Seventh Circuit has taken the view that where an employer's unilateral action is covered by the contract, the parties have thereby "bargained over their respective rights and duties" and are "not under any further obligation to bargain . . . over the effects" of a decision unless they "indicate[d] separate treatment of effects bargaining and decision bargaining." *Columbia College Chicago*, 847 F.3d at 554.

Even if we were to adhere to the contract coverage standard adopted in *MV Transportation*, we would not follow the approach of the Circuits that have held that when a contract authorizes the employer to make a managerial *decision* unilaterally, it necessarily authorizes the employer to act unilaterally with respect to the *effects* of that decision on employees' terms and conditions of employment. This approach collapses the well-established statutory distinction between decisional bargaining and effects bargaining, which represent independent obligations on the part of the employer. To be sure, a contract could grant the employer authority to act unilaterally as to effects, but language actually specifying that authority is required.[95] It may not be presumed simply because the contract gives

[94] Our dissenting colleague does not address this issue.

[95] We note that neither the District of Columbia Circuit nor the Seventh Circuit has ever found that a collective-bargaining agreement covered the decision to unilaterally implement a particular change based on the agreement's silence with respect to the disputed issue. See, e.g., *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 313 (D.C. Cir. 2003) (contract did not cover elimination of projectionist jobs where "[the employer's] actions here are not embraced by the literal language of the management rights clause"). After all, the contract coverage doctrine is premised on the idea that the parties have "negotiat[ed] for a provision in a collective bargaining contract that fixes the parties' rights . . . as to that subject." *Postal Service*, 8 F.3d at 836. It would be inconsistent with that premise

up the union's right to demand decisional bargaining. Such a presumption is contrary to the Board's long experience with the practice and procedure of collective bargaining, to which the Supreme Court has deferred.[96] That experience shows that when employers and unions bargain over management-rights clauses, their focus is almost invariably on employer decision-making authority, not the separate issue of effects bargaining. Based on our experience, we believe it is highly implausible that unions that surrender their right to demand decisional bargaining always intend to give up their right to demand effects bargaining as well, ceding additional and undefined authority to the employer. And we believe that it is equally implausible that the bargaining parties would fail to address such an important concession explicitly in the agreement.

There is certainly no persuasive basis for presuming that the parties intended that an agreement to permit unilateral action with respect to a particular decision includes an agreement to forego bargaining over the decision's effects. No evidence of "industrial practices" supports that presumption. *Fibreboard Paper Products Corp. v NLRB*, 379 U.S. at 211 ("[I]t is appropriate to look to industrial bargaining practices in appraising the propriety of including a particular subject within the scope of mandatory bargaining."). To the contrary, unions and employers regularly bargain over the effects of nonbargainable decisions. As the Supreme Court has recognized, effects bargaining is mandated by Section 8(a)(5) of the Act and serves important purposes especially in those circumstances. *First National Maintenance*, 452 U.S. at 681–682. Among other considerations, the parties cannot reasonably foresee the effects of implementing a particular decision until the specifics of the decision are known. Because effects bargaining over nonbargainable decisions is clearly part of the fabric of labor-management relations in this country, we believe that the proper inference to draw from contractual silence is that the parties did not agree to forego it. Any suggestion that the policies of the Act would be served by presuming otherwise would be in direct conflict with the Supreme Court's decision in *First National Maintenance.*

For all the foregoing reasons, we decline to treat the absence of a decisional bargaining obligation as determinative of whether there is an independent effects-bargaining obligation, especially when a contract contains no indication that the parties so intended. As discussed above, we are guided by Supreme Court precedent requiring a stronger showing before finding a waiver of statutory rights.[97] We see no reason to apply a less exacting standard to a putative waiver of the right to engage in effects bargaining than the right to bargain over a decision itself. Instead, in recognition of the separate status and purpose of bargaining over a decision and its effects, we will apply our traditional clear and unmistakable waiver standard when analyzing an employer's contractual defense to an alleged violation involving either kind of bargaining obligation.

*F. Response to the Dissent*

Our dissenting colleague challenges both our decision to overrule *MV Transportation* and our related decision to return to the clear and unmistakable waiver standard. We have carefully considered our colleague's arguments—several have already been addressed—but we are not persuaded by them.

1.

As a threshold matter, our colleague mistakenly contends that our decision to overrule *MV Transportation* and return to the clear and unmistakable waiver standard is nonbinding, nonprecedential dicta. Specifically, our colleague contends that there is no evidence that the Respondent unilaterally implemented a change in unit employees' terms and conditions of employment, and therefore the question of whether or not the contract would have privileged the Respondent's conduct if it had implemented a unilateral change has no bearing on the outcome of this case.

We respectfully disagree.[98] Our colleague's argument reflects a fundamental misunderstanding of the issues presented in this case, as litigated by the parties and decided by the judge. As relevant here, the complaint alleges two discrete violations of Section 8(a)(5) and (1). First, the complaint alleges that the Union was "put on notice" that the Respondent had implemented the Lytx Driver Safety System, and that the Respondent engaged in this conduct without affording the Union an opportunity to bargain with respect to the conduct and the effects of the conduct. Second, the complaint alleges that the Union requested

---

to find that a collective-bargaining agreement covers the subject of effects bargaining when no such provision exists.

[96] In *C & C Plywood*, for example, the Court endorsed the Board's conclusion that the contract language at issue did not grant the employer the authority to act unilaterally, explaining, "[i]n reaching this conclusion, the Board relied upon its experience with labor relations and the Act's clear emphasis upon the protection of free of collective bargaining. We cannot disapprove of the Board's approach." 385 U.S. at 430. The *C & C Plywood* Board, rejecting the employer's argument that the union had agreed to give it broad authority to alter wage rates, had observed that "[s]uch an intent is so contrary to labor relations experience that it should not be inferred unless the language of the contract or the history of negotiations clearly demonstrates this to be a fact." 148 NLRB at 417.

[97] See, e.g., *14 Penn Plaza LLC*, 556 U.S. at 258, 274; *Wright v. Universal Maritime Service Corp.*, 525 U.S. at 79–80, 82; *Livadas v. Bradshaw*, 512 U.S. at 125; *Norge Division of Magic Chef, Inc.*, 486 U.S. at 409 fn. 9; *Mastro Plastics*, 350 U.S. at 283, 287.

[98] We have already refuted our colleague's argument that there can be no violation here because the Respondent did bargain over the installation of the cameras during the negotiations for a successor collective-bargaining agreement. The record does not support the assertion that the parties bargained over the installation of the cameras (as opposed to their permissible uses), and even assuming, arguendo, that it did, that evidence would not negate the Respondent's failure to bargain with the Union on request 8 months earlier (or the Respondent's view that the management-rights provision in the parties' predecessor agreement foreclosed any duty to bargain).

that the Respondent bargain over the installation of the Lytx System in vehicles driven by unit employees and, since about February 4, 2021, the Respondent has failed and refused to bargain collectively with the Union over that subject.

The Respondent did not argue at any point during the litigation of this case that the complaint allegations should be dismissed because it did not implement a unilateral change in terms and conditions of employment.[99] Rather, as discussed above, the Respondent's Safety Manager Blackwell testified that the installation of the camera system was, from the Respondent's prospective, a "done deal . . . , the decision had been made," months before the Union requested bargaining. Blackwell also testified that the Respondent determined that it had no duty to provide the Union with notice and opportunity to bargain over the decision to install the cameras based on the language of the management-rights clause in the parties' collective-bargaining agreement. The Respondent has steadfastly maintained that position throughout the litigation of this case. In its answer to the complaint, the Respondent asserted, as an affirmative defense, that it "had no duty to bargain concerning the Lytx systems based on the scope of the management-rights clause in the parties' collective-bargaining agreement pursuant to the Board's holding in *MV Transportation*." In its opening statement at the hearing, counsel for the Respondent similarly argued

> [B]ased on the management rights clause in Article 3 in the party's collective-bargaining agreement . . . the company acted lawfully . . . in proceeding with the plan to install the Lytx systems in its trucks operated by [Union] members. The contract language covers the challenged action. And the collective-bargaining agreement authorized the company to proceed with the Lytx equipment unilaterally.

Additionally, in its answering brief to the General Counsel's exceptions to the judge's decision, the Respondent argued that "[b]ased on the plain language of the management rights clause granting [the Respondent] the authority to 'implement changes in equipment' unilaterally, [the Respondent] determined that it was not obligated to bargain with [the Union] over the decision to install the Lytx System."

In turn, applying the contract coverage standard adopted by the Board in *MV Transportation*, the judge found, in agreement with the Respondent, that its decision to install the camera system was "within the compass or scope" of contract language granting the Respondent the right to "implement changes in equipment," and the Respondent was therefore not required to bargain further with the Union, either as to the decision to install the surveillance cameras or as to the effects of the decision on unit employees.

Finally, the General Counsel has requested, in her Brief in Support of Exceptions, that the Board overrule *MV Transportation* and reinstate the clear and unmistakable waiver standard. Accordingly, the question of whether the Board should overrule *MV Transportation* and return to the clear and unmistakable waiver standard to evaluate an employer's affirmative defense that a union contractually surrendered the statutory right "to bargain collectively" with respect to wages, hours, or other terms and conditions of employment is squarely presented in this case. We therefore reject the dissent's claim that our decision today is somehow nonprecedential.

2.

Turning to the merits, our dissenting colleague's reliance on *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015), is similarly unavailing. *M & G Polymers* did not address the scope of the statutory duty to bargain under the Act. Nor did it arise out of unfair labor practice proceedings or otherwise implicate the Board's authority to remedy alleged violations of the Act.[100] As a threshold matter, then, *M & G Polymers* does not squarely speak to the issue presented in this case, which is the standard to be applied when evaluating an employer's affirmative defense that employees have contractually surrendered the statutory right to bargain.

To the extent that *M & G Polymers* properly guides the Board here, it fully supports application of the clear and unmistakable waiver standard, consistent with the pro-bargaining policy of the Act. The *M & G Polymers* Court stated that it would "interpret collective-bargaining agreements . . . according to ordinary principles of contract law, *at least when those principles are not inconsistent with federal labor policy*." Id. at 435 (internal quotation marks and citations omitted; emphasis added). Federal labor policy was not implicated in the case. Rather, the Court found that it was appropriate to apply ordinary principles of contract law to interpret language in a collective-bargaining agreement to ascertain whether the parties thereby intended to provide retirees with lifetime medical benefits. Id. at 430. This case, in contrast, does implicate federal labor policy—and the issue of whether a core right under the National Labor Relations Act has been waived. Thus, ordinary principles of contract law are not the only consideration here. As the *C & C Plywood* Court observed, "the law of labor agreements cannot be based upon abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying the context." 385 U.S. at 430. Unlike our dissenting colleague, we are of the view that the Board's duty to enforce the statutory duty to bargain requires an examination of

[99] Even if that argument were properly before us, we would reject it for the reasons discussed above.

[100] *M & G Polymers* arose out of an action under Sec. 301 of the Act, 29 U.S.C. § 185, and Sec. 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), id. § 1132(a)(1)(B). Id. at 432.

the parties' intent within "the context in which the parties bargained" and in view of "the basic regulatory scheme underlying" that context. Id. The waiver standard better ensures that the Board's analysis takes this relevant context into consideration.

Our colleague also invokes *M & G Polymers* to support his argument that the clear and unmistakable waiver standard "represents an irrebuttable presumption that a contract provision does not authorize unilateral action unless it does so with exacting specificity." In *M & G Polymers*, the Court rejected the Sixth Circuit's *Yard-Man* inference,[101] under which courts presumed that parties providing retiree benefits in collective-bargaining agreements thereby intended the benefits to vest for life. 574 U.S. at 438–439. The Court criticized the *Yard-Man* inference for having "no basis in ordinary principles of contract law" because "it distorts the attempt to ascertain the intention of the parties." Id. at 438 (internal quotation marks, citation, and emphasis omitted). By contrast, the waiver standard, which examines particular contract language to ascertain the intention of the parties, does precisely what the Court in *M & G Polymers* contemplated.[102] We therefore reject our colleague's characterization of the waiver standard, which is neither a presumption nor irrebuttable.[103]

Next, our colleague invokes the principle that "courts, not the Board, have primary jurisdiction to interpret collective-bargaining agreements," citing the Supreme Court's decision in *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991). Our colleague again misconceives the relationship between the statutory and contractual issues presented in this case and others like it. We do not claim that the Board has primary jurisdiction to interpret contracts. Instead, the Board has primary jurisdiction "to prevent any person from engaging in any unfair labor practice [listed in Section 8] affecting commerce." 29 U.S.C. § 160(a). See *Ford Motor Co. v. NLRB*, 441 U.S. at 495 ("Congress assigned to the Board the primary task of construing [Sections 8(a)(5) and 8(d) of the Act] in the course of adjudicating charges of unfair refusals to bargain."). And when the Board's task of construing Sections 8(a)(5) and 8(d) of the Act requires it to interpret contract language, *C & C Plywood* teaches that the Board is empowered to do so. 385 U.S. at 430.

Finally, our colleague contends that the clear and unmistakable waiver standard represents an impermissible judgment that management-rights provisions are disfavored. As we have explained, nothing about the waiver standard disfavors management-rights provisions. Instead, the waiver standard requires parties seeking to displace the statutory duty to bargain to do so clearly and unmistakably, out of due regard for the Act's policies favoring collective bargaining and Supreme Court precedent addressing waivers of statutory rights. The contract coverage standard, by contrast, paid insufficient heed to these important countervailing considerations. We therefore find it appropriate to return to the clear and unmistakable waiver standard.

## AMENDED CONCLUSIONS OF LAW

Delete paragraphs 4 and 5 and substitute the following.

"4. The Respondent has violated Section 8(a)(5) and (1) by failing to provide the Union with notice and the opportunity to bargain over the Respondent's decision to install cameras in vehicles driven by unit employees and the effects of the decision on unit employees, and by failing and refusing to bargain over those subjects on request by the Union.

5. The foregoing unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act."

## AMENDED REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, having found that the Respondent violated Section 8(a)(5) and (1) by failing to provide the Union with notice and the opportunity to bargain over the decision to install cameras in trucks driven by unit employees, we shall order the Respondent to notify and, on request, bargain with the Union before implementing any further changes in the wages, hours, or other terms and conditions of employment of unit employees. Additionally, having found that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union on request concerning the decision to install cameras in trucks driven by unit employees and the effects of the decision on unit employees' terms and conditions of employment, we shall order the Respondent to bargain, on request by the Union, over the decision and its effects.

## ORDER

The National Labor Relations Board orders that the Respondent, Endurance Environmental Solutions, LLC, Florence, Kentucky, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain collectively with Teamsters Local No. 100, an affiliate of the International Brotherhood

[101] See *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).

[102] Inasmuch as our colleague's quarrel with the waiver standard is the "exacting specificity" he claims it requires rather than its status as a "presumption," we respectfully disagree. In our view, for the reasons set forth above, the Board's obligation to enforce Sec. 8(a)(5) and 8(d) of the Act justifies examining whether parties have sufficiently expressed their intention to override the statutory duty to bargain.

[103] Instead, as explained repeatedly above, it is an affirmative defense proven by offering language evincing a clear and unmistakable intention to contractually surrender the statutory right to bargain. We respectfully disagree with our colleague's characterization of this distinction as "semantic wordplay" and instead follow the view of reviewing courts that it is appropriate to impose heightened scrutiny to affirmative defenses. See *Local Joint Executive Bd. of Las Vegas v. NLRB*, 540 F.3d at 1079.

of Teamsters, AFL–CIO (the Union), by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of the Respondent's unit employees.

(b) Changing the terms and conditions of employment of its unit employees without first notifying the Union and giving it an opportunity to bargain.

(c) Failing and refusing to bargain with the Union, on request, concerning the decision to install cameras in vehicles driven by unit employees and the effects of the decision on unit employees' terms and conditions of employment.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Furnish to the Union in a timely manner the information responsive to Request 4 in the January 12, 2021 letter from Timothy Montgomery to Kevin Blackwell.

(b) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

> All employees including drivers, mechanics and loaders employed by the Employer at its Florence, Kentucky facility, excluding office clerical employees and all professional employees, guards and supervisors as defined in the Act.

(c) On request by the Union, bargain concerning the decision to install cameras in vehicles driven by unit employees and the effects of the decision on unit employees' terms and conditions of employment.

(d) Post at its Florence, Kentucky facility copies of the attached notice marked "Appendix."[104] Copies of the notice, on forms provided by the Regional Director for Region 9, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since January 12, 2021.

(e) Within 21 days after service by the Region, file with the Regional Director for Region 9 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. December 10, 2024

________________________________
Lauren McFerran, Chairman

________________________________
David M. Prouty, Member

________________________________
Gwynne A. Wilcox, Member

(SEAL) NATIONAL LABOR RELATIONS BOARD

MEMBER KAPLAN, dissenting.

Before us is the question whether the Respondent violated the Act as alleged by failing to provide the Union with notice and an opportunity to bargain prior to having "implemented the Lytx Security System Suite, which would include installing Lytx security cameras and other employee surveillance devices in trucks driven by the employees in the Unit" and by failing and refusing to bargain over "the installation of Lytx security cameras in the vehicles driven by bargaining[-]unit employees."[1] An administrative law judge dismissed the complaint, applying the "contract coverage standard" and finding that the

[104] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] There are no exceptions to the judge's finding that the Respondent violated Sec. 8(a)(5) by failing to provide some of the information that the Union requested on January 12, 2021. Accordingly, I join the majority in adopting that finding.

Respondent did not have any duty to bargain over the alleged conduct.[2] In excepting to that decision, the General Counsel asked the Board to overrule Board precedent and replace the contract coverage standard with the "clear and unmistakable waiver" standard.

Taking the General Counsel up on her request, my colleagues have written at great length why they believe that the Board's "clear and unmistakable" waiver standard must be reinstated. There are many reasons, both legal and practical, why I disagree with this position. The problem, however, is that the issue of whether the Respondent had a duty to bargain, under either standard, *is not presently before us*. In the instant case, it does not matter whether or not the Respondent had a duty to bargain over the implementation of the Lytx Driver Safety Suite (Lytx security system or security system), including the installation of security cameras in the unit employees' trucks, because the record establishes that—regardless of whether or not it was obligated to do so—the Respondent *did* bargain with the Union prior to any implementation that affected employees' terms and conditions of employment.[3] Furthermore, although it is not critical to finding that the Respondent did in fact bargain with the Union, record evidence establishes that the parties also reached a tentative agreement about these issues, memorialized in a Memorandum of Understanding (MOU). Because the MOU was dated prior to any implementation of the Lytx security system in the trucks driven by the bargaining nit employees—and, in fact, the General Counsel failed to establish that any such implementation ever occurred—it is clear that the General Counsel cannot establish that the Respondent violated the Act as alleged.

So why have my colleagues written a lengthy decision addressing the merits of the "contract coverage" doctrine versus the "clear and unmistakable waiver" doctrine? A good place to start in answering that question is the history of the allegations before us. On March 3, 2021,[4] the Union filed a charge alleging that the Respondent had "unilaterally implement[ed] a program of installing cameras and other employee surveillance devices in trucks driven by bargaining[-]unit members" and had "explicitly rejected the Union's demands to bargain over this matter."[5] On April 29, the region *dismissed* the unfair labor practice charge filed against the Respondent. Importantly, in dismissing the charge, the region determined that the Respondent had *not* refused to bargain with the Union. The region concluded, "[r]egarding the Employer's alleged refusal to otherwise bargain over the [implementation of cameras], the evidence failed to establish that the Employer is refusing to meet and bargain over the matter. Rather the investigation disclosed that, in correspondence between the parties over the Employer's implementation of security cameras, the Employer has offered to meet and discuss such installation with the Union. However, the Union has failed to respond to this offer."[6] On May 14, the region issued a complaint that only alleged the *failure to provide information* violation that, as discussed, is not before us due to the absence of exceptions on that issue.

Accordingly, once the charge against it had been dismissed, the Respondent reasonably assumed that, absent a further response from the Union, it did not have any affirmative duty to bargain over the Lytx security system for nearly three months.[7] However, on August 6, shortly after the beginning of General Counsel Jennifer Abruzzo's

[2] Although I will explain herein why the judge did not actually need to reach the contract coverage issue, I note that even if the Respondent *had* "implemented" the Lytx security cameras as alleged in the complaint, I would find that the Respondent did not violate the Act because the parties' contract permitted the Respondent to make that unilateral change.

[3] In fact, the Union stipulated on the record that when the parties began bargaining on September 16, 2021—a full week before the complaint in this matter issued—the Union presented the Respondent with a proposed MOU addressing any future installation of the Lytx security system in the unit employees' trucks. Union counsel further stated that "[t]he fact that the parties might have discussed [any future installation of the Lytx security system in the unit employees' trucks] in bargaining . . . something like five weeks after the General Counsel directed the issuance of the complaint in this case [on August 5] is just not relevant . . . so all the bargaining that went on in September and October and into November of 2021 is just not relevant." (Tr. 87-88.) In fact, at no point did any party assert, or the judge find, that the Respondent had *not* bargained with the Union about these issues beginning on September 16. Rather the General Counsel and the Union, as well as the judge, took the position that such evidence was irrelevant.

[4] All dates herein after will refer to 2021, unless otherwise noted.

[5] As will be explained infra, the Respondent did not have a duty to bargain over the purchase and implementation of the Lytx security system in non-represented employees' trucks, nor did the Respondent "explicitly reject" the Union's requests to bargain.

[6] Of course, if the region's initial conclusion with regard to the facts in this case is correct—that the Respondent had not refused to bargain at the time that the charge was filed but rather it was the Union that had failed to respond to the Respondent--again the issue of whether or not the Respondent had a duty to bargain would be wholly irrelevant here. As will be discussed infra, I agree with the region's initial determination for the reasons set forth therein. But, even assuming that the region's initial determination was not correct, the record establishes that the parties began bargaining over the relevant issues in a timely manner after the charge was reinstated in August 2021.

[7] My colleagues suggest that the Respondent was "on notice" that it had a duty to bargain with the Union starting on June 11, 2021, when it was informed that the Union had filed an appeal of the Regional Director's decision that the Respondent had not unlawfully refused to bargain with the Union. In support of this contention, they assert that "an unfair labor practice charge remains a proper basis for further proceedings if a party timely appeals a Regional Director's dismissal." That, of course, is settled law. If it were not, the Respondent would presumably have argued that the complaint before us is improperly based on a previously dismissed charge, and I would presumably be voting to dismiss the complaint on that basis. It is, however, an entirely different proposition to state that because a dismissed charge could be reinstated in the future, the party that has been found not to have violated that Act should assume that the regional determination will be reversed as soon as the dismissal has been appealed. Such an assumption not only defies common sense but it is at odds with reality. The percentage of appeals to regional director's dismissals that are sustained each year can be fairly described as miniscule. For fiscal years 2008–2012, the average percentage of appeals cases in which the regional directors' dismissals were reversed was 1.1 percent, with a range from 0.7 percent to 1.5 percent over those years. For instance, in fiscal year 2011, the Division of Appeals processed 2040 appeals but found that only 1 percent of the appeals had merit. See

term, the General Counsel decided to grant the Union's appeal of the region's April 29 dismissal of the underlying unfair labor practice charge and directed the region to issue a complaint in this matter.[8] In that complaint, which issued on September 23, the General Counsel alleged—for the first time—that the Respondent had violated the Act by failing to bargain over either the implementation of the Lytx security system or the installation of Lytx cameras in unit employees' trucks.[9]

After the hearing commenced on November 17, however, it became apparent that the General Counsel was not aware that, during the period between the reinstatement of the charge and the issuance of the complaint, the parties had in fact begun bargaining over the matter. This confusion was made evident when the Respondent attempted to proffer evidence that the parties had engaged in bargaining over the very issues for which the General Counsel was alleging a failure to bargain. At first, the judge indicated that he was "going to permit" the Respondent to proffer evidence pertaining to the parties' bargaining, given that the General Counsel was alleging an ongoing violation. Immediately thereafter, however, the General Counsel asserted that the parties' bargaining was not relevant because "at the time that [the region] issued the [relevant] Complaint, there hadn't been any bargaining" over the Respondent's implementation of the Lytx security system. However, both the Union and the General Counsel stipulated that bargaining "had begun on September 16," the date on which the Union had provided the Respondent with the proposed MOU covering the Lytx security system issues. Again, the complaint did not issue until September 23. Furthermore, the General Counsel took the position at the hearing that it was alleging an "ongoing violation" accordingly, any argument that the General Counsel litigated this case based only on the events prior to the filing of the charge in this matter is not supported by the record.

Thus, the record evidence establishes that the parties had begun bargaining over the possible future implementation of the Lytx security system—regardless of whether the Respondent had any duty to do so—before the complaint in this case issued, continued to bargain over how such implementation could affect employees' terms and conditions of employment, and ultimately agreed upon a MOU addressing those issues, all before any actual installation of the Lytx security system in the unit employees' trucks had been scheduled or had taken place.[10]

My colleagues nevertheless reject this evidence—as they must in order to reach the contract coverage issue—on the basis that the Respondent had a duty to bargain with the Union prior to its "decision" to purchase the Lytx security system with the intention of installing that system in its entire fleet of trucks.[11] It is for that reason that they

General Counsel's Memorandum GC 12-03, *Summary of Operations Fiscal Year 2011* (March 8, 2021). I cannot agree with my colleagues' suggestion that a party is required to ignore a regional director's decision on the merits of the charge against them in light of the fact that there is an infinitesimal chance that the dismissal of the charge will be reversed by the Division of Appeals.

Furthermore, my colleagues' suggestion is particularly nonsensical here, where the Regional Director affirmatively found that the Union, not the Respondent, had the duty to take the next step in order to initiate bargaining. Nor does it make sense to me to require a party to proffer *testimony* that its understanding of a situation was affected when a charge alleging that it had engaged in certain unlawful conduct is dismissed, and a regional director explains in no uncertain terms why the respondent's alleged conduct did not violate the Act.

Finally, I note that the Respondent's conclusion that it did not have a duty to bargain with the Union in early 2021 was first found to have merit by the Regional Director and then, later, by the administrative law judge. Regardless of whether my colleagues disagree with either the Regional Director's dismissal of the charge or the administrative law judge's decision, they do not—and cannot--assert that the Respondent's actions here were unlawful under the "contract coverage" law that applied at the time of the events in this case.

[8] The parties stipulated at the hearing that the General Counsel's direction to issue a complaint occurred on August 6, so I will use that date herein.

[9] Accordingly, although my colleagues state that the Respondent had failed and refused to bargain with the Union for "8 months," that assertion ignores the fact that, from April 29 to August 6, the Respondent reasonably relied on the General Counsel's dismissal of the charge alleging that it had a duty to bargain over the security system issues. Furthermore, the record establishes that the Respondent engaged in timely bargaining with the Union after the charge was effectively reinstated on August 6.

[10] I note that there is no allegation, let alone evidence in the record, suggesting that the Respondent did not engage in good faith bargaining with the Union over the relevant issues beginning on September 16.

To the extent my colleagues recognize that the MOU may have been the result of bargaining, they imply that because the preamble of the agreement states that the Respondent "has stated its intention" to implement the security system in unit employees' trucks, any bargaining must have been based on the Respondent presenting the Union with a fait accompli. Not only do I disagree with that interpretation of the MOU, but, more importantly, the parties never had the opportunity to litigate the scope of the bargaining and the MOU.

To begin, it is obvious that the language they seize upon merely serves to explain the reason for bargaining over the issue. But, further, it is telling that the parties used the phrase "has stated its intention"; specifically, the MOU does not indicate that the Respondent "has decided" to implement the system, which the majority has claimed is the obvious action taken by the Respondent here. Nor does the MOU contain any indication that the parties' bargaining was in any way constrained by the Respondent's "intent," or that the Union had reached the MOU under any sort of protest because it had been presented with a fait accompli. Indeed, the Union stipulated at the hearing that the parties had begun bargaining over the security system issues.

The General Counsel, in turn, never asserted at the hearing that the bargaining should not be taken into consideration because it was limited in scope, nor did she revise her complaint to allege that the Respondent had engaged in bad faith bargaining by presenting the Union with a fait accompli. Rather, the only challenge made by the General Counsel at the hearing with regard to the bargaining evidence was that it was irrelevant. Because the judge agreed, the scope of the parties' subsequent bargaining was never litigated at the hearing. Again, if my colleagues disagree with my reliance on the bargaining evidence because they would interpret it differently, the only path forward is to remand this matter back to the judge so that the parties can proffer evidence regarding the scope of the agreement.

[11] Again, the complaint alleged a failure to bargain over "implementation," not a failure to bargain over any decision.

implicitly agree with the judge that the evidence of the parties' bargaining was not relevant to deciding the case. The short answer to why that position fails is that the Respondent *did not have a duty to bargain* with the Union prior to purchasing the security system and its implementation of that system in trucks that were not driven by the unit employees. My colleagues cannot cite any case to support the view that an employer is not permitted to purchase a security system and install that security system in trucks that are not driven by the unit employees. Nor would that make any sense, as an employer has no duty to bargain with regard to changes in terms and conditions of employment for employees who are not represented by a union. But this is precisely the position my colleagues are taking by asserting that, somehow, the Respondent was required to bargain over the purchase of the Lytx security system with the "intent" to implement that system in its entire fleet of 400 trucks simply because 5 or 6 of those trucks were driven by the unit employees.

Certainly, assuming that the General Counsel had alleged a failure to bargain over the "decision" my colleagues focus on, there could be circumstances under which my colleagues' rationale would make sense. For example, if an employer had purchased a new security system that *automatically* changed employees' terms and conditions across its entire fleet of trucks without first bargaining with the union that represented some of those employees, it would be clear that the decision to purchase the security system itself affected unit employees' terms and conditions of employment.

No such facts, however, are present in this case. Here, the Respondent purchased the Lytx security system and, although it expressed an intent to install the system in all of its trucks, there is no evidence in the record that it *actually did so.*[12] Nor is there any evidence to suggest that the success of the implementation of that security system in the non-unit employees' trucks was dependent in any way on the Respondent's implementation of the security system in unit employees' trucks.

Under my colleagues' view of the case, therefore, employers may not *effect any changes* to unrepresented employees' terms and conditions of employment without first bargaining with the union of its represented employees, so long as the employer has "implemented" changes on represented employees' terms and conditions of employment by informing the unit that it planned to implement changes at some undefined point in the future. Further, under my colleagues' view, an employer's mere unilateral purchase of equipment that is implemented for non-represented employees but is *never implemented* in a way that affects the unit employees' terms and conditions of employment is unlawful so long as, at the time the employer purchased the equipment, it intended to implement the equipment to all of its employees. Not only is this view of the requirements of the Act nonsensical, but my colleagues cannot cite any cases that would support finding a violation under such circumstances.[13]

My colleagues have no real answer to this point but, instead, assert that my position is based on a "markedly different account of the facts at issue." Contrary to this assertion, however, my colleagues and I do not have any disagreement about what happened in this case.[14] Rather, we disagree about whether evidence of the Respondent's subsequent bargaining with the Union is relevant to determining whether the Respondent failed to bargain with the Union as alleged, and, even if that were not relevant, whether the Respondent had a duty to bargain with the Union prior to purchasing, and installing, a new security system in trucks not driven by unit employees, given that the Respondent never installed that security system in the unit employees' trucks.

My colleagues also suggest that my "version of the relevant events" in this case is "speculative," but then fail to identify any aspect of my accounting of the record facts

---

[12] Because the complaint alleges that the Respondent unlawfully "implemented" changes to employees' terms and conditions of employment, and failed to bargain over that implementation, my colleagues assert—as they must—that the Respondent violated the Act by "taking concrete steps" that, presumably, constituted implementation of the Lytx security system in the unit employees' trucks. It is not clear, however, what concrete steps they are relying upon. Certainly, the purchase of the Lytx system and implementation of that system into non-unit employees' trucks cannot constitute an unlawful "concrete step" because, as my colleagues concede, the Respondent had the right to take those actions without providing notice to, and bargaining with, the Union.

I recognize that there are cases in which the Board has found a failure to bargain violation even though the respondent never in fact made any changes to employees' terms and conditions of employment. Without expressing any view with regard to whether those cases were correctly decided, I note that to my knowledge the Board has never found a failure to bargain under such circumstances when the parties have actually bargained in good faith over the possible changes prior to implementation of any of the proposed changes.

My colleagues also accuse me of giving "short shrift" to the statutory right to engage in collective bargaining. Of course, it is my colleagues who have denied the Respondent's efforts to introduce evidence of its bargaining with the Union. In any event, the fact that I would not impose additional bargaining obligations above and beyond what our Act and law requires does not mean that I am giving "short shrift" to anything.

[13] I note that at least one reviewing court has already rebuked my colleagues for attempting to justify finding a violation based on a "nonsens[ical]" interpretation of record facts. *Stern Produce Co. v NLRB*, 97 F.4th 1, 9 (D.C. Cir. 2024).

[14] That is, we have no disagreement apart from when my colleagues assert facts that are not supported by the record. For example, my colleagues indicate that the Respondent "confirm[ed] that it was irrevocably committed to following its declared intention" to install the Lytx system in all of its trucks. Not only did the Respondent never declare that its decision was "irrevocable," but, to the contrary, the Respondent did not in fact install the Lytx system in the unit employees' trucks. Elsewhere, my colleagues state toward the end of their decision that the Respondent "advised the Union that 'bargaining at the expense of safety cannot be a starting point.'" Yet, much earlier in their decision, they concede that the Respondent had *crossed that statement out* in its March 1 letter to the Union. To take the position that the Respondent has made a specific assertion to the Union, despite the fact that the Respondent redacted that sentence, based on the fact that the redaction was "still legible" is hardly a fair recitation of the record facts.

that is "speculative."[15] If my colleagues are referring to their assertion that the Respondent has taken the litigation position that the charge was untimely because its August 2020 announcement put the Union on notice of its intention to install the Lytx Security system in its trucks, I do not dispute that assertion.[16] But that assertion is *irrelevant* to the question of whether the Respondent had a duty to bargain over its intention to install the security camera system in the unit employees' trucks eventually when, in fact, those cameras were never installed. I further note that it is striking that, although my colleagues accuse me of speculative reasoning, they assert that the evidence "suggests" that but for "circumstances beyond the Respondent's control (the supply chain disruption caused by the pandemic)", the Respondent "would have installed the cameras long before the Union learned of the Respondent's decision." Not only is that entirely speculative, but it is irrelevant. Based on the record before us, the Respondent has not installed any cameras in bargaining-unit employees' trucks; the Respondent's stated intention to do so does not change that salient fact.

Because the record establishes that the General Counsel failed to meet her burden to establish that the Respondent either failed to provide adequate notice or failed and refused to bargain with the Union over its implementation of the Lytx security system before any such implementation affected employees' terms and conditions of employment, I would dismiss the allegation. In my view, the judge committed clear error in finding that the parties' bargaining over these issues, which commenced prior to the issuance of the relevant complaint, was not relevant, and my colleagues commit clear error in adopting this view of the case. In light of the General Counsel's failure to establish that the Respondent failed or refused to bargain with the Union over the issues as alleged, the issue of whether "contract coverage" or "clear and unmistakable waiver" should be the standard by which to analyze the Respondent's alleged failure to bargain is simply not before the Board.[17]

Even though the question of whether or not the Respondent had a duty to bargain is irrelevant given the General Counsel's failure to establish that the Respondent had failed and refused to bargain with the Union as alleged at the time that the relevant complaint had issued, my colleagues insist on attempting to use this case to express their disagreement with the doctrine of contract coverage, which was adopted by the Board in *MV Transportation, Inc.*[18] in response to the growing chorus of appellate courts that would not enforce Board decisions that failed to apply contract coverage. Because this is not a contract coverage case, my colleagues' discussion regarding their intent to overrule the Board's decision in *MV Transportation* amounts to non-precedential *dicta*.[19]

Given, however, that my colleagues have written extensive *dicta* that appears to be the blueprint for why they would overrule *MV Transportation* in a future appropriate case, I will explain in *dicta* why I believe that the standard set forth in *MV Transportation* must be retained, especially in light of the fact that reviewing courts, including the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), have made it clear that they expect the Board to apply that standard.[20]

Background

The Respondent operates approximately 400 trucks that transport trash to landfill sites. This business includes 22 nationwide locations, including one in Florence,

---

[15] To the extent my colleagues are suggesting that I am "speculating" about the Respondent's subjective reason for not bargaining with the Union, the Respondent's subjective intent is not relevant here; the General Counsel is not alleging a violation of Sec. 8(a)(3). Rather, the issue is whether the Respondent violated the Act as alleged.

[16] Furthermore, the Respondent's litigation position with regard to its 10(b) argument in no way conflicts with my analysis of this case. The Respondent's contention that the Union had knowledge of "its intention to install the Lytx systems in all trucks operated by the bargaining unit members" in August 2020 in no way concedes or suggests that the Respondent had any duty to bargain with the Union over that intention. In any event, the Respondent is not precluded from raising any of the arguments that I have raised here in a motion for reconsideration. That would indisputably preserve such arguments for consideration by a court of appeals on review under Sec. 10(e).

[17] The fact that the judge erroneously applied contract coverage here—rather than recognizing that the Respondent assumed that it had a duty to bargain over the issue, did bargain over the issue, and reached a tentative agreement with the Union over the issue—does not place the contract coverage doctrine squarely before the Board. Nor does it matter that a reviewing court could, erroneously, apply the contract coverage doctrine here given that, regardless of whether or not the contact privileged the Respondent to act unilaterally, it did not do so here.

[18] 368 NLRB No. 66 (2019).

[19] This, of course, is not the first time my colleagues have attempted to use an inappropriate case--whether due to the issues presented or the posture of the case--for them to attempt to overrule precedent with which they disagree. See, e.g., *Lion Elastomers LLC*, 372 NLRB No. 83 (2023), vacated and remanded 108 F.4th 252 (5th Cir. 2024) (finding Board's purported change of law both beyond the scope of the court's remand and violative of the respondent's due process rights); see also *Siren Retail Corp. d/b/a Starbucks*, 373 NLRB No. 135, slip op. at 18–20 (2024) (Member Kaplan, concurring in part and dissenting in part); *Miller Plastic Products, Inc.*, 372 NLRB No. 134, slip op. at 9–10 (2023) (Member Kaplan, concurring in the result).

I further note that, should the reviewing court agree that it is unnecessary to reach the contract coverage issue to decide the case, the court still may want to address the issue as an alternate finding should the court disagree with my colleagues' purported reversal of *MV Transportation*. If not, it is likely that my colleagues will take the position that their *dicta* with regard to the reversal of *MV Transportation* is binding precedent. See, e.g., *Airgas USA*, 372 NLRB No. 102 (2024) (reasoning that new remedy vacated by the court remains binding precedent).

[20] As discussed, because the Respondent affirmatively chose to bargain with the Union over the alleged unilateral actions insofar as they pertained to the bargaining-unit employees, the question whether an unlawful failure and refusal to bargain was privileged by the doctrine of contract coverage is not before the Board. Accordingly, the issue of how effects bargaining should be treated under the contract coverage doctrine is not before the Board. Should the issue arise in a future appropriate case, I would address my concerns regarding the assumption that a contract clause representing a mutual agreement granting the employer the right to take unilateral action necessarily represents a mutual agreement with regard to effects bargaining.

Kentucky, where the Respondent operates five or six trucks. At that facility, the Union represents a unit of drivers, mechanics, and loaders. The parties' most recent collective-bargaining agreement was effective by its terms from September 24, 2018, to September 26, 2021.

In August 2020, the Respondent decided to purchase the Lytx security system with the intention of installing that system in its entire fleet of 400 trucks, including the 5 or 6 trucks operated by the Florence, Kentucky employees represented by the Union.[21] The system utilizes two cellphone size cameras mounted on the inside windshield of a truck cab, with one camera directed at the driver and the other outward toward the road. Although the system continuously records video and audio footage, it is an event-based system, i.e., it only preserves recordings if there is a triggering event like a collision, hard braking, speeding, or failure to maintain a safe driving distance. In those circumstances, the system preserves recordings for the 10 seconds before and 5 seconds after a triggering event. Preserved recordings are sent to Lytx, which analyzes, scores, and transmits recorded data to the Respondent for further review. Many trucking companies have installed similar cameras as a reasonable response to increasing accident rates and massive increases in the size of awards in accident liability cases.[22]

In early January, the Union learned about the Lytx security system after the Respondent notified its employees that it had begun the process of installing the system in its fleet. The Union contacted the Respondent by email on January 12 asserting that "the cameras cannot be implemented without negotiation with the Union" and demanded that "any steps toward implementation that already have begun should cease."[23] The Union asked that the Respondent explain its reasons for purchasing the Lytx security system and answer the specific questions of where cameras would be placed in trucks, the direction cameras would face, and whether cameras operate continuously, are activated by specific events, send audio or video images to a central location, and how long recordings are stored.

By letter dated February 4, the Respondent responded to the Union's questions. The Respondent explained that it purchased the Lytx security system "in response to unsustainable exposure to claims and litigation." As the Respondent observed, the system would also protect drivers from meritless claims when they were not at fault, as accidents "jeopardize a driver's privilege to drive" and "too often drivers find themselves with no recourse or proof in the event of one of these incidents." The Respondent also explained that the system would be used for coaching to ensure that drivers safely operate trucks to avoid incidents. The Respondent clarified that the system was event-based, provided examples of triggering events, detailed the length and scope of preserved recordings, outlined the process of third-party review by Lytx, and confirmed that recordings could be the basis for disciplinary action.[24] Finally, the Respondent indicated that the implementation of the Lytx security system was "in its beginning stages" and stated that, although a memorandum announcing the plan had been sent out on August 10, 2020, "no collective bargaining has been deemed necessary up to this point."

By email dated February 12, the Union objected to the "installation of cameras in vehicles" and requested bargaining "on the potential installation of cameras."[25] The Union rejected the Respondent's business reasons for purchasing the Lytx security system, asserted that the use of cameras amounted to employee surveillance, claimed that third-party review would bring unwanted subjectivity, questioned how the security system could identify speeding or safe distance following, asked where cameras would be directed, and inquired if employees and the Union could review recordings.

By email dated March 1, the Respondent defended the system as "a tool of safety improvement and incident reconstruction to guard against . . . legal claims," and noted the "wide and diverse use of event recorders in the transportation industry." The Respondent rejected the Union's assertion that the cameras were surveillance devices on the basis that they are not hidden, do not continuously record, and instead provide event-based data. The Respondent

---

[21] My colleagues note Respondent Safety Manager Kevin Blackwell's testimony where he simply agreed with counsel for the General Counsel's statement that in August 2020, the Respondent's decision to "put[] cameras in trucks at some point" was a "done deal." As they do throughout their decision, my colleagues ignore the critical fact that the Respondent never installed the camera system in any truck driven by the unit employees prior to the parties' bargaining over that matter and reaching tentative agreement on an MOU directly addressing it. To that end, in an August 11, 2020, email to the Respondent's facility managers notifying them of the Lytx security system, Blackwell referred to the "pending installation" of the system. Blackwell further testified that installation at the Florence facility was delayed due to a supply chain disruption caused by the COVID-19 pandemic. Blackwell did not testify that the Respondent delayed installation as a means of avoiding bargaining with the Union.

[22] See Forbes Advisor, Truck Accident Statistics For 2024, https://www.forbes.com/advisor/legal/auto-accident/truck-accident-statistics/ (last visited 9/4/24) (large truck accidents increased by 26% From 2020 to 2021); Insurance Journal, "Dash Cams in Fleet Vehicles are Key to Avoiding Nuclear Verdicts, Risk Managers Say," https://www.insurancejournal.com/news/national/2023/11/14/747970.htm (last visited 10/7/24).

[23] As will be shown, the Respondent did not take any action inconsistent with this position. The Union's demand that "any steps toward implementation . . . should cease" necessarily only pertains to the unit employees' location, as the Union has no authority to dictate whether or not the Respondent installs cameras in the trucks of employees whom the Union does not represent.

[24] Notably, there is no complaint allegation that the Respondent violated the Act by announcing that audio and video recordings captured by the camera system could be used as a basis for training and discipline.

[25] As mentioned already, the Union's objection was necessarily limited to installing cameras in trucks driven by the unit employees; the Respondent did not have any duty to bargain with the Union prior to implementing the system in the non-unit employees' trucks given that such implementation did not affect unit employees' terms and conditions of employment.

explained that cameras would be mounted "both forward facing and driver facing." The Respondent asserted that third-party review offers a "neutral and independent review," with no recommendations regarding discipline, and that any coaching and discipline would be taken in accordance with the parties' contract. Finally, the Respondent stated, "[p]lease advise how and when you would like to discuss further." The Union did not respond to the Respondent's offer of further discussions but, rather filed a charge on March 3.[26]

On September 16, as part of their negotiations for a successor agreement, the parties began bargaining with regard to the Respondent's intent to implement the security system in the trucks driven by the unit employees. On that date, the Union provided the Respondent with a draft MOU addressing its concerns regarding the possible future implementation of the security system. The parties bargained over the issues raised by the Union and, on November 10, before the hearing opened in this case, the parties reached a tentative agreement on an MOU, which was initialed and dated by the parties. The MOU explains that the Respondent "has stated its intention to install fleet dash camera and audio systems ('systems') in its trucks driven by Local 100-represented drivers" and it "is understood that the installation of such systems . . . is for matters of safety and security, and not for purposes of routine employee surveillance." The MOU provides that "[i]nformation obtained from the systems may be used for counseling, coaching or discipline depending on the circumstances and consistent with provisions in the Employee Handbook" and may "be used to exonerate an employee accused of any infraction." If a camera recording is used to discipline an employee, the MOU requires the Respondent to provide the Union with "an opportunity to review the systems recording containing the information used by the [Respondent] to support the discipline or discharge," and a copy of system recordings if requested by the Union.

By the time of the hearing in this case, which took place on November 17, 2021, the Respondent had still not installed the camera system in the trucks operated by unit employees.

Discussion

I. THE RESPONDENT HAS NOT FAILED OR REFUSED TO BARGAIN ABOUT THE IMPLEMENTATION OF ITS PLAN TO INSTALL THE LYTX SECURITY SYSTEM IN TRUCKS DRIVEN BY THE UNIT EMPLOYEES

*A. There was No Unilateral Change to Employees' Terms and Conditions of Employment*

In order to prove an unlawful unilateral change, the General Counsel must "show that there is an employment practice concerning a mandatory subject, and that the employer has made a significant change thereto *without bargaining*." *Bath Iron Works Corp.*, 345 NLRB 499, 501 (2005), affd. sub nom. *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14 (1st Cir. 2007). There is no dispute that the implementation of the Lytx security system in trucks operated by the unit employees, including the installation of cameras and other devices, was a mandatory subject of bargaining. Accordingly, assuming—as my colleagues do—that the parties had not agreed to afford the Respondent the discretion to act unilaterally, the Respondent was required to provide the Union with notice and an opportunity to bargain before installing the cameras and, thereby, changing employees' terms and conditions of employment. But that is exactly what the Respondent did.

First it is undisputed that, at the time the Union became aware of the Respondent's purchase of the Lytx security system and the implementation of that system in trucks driven by employees not represented by the Union, the Respondent had not made any changes to the unit employees' terms and conditions of employment at the Florence location.[27] The Respondent had not implemented the security system, including the installation of security cameras, in any trucks operated by the unit employees, nor did it have a concrete timeline for doing so.[28] Second, the record establishes that the parties did in fact bargain over the security system beginning in September and, further, reached a tentative agreement on an MOU addressing that topic before the Respondent had implemented the security system or installed any cameras in trucks operated by the unit employees.[29] Indeed, there is no record evidence that it

[26] As noted previously, that charge was dismissed on April 29. The charge was later effectively reinstated on August 6.

[27] Although the Union indicated its objection to the Respondent's purchase of the security system, I am assuming that the General Counsel was not alleging, and that my colleagues are not finding, that the Respondent's unilateral purchase of the security system was unlawful. As discussed above, the Respondent had the right to purchase the security system and install the system, including the security cameras, in trucks not driven by the unit employees, without bargaining with the Union first. Although the Respondent indicated that it intended to install the security system across the entire fleet, just purchasing the system, and installing it in other trucks in the fleet, did not automatically effect a change in the unit employees' terms and conditions of employment.

[28] My colleagues apparently take the position that, because the Respondent conveyed an intention to install cameras in "100 percent" of its trucks at some undefined point in the future and began installing cameras in the trucks of employees not represented by a union, it somehow "implemented" changes to the unit employees' terms and conditions of employment at that point. I am not aware of any cases that support that position, and my colleagues cite none. From that highly questionable position, my colleagues then conclude that the Respondent failed to provide the Union with notice and an opportunity to bargain prior to implementation, despite the fact that the parties subsequently bargained in good faith and reached a tentative agreement on the issue prior to the cameras ever being installed in the unit employees' trucks and despite the fact that the record does not establish that the terms and conditions of employment of the unit employees were ever changed. Again, I am not aware of any Board precedent that supports that conclusion and, again, my colleagues cite none.

[29] My colleagues imply that the record does not support a finding that the parties bargained and reached tentative agreement because the judge rejected the Respondent's proposed stipulation that "the parties'

*ever* installed cameras on trucks at the Florence facility. Under these circumstances, there is no basis for finding that the Respondent "has *made* a significant change [to a term or condition of employment] *without bargaining.*"[30] Id. (first emphasis added).

Indeed, the absence of any implementation in this case explains why the judge's finding, effectively adopted here by the majority, that the parties' actual bargaining in this case was not relevant to whether or not the General Counsel had met her burden to establish a failure and refusal to bargain was erroneous.[31] In finding that evidence that the parties had actually bargained over the issues, and reached a tentative agreement as a result of that bargaining, did not affect the underlying failure to bargain analysis, the judge reasoned that "[a] union must not be forced to commence bargaining from a disadvantageous position, or bargain from a hole, caused by the employer's unremedied unilateral changes." As support for that principle, the judge cited *CP Anchorage Hotel 2, LLC, d/b/a Hilton Anchorage*, 370 NLRB No. 83, slip op. at 24 fn. 32 (2021), and *Intermountain Rural Electric Assn.*, 305 NLRB 783, 789 (1991), enfd. 984 F.2d 1562 (10th Cir. 1993). Neither of those cases, however, are relevant to the case at issue.

In both of the cases upon which the judge relied, the Board found that the respondent had engaged in bad-faith bargaining where it *implemented* unilateral changes to employees' terms and conditions of employment during bargaining that reduced the Union's bargaining power. In *CP Anchorage Hotel,* the Board found that the respondent had violated its duty to bargain in good faith, in part, because "the Respondent's unilateral implementation of its access proposal moved the baseline for negotiations, took a significant bargaining chip off the table, and impaired the Union's ability to make *quid pro quo* concessions. This action all but ensured that no meaningful bargaining could follow." 370 NLRB No. 83, slip op. at 2. Similarly, in *Intermountain,* the Board found that the respondent could not declare overall impasse and implement its best final offer where, among other things, it implemented unilateral changes during bargaining without affording the Union an opportunity to bargain over those changes.[32]

Here, by contrast, not only did the Respondent bargain with the Union prior to any implementation of the Lytx security system in the unit employees' trucks but, simply put, *there was no unilateral implementation* affecting the unit employees' terms and conditions of employment. Further, unlike in *CP Anchorage* or *Intermountain,* the Union's bargaining power was not diminished as a result of the Respondent's intent to install cameras in the unit employees' trucks. To the contrary, it stands to reason that the Union held a significant bargaining chip in the successor-contract bargaining knowing that the Respondent wanted to install those cameras in the future.[33] Like the judge, my colleagues ignore these critical facts.[34]

'thereafter negotiated . . . on the Lytx system and reached a tentative agreement.'" As noted above, the judge's decision to reject this stipulation was not based on any determination of the merits of the proposed stipulation. Rather, the judge rejected the stipulation because he found that evidence pertaining to the parties' bargaining in September was *irrelevant* and rejected the Respondent's attempt to proffer testimony on that issue. Again, if my colleagues believe that the merits of the rejected stipulation are relevant here, they should remand the case to the judge to allow the Respondent to proffer evidence regarding the parties' bargaining.

[30] Indeed, my colleagues' fundamental error in this regard is demonstrated by the fact that their Order tracks standard Board boilerplate for a refusal to bargain: "On request by the Union, bargain concerning the decision to install cameras in vehicles driven by the unit employees and the effects of the decision on unit employees' terms and conditions of employment." Not only does this language fail to track the allegation alleged in the complaint, but the record establishes that the parties have already bargained over the Respondent's plan to install cameras in the unit employees' trucks as well as any effects that would result from installing the cameras. My colleagues' order, therefore, appears to find that because (in their view) the Respondent did not bargain immediately with the Union upon request, any subsequent bargaining--and any agreements reached between the parties--can be undone upon the Union's request. I am not aware of any case in which the Board has ordered that an agreement reached by the parties be jettisoned upon request where, as here, there is no allegation that any party failed to bargain in good faith. Further, it is clear to me that allowing one party to invalidate an agreement reached through the process of bargaining in good faith will have the effect of undermining the Act's fundamental policy of encouraging collective bargaining as a means of reducing industrial strife.

[31] My colleagues assert that I am taking the position that "the Respondent's failure to bargain with the Union on request" in February 2021 is "negate[d]" by the parties' subsequent bargaining. I am not taking that position. I do not believe that the Respondent had a duty to bargain in February 2021. As my colleagues recognize, citing *NLRB v. Katz*, 369 U.S. 736, 743 (1962), "It is well settled that an employer violates Section 8(a)(5) if it changes employees' terms and conditions of employment . . . without providing the union representing [those] employees with prior notice and the opportunity to bargain." My view is that the Respondent did not violate Sec. 8(a)(5) in February 2021, or at any point thereafter, as that violation is defined in *Katz* because the General Counsel failed to establish that the Respondent actually changed employees' terms and conditions of employment. Although my colleagues appear to take the position that neither the Union nor the General Counsel were required to wait until the employees' terms and conditions were actually changed to establish an 8(a)(5) violation, that view is not supported by *Katz*.

[32] Specifically, the employer unilaterally increased the number of hours employees had to work to make up excused time off before qualifying for overtime premium pay rates; unilaterally abolished its standby and callout systems; and unilaterally reduced employees' take-home pay by limiting the amount that the respondent would contribute to employees' health insurance premiums and deducting the rest of the premium from employees' pay. The respondent implemented the health insurance change only two days after it informed the union of its intention to change the plan. *Intermountain*, 305 NLRB at 784, 788–789.

[33] Again, there is no allegation that the Respondent engaged in bad faith in its subsequent bargaining, nor is there evidence in the record that the Union had any concerns regarding the effect of Respondent's conduct on the bargaining process that resulted in the parties reaching a tentative agreement on the camera issue. Nor did the General Counsel allege in her complaint, litigate, or proffer evidence at the hearing to support her claim that the Respondent failed to engage in good faith bargaining in September 2021 by presenting the Union with a "*fait accompli.*"

[34] In an attempt to bolster the judge's rationale, my colleagues assert that the parties' subsequent bargaining over the Respondent's intent to implement the security system, including installing cameras, is irrelevant because the Board "considers circumstances as they existed at the time of the alleged violation." Citing *Windsor Redding Care Center, LLC*, 366 NLRB No. 127, slip op. at 4 (2018), and *Mid-Wilshire Health Care*

My colleagues assert that the Board must ignore the fact that the General Counsel failed to establish in the record that the Respondent ever changed employees' terms and conditions of employment by implementing the Lytx security system or installing the Lytx security cameras because the Respondent "did not argue at any point during the litigation of this case that the complaint allegations should be dismissed because it did not implement a unilateral change in terms and conditions of employment." Yet, it was not the Respondent's burden to establish that it had violated the Act by changing employees' terms and conditions without bargaining; that burden fell squarely on the General Counsel, and she failed to proffer evidence to support that finding. Furthermore, the Respondent implicitly argued that it had not implemented any changes to employees' terms and conditions of employment without bargaining by attempting to proffer evidence that it had not failed to bargain as alleged in the complaint because it had, in fact, bargained. Certainly, such evidence would not have served as a defense had the Respondent implemented any changes prior to the bargaining.[35]

*Center*, 337 NLRB 72, 73 (2001)), enfd. in relevant part 944 F.3d 294 (D.C. Cir. 2019), cert. denied 2020 WL 13120614 (2020). But the circumstances at the time of the alleged violation do not support their position and, therefore, the majority's cited cases are inapplicable. At the time that the majority is referencing, the Respondent did not have anything more than an intent to install the security system in the unit employees' trucks. Indeed, the Respondent still had not taken any action to implement the security system in the unit employees' trucks--nor did it have any specific plans to so--at the time that it offered to continue discussing the issue with the Union. Nor did it have any specific plans to do so at the time that the parties bargained over, and reached a tentative agreement on, that intention. It defies reason to find a violation that an employer "failed and refused to bargain" over an intention to change employees' terms and conditions of employment when the union and employer have stipulated that, in fact, the parties did bargain with regard to that intention and reached a tentative agreement before the employer ever implements the changes. That is, of course, assuming that the record establishes that the changes were implemented, which is not the case here.

Furthermore, in both *Windsor* and *Mid-Wilshire*, the employers actually implemented disputed unilateral changes before rescinding them and thereafter engaging in bargaining. Again, no such implementation has been shown in this case.

[35] My colleagues clearly err by contending that the question whether the General Counsel failed to meet her burden of proof is not before the Board. But, to the extent that they are suggesting that I am limited to the arguments put forward by the Respondent at this stage of the proceeding--which arguments, of course, addressed the judge's decision to find that the Respondent had no duty to bargain based on the contract coverage standard--they are incorrect. Any suggestion that I am precluded from applying my own analysis in determining whether the Respondent violated the Act is not supported by the Board's Rules and Regulations. Sec. 102.46(a)(1)(ii) of the Board's Rules and Regulations indicates that *exceptions* not raised by a party "*will* be deemed to have been waived" (emphasis added). The second sentence of Sec. 102.46(a)(1)(ii), in turn, states that exceptions that are raised but fail to conform with the requirements of Sec. 102.46(a)(1)(i)—including Sec. 102.46(a)(1)(i)(D), pertaining to bare exceptions containing no supporting argument--"*may* be disregarded." Sec. 102.46(a)(1)(ii) (emphasis added). In other words, even when parties make exceptions that do not include *any* supporting argument, the Board still has the option to consider those exceptions. And if the Board has the option to consider exceptions that lack supporting argument, the Board must have the authority to decide those exceptions based on its own legal analysis. Accordingly, although Sec. 102.46(a)(1)(ii) suggests that exceptions not raised by a party are deemed to have been waived, the section does not support an interpretation that arguments in support of those exceptions may not be considered as part of the Board's analysis when they are not raised by a party.

Furthermore, to the extent that my colleagues would find that the Board's Rules would so limit the Board's ability to apply a different analysis for deciding a case if that analysis is not raised by a party, I note that they have consistently found to the contrary with respect to one particular party, the General Counsel. There can be no argument that the General Counsel is not a party covered by the Board's litigation regulations. Accordingly, if the Board's rules prevent the Board from deciding cases on legal theories not raised by a party, then my colleagues could not have recently held that "[e]ven assuming *arguendo* that [their] rationale for finding [the violation] differed in some respect from the theory urged by the General Counsel," it was entirely appropriate for them to apply that different theory so long as that issue did not raise due process concerns. *Home Depot USA*, 373 NLRB No. 25, slip op. at 16–17 fn. 37 (2024). There is no reason why the Board, which is supposed to be a neutral arbiter of cases brought before us, should be allowed to *find* violations based on a theory not raised by a party before us but not *dismiss* alleged violations based on an argument not before us. Indeed, I would argue that if the Board is allowed to use its own theory to find that a party violated the Act, there is more reason for allowing the Board to apply its own rationale for finding that a party did not violate the Act. The former raises concerns of the Board exceeding the scope of its authority by acting as a de jure prosecutor, whereas the latter ensures that parties will not be ordered to remedy unfair labor practice violations that did they did not commit.

Recently in *Quickway Transportation, Inc.*, 372 NLRB No. 127 (2023), enfd. 117 F.4th 789 (6th Cir. 2024), my colleagues similarly attempted to explain why analyses not proffered by a party should not be available to the Board. They wrote: "As the United States Court of Appeals for the Fifth Circuit recently observed, our adversarial system of adjudication . . . . is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument[s] entitling them to relief." Id., slip op. at 18 (internal quotation marks and citations omitted). If that is my colleagues' view, then I do not see any reason for them to assume that all parties have competent counsel other than the General Counsel.

Finally, I note that a judge on the Third Circuit has recently raised concerns with the manner in which the Board uses the litigation processes set forth in Sec. 104.6(a) - (f) of the Board Rules and Regulations to frustrate parties' ability to raise issues on review. See *New Concepts for Living, Inc. v NLRB*, 94 F.4th 272 (2024) (J. Krause, concurring). Although Judge Krause's concurrence mostly focused on her disagreement with the application of the Board's Rules to limit judicial review, she also criticized the Rules as applied at the Board level. She noted that the Board's Rules are imprecise and therefore cause confusion, including the question, relevant here, of whether a party who *prevailed* before the administrative law judge must still file "exceptions" to preserve an issue for appeal. Id. at 291–292. As she further concluded:

> By its terms, then, the Board's regulation imposes different, more cumbersome, and less straightforward requirements on a litigant to preserve its opportunity for judicial review. While the statute requires merely that a party "urge[ ]" an "objection" before the Board, 29 U.S.C. § 160(e), the regulation demands that a party "*specifically* urge[ ]" an "exception" to each and every "ruling, finding, conclusion, or recommendation," 29 C.F.R. § 102.46(a)(1)(ii) (emphasis added), that the exception conform to precise specifications lest it be "disregarded," *id.*, and that regardless of whether the Board was in fact on notice of a "matter[ ]" and even addressed it in its opinion, a party who fails to include that matter in exceptions or cross-exceptions cannot raise it in court, id. § 102.46(f). In practice, this conflict creates uncertainty about parties' pleading obligations, enables arbitrary enforcement by the Board, and spawns confusion in the Courts.

*B. In Light of the Record Evidence that the Respondent Bargained with the Union with Sufficient Advance Notice Before the Implementation of Any Changes to Unit Employees' Terms and Conditions, the General Counsel Failed to Establish that the Respondent Violated the Act by Failing and Refusing to Bargain with the Union*

As I have explained, because the General Counsel failed to establish that the Respondent ever implemented any changes to the unit employees' terms and conditions of employment, as alleged in the complaint, and because, in any event, the record establishes that the Respondent bargained with the Union in good faith prior to any changes to the unit employees' terms and conditions of employment, the issue of whether the Respondent had any duty to do so is not before the Board. As previously noted, however, my colleagues' finding that the Respondent had refused to bargain in February and March of 2021 is without merit. It is true that the Respondent did not immediately commence bargaining in January 2021 when the Union first requested it. But neither did the Respondent refuse to bargain over the matter at that time or any other time.[36] To the contrary, the Respondent's February 4 letter stated only that collective bargaining had not "been deemed necessary *up to this point*." (emphasis added). My colleagues make much of this statement, but it does not in any way suggest that the Respondent was refusing to bargain. Rather, this was a true statement; the Respondent had not deemed bargaining necessary because, up to that point, it had only begun installing the cameras at locations where employees were not represented by unions.

Then, following a second letter from the Union, the Respondent sent a follow-up letter on March 1 that, again, did not indicate that the Respondent refused to bargain over the cameras. In fact, the Respondent specifically asked the Union in that letter to "[p]lease advise how and when you would like to discuss further." At no time thereafter did the Union suggest bargaining times or dates to the Respondent but, rather, the Union filed an unfair labor practice charge. The view that the Respondent's letters conveyed a refusal to bargain over its plan to install cameras in the unit employees' trucks at some undefined point in the future is, of course, belied by the fact that the Respondent *did* bargain with the Union about that very subject and reached a tentative agreement with the Union before any cameras were "implemented." It is simply absurd to find an unlawful refusal to bargain on these facts.[37]

It also bears emphasis that there is no indication that the bargaining over the possible future implementation of the Lytx security system in the unit employees' trucks, including the installation of that system and related devices in the unit employees' trucks, was impaired in any way because it took place in September and not sooner.[38] To the contrary, the MOU contained significant concessions that addressed the Union's earlier-expressed concerns. Among other things, the MOU confirmed that the system was not for the purpose of routine employee surveillance, stated that information from the cameras could only be used for counseling, coaching, or discipline "consistent with provisions in the Employee Handbook," acknowledged that information from the system could be used to exonerate employees accused of any infraction, and agreed to provide the Union with a copy of any recording used to discipline an employee. There is no record evidence that the Union is dissatisfied with the terms of the MOU, nor any evidence that its bargaining position was impaired because the negotiations took place when they did.

Because I agree with the region's initial finding that the Respondent did not violate the Act by failing and refusing to bargain with the Union over the possible future implementation of the Lytx security system in light of the Union's failure to respond to the Respondent's offer to continue discussing the matter, the question whether the Respondent had any duty to bargain over those issues has no bearing whatsoever on the outcome of this case. Similarly, given that there is no evidence that the Respondent unilaterally implemented any change in the unit employees' terms and conditions of employment without bargaining with the Union, the question of whether or not the contract would have privileged the Respondent's conduct if it had implemented a unilateral change has no bearing whatsoever on the outcome of this case. Accordingly, despite their protests to the contrary, my colleagues' discussion of these issues and the related overruling of *MV Transportation* is nothing more than non-binding, nonprecedential dicta.[39] Nevertheless, I participated in *MV Transportation*

Id. at 291.

[36] As mentioned previously, following its investigation, the region concluded that the Respondent had not failed to bargain with the Union but, rather, that the Union had failed to respond to the Respondent's offer to continue discussing the Union's concerns with regard to how the implementation of the security system would affect employees' terms and conditions of employment.

[37] This fact is even more obvious when one considers that the Respondent here never implemented the Lytx security system in any manner affecting the terms and conditions of employment of any trucks driven by unit employees. Indeed, although my colleagues protest that it makes no difference, they cannot cite a single case where the Board has found that a respondent failed to provide sufficient notice and opportunity to bargain, or failed and refused to bargain, when the record establishes that the party *actually bargained* with the Union over the proposed changes to employees' terms and conditions of employment before implementing those changes, and there is no allegation that the bargaining was conducted in bad faith. Nor can my colleagues cite a case where the Board found a violation where the General Counsel's complaint only alleged a failure to bargain over an "implementation" of changes to employees' terms and conditions of employment but no implementation occurred.

[38] The General Counsel never amended her complaint to include an allegation that the Respondent violated the Act by unlawfully delaying bargaining.

[39] As in court decisions, analyses in Board decisions are *dicta* where they are not necessary to decide the case at issue. See *Hospital Metropolitano*, 373 NLRB No. 89, slip op. at 8 (2024) (observing that the Board's statement in an earlier case "is not necessary to the holding [in that case] . . . but rather is dicta"); see also *Allied Mechanical Services v.*

and adhere to the principles stated there. As I now explain, none of the justifications my colleagues have given for purportedly overruling it has any merit.

II. ALTHOUGH THE CONTRACT COVERAGE STANDARD IS NOT RELEVANT TO THIS CASE, IT BEST EFFECTUATES THE POLICIES OF THE ACT

The Supreme Court has instructed that provisions in a collective-bargaining agreement must be interpreted according to ordinary principles of contract interpretation. In *M & G Polymers USA,* 574 U.S. 427, 435 (2015), the Court stated:

> We interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy. In this endeavor, as with any other contract, the parties' intentions control. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

(internal citations and quotations omitted). And that is what the contract coverage standard does. See *MV Transportation,* slip op. at 11 (finding that, under contract coverage standard, "the Board will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation"); accord *Wilkes-Barre Hospital Co., LLC v. NLRB*, 857 F.3d 364, 373, 376 (D.C. Cir. 2017) (finding that contract coverage standard applies "ordinary principles of contract law" and gives "full effect to the plain meaning of" contract language, including a management rights provision).[40] The contract coverage standard is therefore consistent with long-standing precedent establishing that courts, not the Board, have primary jurisdiction to interpret collective-bargaining agreements. See, e.g., *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 202 (1991) (declining to afford deference to the Board's interpretation of a collective-bargaining agreement because "[a]rbitrators and courts are still the principal sources of contract interpretation"); see also *MV Transportation,* slip op. at 6–7.

The contract coverage standard also properly recognizes that management-rights provisions are a standard industrial practice that serves the interests of employers, employees, and unions alike. See *NLRB v. American National Insurance Co.*, 343 U.S. 395, 407–409 (1952) (holding that an employer's insistence on a broad management-rights provision is not a *per se* violation of the Act); *Rescar, Inc.*, 274 NLRB 1, 2 (1985) ("[I]t is not a violation for an employer to bargain for [a management-rights] provision[] . . . any more than it would be for a union to bargain for provisions favorable to it."). Employers could not successfully operate their businesses if every decision that affected terms and conditions of employment had to be individually bargained to impasse or agreement before the employer could act. Employees share an interest in the success of their employer's business, as the Act "seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise." *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464, 472 (1953).

Consistent with these principles, the Supreme Court has held that

> [w]hether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board. If the latter approach is agreed upon, the extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.

*NLRB v. American National Insurance Co.*, 343 U.S. at 409. The contract coverage standard respects that principle by interpreting management-rights provisions using ordinary principles of contract interpretation. That standard focuses on the intent of the parties, consistent with the Court's holding that management-rights provisions are "an issue for determination across the bargaining table, not by the Board." Id.

The Board routinely applies ordinary principles of contract interpretation when determining the scope of an employer's contractual *obligations*. The courts do too, even in cases where the Board would have applied a different standard. See *PG Publishing, Inc. v. NLRB*, 83 F.4th 200, 204 (3d Cir. 2023) (observing that "[t]he proper mode of analysis requires application of ordinary contract principles to the expired CBA to determine whether the parties intended" that a condition of employment end with the expiration of the agreement); *Finley Hospital v. NLRB*, 827 F.3d 720 (8th Cir. 2016) (same). As the Board noted in *MV Transportation,* contractual obligations are typically agreed to through the give-and-take of negotiations in which the union consents to provisions granting the employer the right to take certain actions without further

*NLRB*, 668 F.3d 758, 768 (D.C. Cir. 2012) (recognizing a statement that "is unnecessary to the decision" is "dicta"); *NLRB v. Master Slack*, 773 F.2d 77, 82 (6th Cir. 1985) (holding that judge's finding "was not essential to either his order or the Board's order; it was mere dicta"); *NLRB v. Browning-Ferris Industries*, 691 F.2d 1117, 1123 (3d Cir. 1982) (finding joint employer analysis to be dicta where the employers were found to be a single employer).

[40] Ordinary principles of contract law include a number of interpretive canons, and the contract coverage standard applies those too. See *Conoco Inc. v. NLRB*, 91 F.3d 1523, 1527 (D.C. Cir. 1996) (finding that "a specific provision in a [contract] will control over a generalized provision in a management rights clause"), denying enf. to 318 NLRB 60 (1995); *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 313 (D.C. Cir. 2003) ("[T]he canon of *ejusdem generis* (of the same kind or class) counsels against . . . reading [a] general phrase to include conduct wholly unlike that specified in the immediately preceding list of prohibited acts.") (internal quotation omitted), enfg. 334 NLRB 304 (2001); *IBEW Local 43 v. NLRB*, 9 F.4th 63, 75 (2d Cir. 2021) (noting that "specific terms and exact terms are given greater weight than general language"), remanding 371 NLRB No. 110 (2022).

bargaining. Applying the same standard when determining the scope of those rights promotes the collective bargaining process by ensuring that both parties receive the benefit of their bargain. *MV Transportation,* slip op. at 6.

The contract coverage standard also conforms to the Congressional policy of free collective bargaining, under which "the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." See *American National Insurance*, 343 U.S. at 404. Applying a more restrictive standard to management rights provisions, in contrast, would necessarily represent a "judgment" that they are disfavored, a power the Board does not have. See *MV Transportation,* slip op. at 4.

In addition, the contract coverage standard properly balances the statutory policy of "encouraging the practice and procedure of collective bargaining" with the intent of Congress to stabilize collective bargaining agreements during their term. After all, Congress intended collective bargaining to be "a process that looked to the ordering of the parties' industrial relationship through the formation of a contract." *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960). Section 8(d) of the Act codifies Congress' intent to stabilize agreements by imposing multiple requirements on any party that seeks to modify or terminate them. *MV Transportation,* slip op. at 5. Section 8(d) was added to the Act in 1947 for the express purpose of repudiating Board decisions holding that an employer was under a continuous duty to bargain even over matters that were covered by the contract.[41] It would contravene that principle to hold that even where a change is covered by a provision in a collective-bargaining agreement an employer must nevertheless bargain over it.[42]

III. THE MAJORITY'S *DICTA* FAILS TO PROVIDE A COMPELLING JUSTIFICATION FOR OVERRULING *MV TRANSPORTATION* IN A FUTURE APPROPRIATE CASE

In dicta, my colleagues explain why they believe that the "clear and unmistakable waiver" standard is preferable to the contract coverage standard. Under the former standard, provisions granting an employer discretion to make changes in terms and conditions of employment are deemed ineffective unless the provision "unequivocally and specifically" expresses the parties' "mutual intention to permit unilateral employer action with respect to a particular employment term." *Provena St. Joseph Medical Center*, 350 NLRB 808, 811 (2007). The waiver standard, however, expressly refuses to give effect to the intent of the parties as determined by applying ordinary principles of contract law. Id. at 814 ("The waiver standard, however, does not involve merely [sic] a question of contract interpretation, in the sense of determining what the contract means and whether it has been breached. Rather, the waiver standard reflects the Board's interpretation of the statutory duty to bargain during the term of an existing agreement.") Therefore, even though, as I have discussed, the courts have established that collective-bargaining agreements are to be interpreted consistent with common law principles, the waiver standard ignores that clear directive.[43]

My colleagues cite no intervening development as justification for their view that *MV Transportation* should be overruled in a future appropriate case. The majority claims that "the contract coverage standard creates an escape hatch for employers to avoid their bargaining obligations during the term of a collective-bargaining agreement," but they cite no case in which the application of that standard led to such an outcome. The Board has applied *MV Transportation* in at least six cases, but the majority does not claim, much less show, that any of *those* decisions reached a result that was unreasonable in their view.[44] Nor has any court so much as questioned the *MV*

[41] See *NLRB v. Jacobs Mfg.*, 196 F.2d 680, 683 (2d Cir. 1952).

Sec. 8(d) relevantly provides that the duty to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract."

[42] Indeed, my colleagues' attempt to apply the clear and unmistakable waiver standard to the instant case demonstrates how that standard serves to deny parties the benefit of their bargains. Here, Art. III of the parties' contract unequivocally authorizes the Respondent "to make shop rules and regulations, to create new jobs, develop new processes, and implement changes in equipment." In *dicta,* my colleagues conclude that this provision "lacks the degree of specificity required to constitute a clear and unmistakable waiver of the Union's right to bargain over the installation and use of cameras to monitor and potentially discipline the unit employees" because it "does not refer in any way to video and audio monitoring or the surveillance of employees. It also makes no specific reference to the use of video or audio recordings as a basis for disciplining or coaching employees." Of course, Art. III did not make any "specific reference" to any other type of equipment either. Taken at face value, then, the majority has interpreted a clause stating that the Respondent *has* the right "to implement changes in equipment" to in fact mean that "the Respondent *does not have* the right to implement changes in *any* equipment." Under my colleagues' reasoning, unions are free, as part of the give and take of negotiating, to grant employers the right to effect certain changes but then are free to revoke the employer's benefit of the bargain should the employer ever attempt to assert the right granted to them. Not only is this an unreasonable interpretation of the agreement before us, but affording one party the ability to ignore a provision contained in the parties' contract is usually viewed as a mid-term modification, not as a valid interpretation of the parties' contract. It is that result, not the contract coverage standard, that undermines, "the Act's fundamental policy of encouraging . . . the procedure of collective bargaining to reduce industrial strife."

[43] Even so, the majority defends the waiver standard on the basis that it "protect[s] employees from unilateral changes in mandatory subjects of bargaining as to which no mutual understanding was reached." In determining whether a "mutual understanding was reached," courts apply ordinary principles of contract law. There is no valid basis for the majority's claim that those principles are insufficient for that purpose.

[44] *Twinbrook OPCO, LLC*, 373 NLRB No. 6, slip op. at 2–3 (2023); *ExxonMobil Research & Engineering Co.*, 372 NLRB No. 138, slip op.

*Transportation* standard. Indeed, the Second Circuit approved *MV Transportation* as "thorough and carefully reasoned." *Electrical Workers IBEW Local 43 v. NLRB*, 9 F.4th at 72.

Instead, my colleagues defend their position by asserting that replacing the contract coverage standard with the clear and unmistakable waiver standard respects the statutory policy favoring collective bargaining. Nothing could be further from the truth. Respect for the statutory policy favoring collective bargaining *inherently* includes respect for the final product of the parties' collective bargaining. Put another way, I do not see how the Board is encouraging parties to reach agreement through collective bargaining when, after that process is complete, the Board can step in after the fact and interpret a provision so that the parties' agreement, as memorialized in writing and as analyzed according to ordinary rules of contract interpretation, is overruled.

In this regard, the clear and unmistakable waiver standard represents an irrebuttable presumption that a contract provision does not authorize unilateral action unless it does so with exacting specificity. But the validity of any Board-adopted presumption "depends upon the rationality between what is proved and what is inferred." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 805 (1945); see also *NLRB v. Baptist Hospital*, 442 U.S. 773, 787 (1979) ("It is, of course, settled law that a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts."). The clear and unmistakable waiver standard fails that test. There is no "sound factual connection" between the fact that a management-rights provision grants an employer the authority to act unilaterally in general terms and the inference that the parties therefore did not intend it to have any effect in specific situations.[45]

The Supreme Court rejected a similar judicially-crafted presumption in *M & G Polymers*. There, the Court rejected the Sixth Circuit's presumption that retiree health care benefits are vested. As the Court observed, that presumption had no basis in ordinary principles of contract law, distorted the inquiry into the intent of the parties, and improperly "derived its assessment of likely behavior not from record evidence, but instead from [the court's] own suppositions about the intentions of employees, unions, and employers negotiating retiree benefits." 574 U.S. at 438–439. The Court also emphasized that "[a]lthough a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case." Id. at 439.

Like the Sixth Circuit presumption condemned by the Court in *M & G Polymers,* the waiver standard's presumption is not based on any record evidence of industrial bargaining practices in this or any other case. Rather, the presumption is based on the Board's "own supposition[]" that employers and unions intend management-rights provisions to have no meaning unless they address a disputed change in specific terms. *M & G* Polymers, 574 U.S. at 439. As a result, the waiver standard "violates ordinary contract principles by placing a thumb on the scale" and "distorts the attempt to ascertain the intention of *the parties*." Id. at 438 (internal quotations omitted). As the Court recognized, "[i]n this endeavor, as with any other contract, the parties' intentions control." Id. at 435 (internal quotation omitted). Because the waiver standard contradicts the Supreme Court's holding in *M & G Polymers,* it cannot stand.[46]

*C & C Plywood*, 385 U.S. 421 (1967), on which the majority principally relies, does not compel a different result. There, the Board applied the clear and unmistakable waiver standard to interpret a contractual provision granting an employer the "right to pay a premium rate over and above the contractual classified wage rate to reward any particular employee" as not authorizing the employer's unilateral institution of a premium pay rate to all members of a glue spreader crew. See *C & C Plywood*, 148 NLRB 414–417 (1964), enf. denied 351 F.2d 224 (9th Cir. 1965).

---

at 4 (2023); *Hospital de la Conception*, 371 NLRB No. 155 (2022), enfd. 106 F.4th 69 (D.C. Cir. 2024); *Michigan Bell Telephone Co*., 369 NLRB No. 124, slip op. at 2–3 (2020); *ABF Freight System, Inc*., 369 NLRB No. 107, slip op. at 3 (2020); *Huber Specialty Hydrates, LLC*, 369 NLRB No. 32, slip op. at 3 (2020).

[45] The majority asserts that the waiver standard cannot be characterized as an irrebuttable presumption because it is an affirmative defense. The majority cites no precedent to support this semantic wordplay and for good reason. The fact that the waiver standard is applied to evaluate an affirmative defense does not change the fact that it constitutes an irrebuttable presumption that a contract does not authorize unilateral action unless it does so with explicit precision.

[46] The majority acknowledges, as they must, that "ordinary principles of contract law are not the only consideration" under the waiver standard. This view, however, is in conflict with the clear directive in *M & G Polymers* to interpret collective-bargaining agreements using those principles. In fact, the waiver standard's demand for exacting specificity effectively overrides ordinary principles of contract law to the extent that the waiver standard considers them at all.

Undeterred, my colleagues vainly seek to square their decision today with *M & G Polymers* by asserting that *M & G Polymers* was not an unfair labor practice case. But the dispositive issue under both the waiver *and* contract coverage standards is how the Board should interpret a collective-bargaining agreement to determine the intent of the parties. And *M & G Polymers* does speak to that.

Nor is there any merit to the majority's claim that *M & G Polymers* is inapplicable because the application of ordinary principles of contract interpretation by the Board would contravene federal labor policy. See *M & G Polymers USA,* 574 U.S. at 435 (stating that "[w]e interpret collective-bargaining agreements . . . according to ordinary principles of contract law, *at least when those principles are not inconsistent with federal labor policy*") (emphasis added). Instead, the application of ordinary principles of contract law is consistent with federal labor policy for the reasons I have already explained. Indeed, federal labor policy requires their application, as the District of Columbia, First, and Seventh Circuits have repeatedly held. See also *PG Publishing, Inc. v. NLRB*, 83 F.4th 200 (applying ordinary contract principles to interpret expired collective-bargaining agreement); *Finley Hospital v. NLRB*, 827 F.3d 720 (8th Cir. 2016) (same).

The Supreme Court granted certiorari to consider a limited question—whether "the Board is without power to decide any case involving the interpretation of a labor contract." 385 U.S. at 427. Answering that question, the Court held that the Board has the authority to interpret collective-bargaining agreements to the extent necessary to resolve unfair labor practice cases. Id. at 426–428. To be sure, the Court affirmed the Board's interpretation of the contractual provision at issue and the Board applied a clear and unmistakable waiver standard. But the Court's ultimate task in *C & C Plywood* "was [to determine] whether the Board has the authority to interpret collective-bargaining agreements, not *how* the Board should do so." *MV Transportation*, slip op. at 10.

Moreover, the Court's own brief examination of the contract language at issue in *C & C Plywood* refutes my colleagues' assertion that the Supreme Court has required the level of specificity and precision that the clear and unmistakable waiver standard requires. To the contrary, the Court observed that "the disputed contract provision referred to increases for 'particular employee(s),' not groups of workers" and that "there was nothing in it to suggest that the carefully worked out wage differentials for various members of the glue spreader crew could be invalidated by the respondent's decision to pay all members of the crew the same wage." *C & C Plywood*, 385 U.S. at 431. This analysis closely tracks the ordinary principles of contract interpretation applied under the contract coverage standard.[47]

*C & C Plywood,* moreover, must also be understood in light of subsequent Supreme Court precedent holding that federal courts have the primary authority to interpret collective-bargaining agreements and that collective-bargaining agreements must be interpreted using ordinary principles of contract law. *M & G Polymers*, 574 U.S. at 435 (discussing application of ordinary principles of contract law); *Litton Financial Printing Division*, 501 U.S. at 202-203 (holding courts have primary jurisdiction over contract interpretation). For all of these reasons, *C&C Plywood* simply cannot bear the weight the majority places on it.

This conclusion is reinforced by the *C & C Plywood* Court's citation to Archibald Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1 (1958). See 385 U.S. at 430. That article espouses the importance of applying ordinary principles of contract interpretation to the interpretation of collective-bargaining agreements, denounces the use of a waiver analysis for contract interpretation purposes, acknowledges "that many provisions of the labor agreement must be expressed in general and flexible terms," and that "[m]anagement and labor are certainly free to bring some areas of mutual concern under the regime of collective bargaining and to assign others exclusively to management." Cox, supra at 4, 16–19, 23, 32. The article continues, "[t]his is true as a matter of legal theory, and the freedom is exercised as a matter of practical living" and that "[e]ven a vague management-functions clause suggests that the boundaries [of the matters subject to bargaining] may be narrower than under a contract without it." Id. at 32, 35-36. The *C & C Plywood* Court cited that article as an illustration of the context in which collective-bargaining agreements are negotiated and those observations support a contract coverage approach far more readily than they do a waiver analysis.[48]

To be sure, the Supreme Court has held that a collective-bargaining agreement may not properly be construed to waive employees' rights under Section 8(a)(3) of the Act unless it does so in specific terms.[49] The majority posits that the same standard should apply in determining whether a union has "waived" its right to bargain under Section 8(a)(5). But that is simply not the case where, as here, the issue is solely whether the disputed action is an unlawful unilateral change. As the D.C. Circuit has repeatedly noted, "when a contract's terms cover a mandatory subject of bargaining, the contract represents the result of the union's exercise of its bargaining rights. . . . An employer cannot be deemed to have 'refuse[d] to bargain collectively,' 29 U.S.C. § 158(a)(5), over a particular subject when it has bargained over that subject matter and memorialized the results in a contract." *Honeywell International Inc. v. NLRB,* 253 F.3d 119, 124 (D.C. Cir. 2001). Rather, "[w]hen an 'employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue.'" Id. (quoting *NLRB v. Postal Service*, 8 F.3d 832, 837 (D.C. Cir.1993)). For these reasons, the question of whether an employer has satisfied its duty to bargain by entering into a collective-bargaining agreement does stand on a different footing, for contract interpretation purposes, than the question of whether a particular contract provision waives rights under other provisions of the Act.[50]

---

[47] See cases cited in footnote 44, supra.

[48] Contrary to the majority's suggestion, the *C & C Plywood* Court's observation that "the law of labor agreements cannot be based upon abstract definitions unrelated to the contract in which the parties' bargained" does not support the level of specificity and precision that the clear and unmistakable waiver standard requires. See 385 U.S. at 430.

[49] *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983) (holding that employer violated Sec. 8(a)(3) of the Act when it disciplined union officials more severely than its other employees for engaging in a work stoppage that violated a no-strike clause); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 281-284 (1956) (holding that no-strike clause did not waive employees' right to engage in an unfair labor practice strike).

[50] The cases cited by the majority are not to the contrary, as none of these cases involved the question of whether a disputed unilateral change was authorized by a collective-bargaining agreement. See, e.g., *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 252, 260 (2009) (enforcing a contractual provision waiving a union's statutory right to a judicial forum for an Age Discrimination in Employment Act (ADEA) claim, where the provision stated, "all [ADEA] claims shall be subject to the grievance and arbitration procedure . . . as the sole and exclusive remedy for

Of course, a collective-bargaining agreement cannot reasonably be read to authorize an employer's action if it is truly silent as to the disputed issue under any standard of interpretation. That was the case in *Tide Water Associated Oil Co.*, 85 NLRB 1096 (1949), cited by the majority as an early example of the Board's analysis that ripened into the clear and unmistakable waiver standard. There, the Board rejected an employer's argument that its refusal to bargain with a union over its pension plan (the Retirement Allowance Plan) was lawful based on the "Management Functions" clause of the parties' agreement. That clause provided that the "management of the Refinery and the direction of the working forces and the operations at the Refinery, including the hiring, promotion, demotion, transferring and retiring of Employees . . . are the exclusive functions of the Management of the Company." Id. at 1098 fn. 4. As the trial examiner properly recognized, the reference to "retiring of Employees" simply gave the employer "the right to determine *when* an employee's services shall be terminated because of age." Id. at 1121. Otherwise, the contract said nothing about the terms of any pension plan that governed the benefits to be paid to such an employee upon retirement, much less whether the employer had a duty to bargain over those terms.[51] Id. at 1098.

Although the Board's analysis of the contractual issue in *Tide Water* concluded that there was no "specific waiver of the [u]nion's right to bargain on the Retirement Allowance Plan," it cannot be disputed that the contract at issue was entirely *silent* on the subject matter at issue. Absent any contractual sanction for the refusal to bargain, then, the issue *was* one of waiver. Accord *MV Transportation*, slip op. at 12 (holding that the waiver standard applies when a contract does not cover a unilateral change). In sum, *Tide Water* provides no support for the majority's insistence that a management-rights provision that *does* refer to the type of change at issue must be deemed ineffective unless it does so with the level of specificity that the clear and unmistakable waiver standard requires.[52]

According to the majority's own history of the clear and unmistakable waiver standard, then, it has evolved from a (reasonable) insistence that contractual authority cannot be inferred from contractual silence in *Tide Water Oil* to an (unreasonable) insistence that contractual authority requires exacting specificity even where the contract is not silent in *Provena*—such that even a contractual right to make changes in "equipment" is insufficient because no specific type of equipment is specified. My colleagues cite no case in which the Board has even acknowledged this shift, much less any valid justification for it. Accordingly, this appears to be another instance of what the D.C. Circuit has described as "a familiar phenomenon" for the Board. *Stern Produce*, 97 F.4th at 11 (internal quotations omitted). Specifically, the court noted that "years ago the Board took an expansive view of the scope of the Act and then, over time, it presse[d] the rationale of that expansion to the limits of its logic. The Board then focused its analysis here not on the statutory text—the 'authoritative source of the law'—but on its own constructions of (its own constructions of) the Act." Id. (citations omitted).

---

violations"); *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 79–82, (1998) (finding no waiver of employees' right to a judicial forum for employment discrimination claims where a clause required arbitration of "[m]atters under dispute" but contained no mention of any antidiscrimination statutes); *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) (stating, in dicta, that a union's purported waiver of state law protections would have to be clear and unmistakable before a court could even consider whether to give it effect); and *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 409 fn. 9 (1988) (same).

[51] A separate section of the "Management Functions" clause provided, "[t]his Agreement shall in no way affect the operation of, or the status of any Employee with respect to, any welfare or benefit plan of the Company . . . that may be in effect during the term hereof. Such plans at the present time are . . . the Retirement Allowance Plan." Id. at 1098 fn. 4. Although this provision did mention the pension plan, it did not state that the employer had any right to act unilaterally with respect to it. It merely provided that the contract did not "affect the operation of" the plan. If anything, that provision confirmed that the parties had *not* contractually agreed that the employer could act unilaterally with respect to the plan.

[52] My colleagues contend that "the employer in *Tide Water*, like the Respondent in this case, argued that its unilateral conduct was privileged by a management-rights clause." One problem with that contention, of course, is that the Respondent in the instant case did not engage in any "unilateral conduct" that affected employees' terms and conditions of employment without bargaining with the Union. But putting that aside--assuming that one can put aside the determinative fact in a case--it could not be more clear that the contract language and bargaining history at issue in *Tide Water* are different from those present here. To begin, the management-rights clause in *Tide Water* was written *after* the respondent had attempted, and failed, to reach agreement with the union on making revisions to the pension plan at issue. In addition, the Board correctly found that the contract in *Tide Water* did not contain any language that could be reasonably read as granting the respondent the right to unilaterally revise the employees' pension plan. By contrast, the language in the contract at issue here expressly grants the Respondent the right both to "implement changes in equipment," which could reasonably be read to include the installation of new camera equipment, and the right to make "changes . . . or improvements . . . in the interest of improved methods and product," which again could be reasonably read to cover the installation of the cameras.

It is clear that my colleagues view the difference in the management-rights clauses in *Tide Water* and the instant case as a distinction without a difference. Throughout the decision, they talk about, and cite cases referring to, issues "on which the contract is silent." In my view, contracts are silent when they cannot be reasonably read as covering the area at issue. Apparently, my colleagues' view is that, even when the parties have included language in a management-rights clause that would be reasonably read to grant the employer the right to act unilaterally, the contract is "silent" unless the right to act in a certain way is specifically and precisely articulated. This simply cannot be right, however. For example, let's assume parties include a sentence in the management-rights clause granting the employer the right to "recognize employee achievements" during the term of the contract. Under my colleagues' logic, the employer would be violating the Act by unilaterally giving an employee a plaque because the contract did not include a provision expressly allowing the employer to give out plaques. Perhaps this is my colleagues' intent: to eliminate the ability of employers to exercise the rights afforded to them in management-rights clauses that the parties bargained over and approved. Not only do I believe this is bad policy, but I do not believe that there is a chance it will survive judicial review.

The majority gains no ground insofar as they claim to be interpreting the statutory duty to bargain rather than the language of the contract. Congress has already defined the duty to bargain in Section 8(d) of the Act.[53] Although Section 8(d) requires both parties to execute "a written contract incorporating any agreement reached if requested by either party," it does not require that the parties' "written contract" address the subject of management rights or any other subject with specificity in order for it to have legal effect. And the Board lacks the authority to expand on the definition of the duty to bargain as provided by Congress. Efforts by the Board to do so in the past have been roundly rejected. See *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 102 (1970) (holding that the Board lacked the authority to interpret the duty to bargain as requiring an employer to agree to dues checkoff provision); *NLRB v. Insurance Agents' International Union,* 361 U.S. at 487 (holding that the Board lacked the authority to interpret the duty to bargain as prohibiting the use of certain forms of economic pressure to enforce a party's demands); *American National Insurance*, 343 U.S. at 404 (holding that the Board lacked the authority to interpret the duty to bargain as prohibiting insistence on management rights provisions). I believe the Board should learn from that experience. Instead, in their *dicta*, the majority doubles down.[54]

The Act is designed to promote a "policy of free collective bargaining. . . . [T]he parties' agreement primarily determines their relationship. . . . If the parties' agreement specifically resolves a particular issue, the courts cannot substitute a different resolution." *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 218–219 (1979). That principle applies with equal force to management-rights provisions, as the Supreme Court has squarely held. See *NLRB v. American National Insurance Co.*, 343 U.S. at 409 ("Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board."). The contract coverage standard respects that principle, while the waiver standard explicitly rejects it. The waiver standard also subverts the Congressional policy in favor of stabilizing collective-bargaining agreements by increasing the circumstances in which parties would be required to engage in mid-term bargaining. As the Board recognized in *Provena,* and the majority reiterates today, the waiver standard results in more midterm bargaining not less. My colleagues may view this as good policy, but Congress has made a different choice. See *MV Transportation,* slip op. at 5.

The waiver standard is also in tension with Section 8(d)(4) of the Act. Section 8(d)(4) relevantly states that the statutory duty to bargain "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." Obviously, a management-rights clause is a term and condition of employment "contained in a contract." Requiring an employer, during the term of the agreement, to bargain over an action that is covered by that clause, on the premise that the clause does not explicitly address the action, flies in the face of the admonition that such discussions are not required.

*Jacobs Mfg. Co.*, 94 NLRB 1214 (1951), enfd. 196 F.2d 680 (2d Cir. 1952), cited by the majority, is not to the contrary. There, the Board held that Section 8(d) did not absolve the employer of its statutory obligation to bargain over the subject of pensions during the term of the parties' agreement because the contract was silent on the issue of pensions. Id. at 1217. As the majority notes, the Second Circuit held that Section 8(d) used "precise and explicit" language to limit the scope of the bargaining obligation but was not meant to "relieve[] an employer of the duty to bargain as to subjects which were *neither* discussed *nor* embodied in any of the terms and conditions of the contract." 196 F.2d at 684 (emphasis added). Nothing in that case, however, suggested that the court viewed Section 8(d) as requiring a party to bargain over a subject matter—here, the introduction of new equipment—that *was* discussed and *was* embodied in the parties' contract. Nor is there anything in *Jacobs* to suggest that subjects that are embodied in the parties' contract in a management rights clause do not constitute subjects embodied in that contract for the purposes of Section 8(d).

[53] Sec. 8(d) relevantly provides that "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party."

[54] Contrary to the majority's representation, cases that address the scope of the duty to bargain over proposals that grant an employer discretion over terms and conditions of employment have no bearing on how those provisions should be interpreted once lawful agreement is reached. See, e.g., *Altura Communication Solutions, LLC*, 369 NLRB No. 85 (2020) (finding bad-faith bargaining in part on the basis of proposals granting employer unilateral control over wide range of employment terms), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *McClatchy Newspapers, Inc.*, 321 NLRB 1386, 1390–1391 (1996) (finding employer could not lawfully implement discretionary merit pay proposal after bargaining to impasse) (footnotes and citations omitted), enfd. in pert. part 131 F.3d 1026 (D.C. Cir. 1997). The same is true for decisions addressing the extent to which management-rights provisions survive contract expiration. See *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 369 NLRB No. 61, slip op. at 2–3 (2020) (finding management-rights clause did not survive contract expiration as part of the statutory status quo absent an explicit agreement to the contrary), enfd. 4 F.4th 801, 811 (9th Cir. 2021). The sole issue in those cases is the scope of the statutory duty to bargain, an issue over which the Board has primary jurisdiction. But the Board does not have primary jurisdiction over issues of contract interpretation. Nor does it have the power to substitute its judgment of the meaning of contract provisions for the meaning that the parties intended, for all the reasons stated above.

IV. ABANDONMENT OF THE CONTRACT COVERAGE TEST IN FAVOR OF THE WAIVER STANDARD IN A FUTURE APPROPRIATE CASE WOULD RENDER ANY DECISION ISSUED BY THE BOARD APPLYING THAT STANDARD POTENTIALLY UNENFORCEABLE

In light of these compelling considerations, it is no wonder that the First, Seventh, and D.C. Circuits have all rejected the waiver standard in favor of the contract coverage standard. See *Bath Marine Draftsmen's Assn. v. NLRB*, 475 F.3d 14, 25 (1st Cir. 2007) ("[W]e adopt the District of Columbia Circuit's contract coverage test . . ."); *Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 937 (7th Cir. 1992) ("We agree, therefore, that 'where the contract fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining, it is incorrect to say that the union has 'waived' its statutory right to bargain; rather the contract will control and the 'clear and unmistakable' intent standard is irrelevant.'" (quoting *Local Union No. 47 v. NLRB*, 927 F.2d 635, 641 (D.C. Cir.1991)); *NLRB v. Postal Service*, 8 F.3d 832, 836 (D.C. Cir. 1993) ("[W]here the matter is covered by the collective bargaining agreement, the union has exercised its bargaining right and the question of waiver is irrelevant." (internal quotation omitted)).[55]

My colleagues concede that the established law in these circuits has expressly rejected the "clear and unmistakable" waiver standard that they apparently intend to adopt in a future appropriate case. Nevertheless, they contend, essentially, that those circuits are all wrong and have issued decisions that are inconsistent with Supreme Court law. With all due respect to my colleagues, I do not believe that the courts will view that argument favorably, nor would I want to be the agency attorney tasked with taking that position in oral argument in light of the D.C. Circuit's clear rejection of the "clear and unmistakable waiver" standard, longstanding adherence to the "contract coverage" standard, and recognition that the court owes no deference to the Board in interpreting labor contracts.[56] See *NLRB v. Postal Service*, 8 F.3d 832, 837 (D.C. Cir 1993) (citing Supreme Court law and concluding that the court "accord[s] no deference to the Board's interpretation of labor contracts" because such deference "would risk the development of conflicting principles for interpreting collective bargaining agreements").

My colleagues also cite the fact that "aggrieved parties can and do seek review in various circuits," that "the Board, too, is not limited to a single circuit in seeking enforcement," and that "the Board thus cannot render its decisions with an eye only to one particular circuit court's views." Although the first statement is true, I do not believe that there is anything in this dissent that is contrary to that assertion. Indeed, my reasoning is based in large part on the fact that, because parties can choose which circuit in which to seek review, any respondent presumably will seek review in the circuit with the most favorable law. Accord *Heartland Plymouth*, 838 F.3d at 26 ("There is no reason to think that Heartland would seek appellate review in a circuit where it would almost certainly lose."). But my colleagues' suggestion that the Board "cannot render its decisions with an eye only to one particular circuit court's views" is simply false.

My colleagues are pointedly ignoring the critical fact that *any* party can seek review in the D.C. Circuit and, for that reason, the Board's consideration of the law of that circuit is markedly different from the other circuits. Indeed, contrary to my colleagues' assertion, the Board *does* issue decisions with a "particular eye" to the law in the D.C. Circuit. For example, the D.C. Circuit has established that, in order for an affirmative bargaining order to be enforced, the Board must include a specific analysis defending the order. Accordingly, in light of D.C. Circuit law, the Board has made a point of including the analysis required by that court in cases ordering affirmative bargaining orders. My colleagues recently recognized this by including the analysis required by the D.C. Circuit in *Columbus Electric Cooperative, Inc.*, 372 NLRB No. 89 (2024).[57]

---

[55] I further note that the Second Circuit rejected the waiver standard in favor of a modified contract coverage standard in a case that issued prior to *MV Transportation*. See *Electrical Workers Local 36 v. NLRB*, 706 F.3d 73, 83–85 (2d Cir. 2013), cert. denied 573 U.S. 958 (2014). More recently, the Second Circuit has adopted the Board's contract coverage test, calling it "thorough and carefully reasoned." *Electrical Workers*, 9 F.4th at 77. It remains to be seen how that court will view the majority's about-face in this case.

[56] Although the Respondent could seek review in the Sixth Circuit, I am assuming that it will seek review in the D.C. Circuit, where the law is most favorable to the Respondent's position. And, beyond the circuit courts, if my colleagues believe that their interpretation of Supreme Court precedent would survive review by that Court, I cannot say that I share their optimism.

[57] Specifically, that case includes the following standard language:

> Having found that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union in good faith during first contract negotiations, the judge recommended an affirmative bargaining order to remedy this unlawful conduct. For the reasons set forth in *Caterair International*, 322 NLRB 64 (1996), we agree that an affirmative bargaining order is warranted in this case as a remedy for the Respondent's unlawful failure and refusal to bargain in good faith. The Board has consistently held that an affirmative bargaining order is "the traditional, appropriate remedy for an 8(a)(5) refusal to bargain with the lawful collective-bargaining representative of an appropriate unit of employees." Id. at 68.
>
> In several cases, however, the United States Court of Appeals for the District of Columbia Circuit has required that the Board justify, on the facts of each case, the imposition of such an order. See, e.g., *Vincent Industrial Plastics v. NLRB*, 209 F.3d 727, 738–740 (D.C. Cir. 2000); *Lee Lumber & Building Material Corp. v. NLRB*, 117 F.3d 1454, 1460–1462 (D.C. Cir. 1997); *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1248–1249 (D.C. Cir. 1994). In *Vincent*, supra, 209 F.3d at 738, the court summarized its requirement that an affirmative bargaining order "must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' [Section] 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act."

Finally, my colleagues take the position that my position in inconsistent with the Board's doctrine of nonacquiescence. As I have discussed, the Board's adoption of the analysis required in affirmative bargaining order cases by the D.C. Circuit—even though it disagrees with the need for that analysis—in all cases ordering that remedy shows that the doctrine of nonacquiescence has a clear asterisk where the D.C. Circuit is involved. But, more importantly, the D.C. Circuit has made clear that it has little patience for the Board's assertion of nonacquiescence with regard to the court's established contract coverage doctrine. The court has stated, "Facts may be stubborn things, but the Board's longstanding 'nonacquiescence' towards the law of any circuit diverging from the Board's preferred national labor policy takes obduracy to a new level." *Heartland Plymouth*, 838 F.3d at 18; see also id. at 20–21 (noting that, in opposing the petition for review, "the Board referenced its general policy of flouting any circuit's NLRA interpretation with which the Board disagrees--a policy described colloquially as "nonacquiescence"). Notably, the court explains that "any nonacquiescence depends upon the agency actually seeking Supreme Court review of adverse decisions." Id. at 22. Given that, even following the *Heartland Plymouth* decision, the Board has declined to seek *certiorari* on the issue, I am not optimistic that the Board's nonacquiescence argument will prevent the Board from facing sanctions from a panel of the D.C. Circuit should we seek enforcement of this case in that circuit. Nor do I believe that a similar nonacquiescence argument will be persuasive in any other circuit that has definitively established contract coverage as the law of the circuit.

Accordingly, if my colleagues do ultimately overrule *MV Transportation* and reinstate the "clear and unmistakable waiver" standard, we will be faced with the same scenario that prompted the Board to issue *MV Transportation* in the first place: once again, the Board will waste valuable agency resources issuing cases that are unenforceable, at best, and that will possibly subject the agency to the imposition of sanctions, at worst.[58]

Despite the fact that my colleagues have to recognize that any future Board decision that reinstates the waiver standard can be appealed to the D.C. Circuit, and that the court will not enforce any such cases, they nevertheless believe that the change in law will be warranted, claiming that the Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits "have consistently deferred to the Board's clear and unmistakable waiver standard as a rational and permissible interpretation of the Act." Notably, however, the cases they cite in support all predate the Supreme Court's issuance of *M & G Polymers* in 2015. But, even on their own terms, the court decisions cited by the majority do not endorse the notion that a provision must have the specificity my colleagues demand before it will be given effect. In one of those cases, in fact, the court held that the contract did authorize the employer's actions.[59] Another case cited by the majority found no waiver where the contract was silent on the disputed issue.[60] Indeed, the majority fails to cite any case in which any court has endorsed the specificity that they assert, in *dicta*, that the clear and unmistakable waiver standard requires.[61]

Conclusion

My colleagues have made clear that they believe that *MV Transportation* should be overruled and that the Board

Although we respectfully disagree with the court's requirement for the reasons set forth in *Caterair*, supra, we have examined the particular facts of this case as the court requires and find that a balancing of the three factors warrants an affirmative bargaining order.

*Columbus Electric Cooperative*, 372 NLRB No. 89, slip op. at 2.

[58] I note that the scope of wasted agency resources would exceed even the waste of agency resources involved in issuing a case discussing *MV Transportation* in a case that does not present that issue.

My colleagues state that their decision aims "to respectfully respond to the criticism of those circuits" and to "contribute to the resolution of the current split among the circuits." I have not challenged that this is their intention. But, again, this stated intention amounts to nothing more than a gentler way of saying "we are going to go into court and explain to the federal judges in the Circuits at issue why they have been misinterpreting Supreme Court precedent and why their decisions have been inconsistent with the policies of the Act." I do not think there is any chance that the Board will be successful in convincing these circuits, who have *repeatedly* rejected the "clear and mistakable waiver," that they were wrong all along.

[59] See *Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 693, 697 (10th Cir. 1996) (holding that provision permitting an employer to "pay wages in excess of the minimum requirements . . . to one or more employees in different amounts to different employees" authorized the employer "to implement raises unilaterally during the term of the contract").

[60] *American Oil Co. v. NLRB*, 602 F.2d 184, 188–189 (8th Cir. 1979) (finding contract did not authorize unilateral change to work schedules where it was silent on that issue).

[61] *Bonnell/Tredegar Industries v. NLRB*, 46 F.3d 339, 344 (4th Cir. 1995) (agreeing with the Board that the "plain meaning" of a provision stating a Christmas bonus plan would remain "in full force and effect" during the term of a contract did not permit an employer to unilaterally change a longstanding bonus formula, which was an implied term of the contract established by the parties' past practice); *Ciba-Geigy Pharmaceuticals Division v. NLRB*, 722 F.2d 1120, 1122–1123, 1127 (3d Cir. 1983) (finding that parties "did not bargain for an illusory contract;" a provision stating, "[c]onditions and standards already existing in the plant shall not be changed during the life of this agreement without the consent of the [u]nion, except for the purpose of improving the production or the efficiency of the plant" did not authorize employer's unilateral modification of a "detailed" provision covering absenteeism); *American Distributing Co. v. NLRB*, 715 F.2d 446, 449–450 (9th Cir. 1983) (holding that employer was not authorized to unilaterally cease pension contributions, after the parties' contract expired, based on a provision in the parties' pension certification stating the pension would expire when the contract terminated), cert. denied 466 U.S. 958 (1984); *Tocco Division v. NLRB*, 702 F.2d 624, 627–628 (6th Cir. 1983) (finding that provision stating "[i]n the event the company *determines* to . . . close or transfer a . . . department or operation . . . in whole or in part, Severance Allowances will be payable" did not authorize unilateral relocation of work); *Beverly Health & Rehabilitation Services v. NLRB*, 297 F.3d 468, 480 (6th Cir. 2002) (agreeing with the Board that a contractual provision waiving a union's right to bargain over a mandatory subject of bargaining does not survive contract expiration).

should return to the "clear and unmistakable" waiver test for determining whether parties' collective-bargaining agreements granted the employer the discretion to act unilaterally with regard to a change in employees' terms and conditions of employment.

What is also clear, however, is that this case does not present that question. To begin, the General Counsel alleged a failure to bargain over the "implementation" of the Lytx security system in trucks driven by unit employees, not a failure to bargain about any "decision." And the record establishes that the alleged implementation, with its resulting changes to employees' terms and conditions of employment, never occurred.

The record also reflects that the Respondent did, in fact, bargain with the Union over the issues, regardless of whether it had any duty to do so. On September 16—less than 5 weeks after the charge was reinstated by the General Counsel and a full week before the relevant complaint issued—the parties began bargaining over the issues when the Union offered its proposed MOU on the Respondent's "intent" to implement the Lytx security system in the unit employees' trucks. And the record establishes that, as a result of that bargaining, the parties signed a tentative Memorandum of Understanding that addressed concerns raised by the Union prior to the opening of the hearing in this matter. Again, because the Respondent *voluntarily bargained* with the Union prior to any implementation of the Lytx system in the unit employees' trucks, as alleged, the question whether or not the Respondent had a *duty* to engage in that bargaining--and what standard should be applied in answering that question—is not before us. And to the extent that my colleagues' decision depends, in any way, on their view that the evidence establishing the parties' bargaining over these issues is not sufficient, then, at the very least, they must remand this case to the judge with directions to allow the Respondent the opportunity, previously denied, to proffer evidence concerning the scope of the negotiations.

As my colleagues know, the Board has two avenues by which to enforce the Act and establish labor policy: as a quasi-judicial body, establishing new policy in the course of deciding individual cases under Section 10 of the Act, or by promulgating rules that apply prospectively under Section 6. Here, however, my colleagues are seeking to establish new policy (rejecting contract coverage in favor of the waiver standard) through a third avenue: by purporting to overrule precedent in a case that, simply put, does not present the issue. No precedent supports their use of this procedure. See *NLRB v. Bell Aerospace Co,* 416 U.S. 267, 291–295 (1974) (recognizing that the Board could change precedent regarding the managerial status of buyers in the course of adjudicating a case where the managerial status of particular buyers was at issue).

For all of the reasons explained above, I believe that the contract coverage standard best effectuates the policies of the Act, best conforms to current Supreme Court precedent, is the most reasonable standard to use in determining both the rights and the obligations of employers under a collective-bargaining agreement, and would, in the instant case, properly recognize that, if the Respondent had in fact implemented the Lytx security system in the bargaining-unit employees' trucks, it would have been entitled to do so based on the parties' agreement.

Accordingly, I would adopt the judge's dismissal of the failure to bargain allegation, and I will continue to apply *MV Transportation* until such time as my colleagues overrule that precedent either through rulemaking or through a case presenting that issue.

Dated, Washington, D.C. December 10, 2024

Marvin E. Kaplan, Member

NATIONAL LABOR RELATIONS BOARD

## APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT refuse to bargain collectively with Teamsters Local No. 100, an affiliate of the International Brotherhood of Teamsters, AFL–CIO (the Union) by failing and refusing to furnish it with requested information that is relevant and necessary to the Union's performance of its functions as the collective-bargaining representative of our unit employees.

WE WILL NOT change your terms and conditions of employment without first notifying the Union and giving it an opportunity to bargain.

WE WILL NOT fail and refuse to bargain with the Union, on request, concerning our decision to install cameras in vehicles driven by unit employees and the effects of our decision on unit employees' terms and conditions of employment.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL furnish to the Union in a timely manner the information responsive to Request 4 in the January 12, 2021 letter from Timothy Montgomery to Kevin Blackwell.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following bargaining unit:

> All employees including drivers, mechanics and loaders employed by the Employer at its Florence, Kentucky facility, excluding office clerical employees and all professional employees, guards and supervisors as defined in the Act.

WE WILL, on request by the Union, bargain concerning our decision to install cameras in vehicles driven by unit employees and the effects of our decision on unit employees' terms and conditions of employment.

ENDURANCE ENVIRONMENTAL SOLUTIONS, LLC

The Board's decision can be found at www.nlrb.gov/case/09-CA-273873 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

*Daniel A. Goode, Esq.,* for the General Counsel.
*William G. Miossi, Esq. (Winston & Strawn LLP),* of Washington, D.C., for the Respondent.
*Julie C. Ford, Esq. (Doll, Jansen & Ford),* of Dayton, Ohio, for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

PAUL BOGAS, Administrative Law Judge. I heard this case remotely using videoconferencing technology on November 17, 2021. Teamsters Local No. 100, an affiliate of the International Brotherhood of Teamsters, AFL–CIO (Local 100 or the Charging Party) filed the charge on March 3, 2021, and a copy was served on Endurance Environmental Solutions, LLC, (the Respondent or the Employer) on March 10, 2021. The Director of Region Nine of the National Labor Relations Board (the Board) issued the complaint and notice of hearing on May 14, 2021, and the amended complaint and notice of hearing (the complaint) on September 23, 2021. The complaint alleges that the Respondent violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act or NLRA): by making a unilateral decision to install security cameras and other surveillance devices in trucks operated by employees represented by Local 100; by refusing Local 100's requests to bargain over the installation of the security cameras; and by failing to furnish information requested by Local 100 about the cameras. The General Counsel argues, inter alia, that the facts present here warrant overruling the "contract coverage" standard for determining when a party has contractually waived bargaining over an issue, see *MV Transportation*, 368 NLRB No. 66 (2019), and returning to the standard that places the burden on the party asserting contractual waiver to show that the waiver was explicitly stated, clear and unmistakable, see *Metropolitan Edison Co.,* 460 U.S. 693, 708–709 (1983), *Quality Roofing Supply Co.*, 357 NLRB 789 (2011), *Provena St. Joseph Medical Center*, 350 NLRB 808, 810–811 (2007), and *Johnson-Bateman*, 295 NLRB 180, 184 (1989).

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel and the Respondent, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. JURISDICTION

The Respondent is a limited liability corporation with principal offices in the State of Illinois and a facility in Florence, Kentucky, that operates trucks that move garbage and refuse. In conducting these operations the Respondent annually performs services valued in excess of $50,000 in states other than the State of Illinois. The Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act, and that the Charging Party is a labor organization within the meaning of Section 2(5) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### *A. Background Facts*

The Respondent operates over-the-road tractor trailer trucks that transport trash to landfill sites. The Respondent has approximately 400 trucks at 22 locations across the United States. This litigation concerns alleged violations at one of those locations, the Respondent's facility in Florence, Kentucky. At that facility, Local 100 represents a bargaining unit of drivers, mechanics and loaders,[1] and the Respondent operates five or six trucks. The Respondent and Local 100 are parties to a collective bargaining agreement (CBA or contract) that was effective by its terms from September 24, 2018, to September 26, 2021.[2] Local 100 does

---

[1] The bargaining unit is defined as: All employees including drivers, mechanics and loaders employed by the Employer at its Florence, Kentucky facility, excluding office clerical employees and all professional employees, guards and supervisors as defined in the Act.

[2] The CBA identifies the employer as K.R. Drenth, which is usually referred to in the record by the initials KRD. On about August 28, 2020, K.R. Drenth was renamed Endurance Environmental Solutions, LLC – which is how it is identified in the complaint's caption. There is no dispute that the Respondent is the successor to K.R. Drenth and that the CBA continued in effect after the name change. Brief of Respondent at p. 3, fn. 3; Joint Exhibit Number(s) (Jt. Exh. 2 and 3); Transcript at page(s) (Tr. 66–67). The complaint alleges that Endurance Environmental continued as the employing entity, General Counsel Exhibit Number(s) (GC Exh.) 1(k) at par. 5, and, at trial, the Respondent confirmed that Endurance Environmental was the successor to K.R. Drenth and that the two were, in fact, one and the same business. (Tr. 66–67.) Given this, I refer to the employing entity throughout this decision simply as the Respondent, regardless of whether I am referencing the period when

not represent employees at any of the Respondent's other facilities, but at three of the Respondent's other facilities employees are represented by other union locals.

*B. Decision to Install Cameras in its Truck Fleet*

In August 2020, the Respondent decided to purchase a camera system for its entire fleet of about 400 trucks, including those five or six trucks driven by employees represented by Local 100. Transcript at page(s) (Tr. 57, 86.) The Respondent proceeded to purchase the system for 100 percent of its fleet. Ibid. This camera system includes both cameras directed at the driver and cameras directed outward, and makes both video and audio recordings. Although the cameras record continuously, the system deletes the recordings on an ongoing basis and only preserves what it has recorded if there is a triggering event such as a collision, hard breaking, or a sudden lane change. When triggered by such an event, the camera system retains the video and audio recording of the period starting 10 seconds before the event and ending 5 seconds after the event. The Respondent states that it decided to install the cameras in order to address concerns about liability from accidents and lawsuits, and that it will use the recordings to, inter alia, initiate driver coaching or disciplinary action as appropriate. (Tr. 56, 96, 125.)

Timothy Montgomery is the only Local 100 business agent responsible for servicing the unit employees at the Florence facility. He testified that the Respondent did not provide Local 100 with notice about the August 2020 decision to install the cameras. Montgomery credibly testified that he did not find out about the decision until approximately 5 months later when, in early January 2021, he heard about it from a unit employee who was also a union steward. The Respondent's only witness, Kevin Blackwell—director of safety since June 2020—confirmed that the Respondent did not notify Local 100 prior to making the decision to purchase the camera system for the trucks driven by the Local 100 unit members. (Tr. 96–97.) Blackwell stated that there "wasn't the need to" notify Local 100 because the company had determined that it had the right to make the change unilaterally under a management rights provision in the CBA. (Tr. 59, 96–97.)

The management-rights provision in the CBA states:

> The management of the plant and direction of the working force is vested exclusively in the Company, and in furtherance and not in limitation of such authority, shall include the right to assign, to suspend or to terminate employees for just cause, to transfer and relieve employees from duty because of lack of work and for other legitimate reasons, to subcontract bargaining unit work, to make shop rules and regulations, to create new jobs, develop new processes, and implement changes in equipment, changes in the content of jobs or improvements brought about by the Company in the interest of improved methods and product, PROVIDED, that this exercise of management's rights will not violate or supersede any other provisions of this Agreement. The parties acknowledge that, as part of its right to make shop rules and regulations, the Company has the right to issue an employee handbook. The Union acknowledges that the Company provided it with a copy of its most recent draft employee handbook for consideration and bargaining during the collective bargaining negotiations.

Joint Exhibit Number(s) (Jt. Exh. 1, pp. 4 to 5 ) (art. III). There is no provision in the CBA that expressly addresses the installation or use of cameras or other recording equipment in the trucks.

Although the Respondent takes the position that it had no obligation to provide Local 100 with notice before making the decision to purchase and install the camera system, it claims that it did, in fact, provide notice to Local 100 in August 2020 shortly after making that decision. I find that the evidence the Respondent presented at trial does not support its contention that this notice was provided. The Respondent relies on an email from Blackwell, dated August 11, 2020, and the attached message, which it characterizes in its brief as "written communication to the entire workforce, including the employees represented by Local No. 100, announcing and explaining the purpose for the installation of the [camera] system." (R Br. at p. 5.) However, a review of that email shows that it was not a communication to the entire workforce, but rather an email from Blackwell to the Respondent's terminal managers and regional managers. Respondent Exhibit Number(s) (R Exh. 2, Tr. 63.) Not a single official of Local 100 or even any bargaining unit employee is listed as a recipient. The email tells the managers that the message about the cameras "*can*" be shared with drivers and team members, but does not command such sharing. Perhaps more importantly, the email does not tell managers that they must, or even that they may, share the message with any union representing employees. The Respondent did not present any emails in which one of the original manager-recipients of the announcement forwarded the message to Local 100 or even to any bargaining unit employees at the Florence location. Nor did Respondent call as a witness any manager-recipient who testified that they forwarded, or otherwise communicated, the August 11 message to Local 100 or to the employees it represented. Nor, for that matter, did the Respondent call any unit employees to testify that the August message was shared with them. While Blackwell's email did not direct managers to share the camera announcement with Local 100 or unit employees, Blackwell testified that it was his *expectation* that the managers would share the message with employees. However, Blackwell did not have actual knowledge that any manager, in fact, shared the August message at a single one of its locations, much less that managers did so at *all* of them *including* the Florence location. Moreover, Blackwell's trial testimony about his expectation that the August 11 message was shared with Local 100 employees in August 2020 is undercut by his February 4, 2021, letter to Montgomery, stating that the Respondent "began informing drivers" about the change *"in January."* (Jt. Exh. 5) (emphasis added). On the other hand, Montgomery credibly testified that he had not seen the August 11 message until he was shown it on the day of the November 17, 2021, hearing in this matter. For these reasons, the evidence about the August 11, 2020, message fails to show that, prior to January 2021, the Respondent provided notice of the decision to purchase and install cameras either to Local 100 or even to the employees represented by Local 100.

The other document that the Respondent points to as evidence that it notified Local 100 about its decision to install cameras is a statement that Steven Ruckert—the Respondent's general manager—made to Blackwell in a series of emails that the two exchanged during the period from August 4 to 17, 2020. In the

---

its name was K.R. Drenth (KRD) or the period when its name was Endurance Environmental Solutions. I note, however, that the record does not show that, during the time period relevant to the allegations here, Local 100 had been made aware that K.R. Drenth and Endurance Environmental were one and the same business.

final email of that 2-week exchange, Ruckert stated, "I called and left a message with the business agent and explained what's happening. He never called me back so I don't think it will be an issue."[3] Ruckert did not testify and so the email statement relied upon by the Respondent is hearsay and would generally be inadmissible to prove that Ruckert reached out to a business agent. Fed. Rule of Evid. 801 and 802. The Respondent contends that Ruckert's hearsay statement should be excepted from the hearsay rule because emails between Ruckert and Blackwell are kept and maintained in the normal course of business and therefore qualify for the business records exception to the hearsay rule. (Tr. 73–74); See Fed. Rule of Evid. 803(6). Whether this exception applies to statements in emails such as this one is, as courts have recognized, not certain.[4] However, even if I assume that Ruckert's statement falls within the hearsay exception, I find that it is insufficiently specific and reliable to rebut Montgomery's clear and confident testimony at the hearing that notice about the camera decision was not provided to Local 100 in August 2020, or at any other time before a unit employee alerted Montgomery in January 2021 that the Respondent had announced the decision to employees. I note that Ruckert's email makes no mention of Montgomery or Local 100. Three different unions are present at various Respondent locations, presumably with three different business agents (Tr. 107), but Ruckert states that he left a message for "*the* business agent"—singular. As Blackwell conceded, the email does not provide a basis for surmising whether the business agent who Ruckert says he contacted was Montgomery as opposed to a business agent for one of the other union locals. Ibid. Moreover, in the email, Ruckert does not disclose the content of the message he left other than to say he "explained what's happening." Even if Ruckert left some sort of message for Montgomery—and the email leaves that very much in doubt—(there is no way of knowing if the message was sufficiently detailed and clear to notify Local 100 that the Respondent had decided to purchase, and install, cameras without bargaining. Montgomery credibly testified that he had not received a voice mail or phone call from Ruckert. (Tr. 36, 129.) Moreover, Montgomery testified more generally that the Respondent did not, in August 2020 or at any other time prior to January 2021, provide Local 100 with notice of the decision to install the cameras. (Tr. 36.) For the reasons discussed above, I find Montgomery's confident sworn testimony that the Respondent did not notify Local 100 of the decision to install cameras far more credible than any contrary implication in Ruckert's email. Cf. *UPMC*, 366 NLRB No. 185, slip op at 48 (2018) (crediting employee's testimony that he did not receive a phone call from dispatcher over the dispatcher's hearsay email statement that the phone call was made).

As of the time of hearing on November 17, 2021, the Respondent had installed the cameras in 80 percent of its trucks, but not in the five or six trucks driven by the employees represented by Local 100. The Respondent attributes the fact that the cameras have not been installed in those trucks to delays in the delivery of cameras (Tr. 57–58), not to the challenge lodged by Local 100 or to the pendency of the instant litigation. On September 26, 2021, the Respondent and Local 100 began bargaining for a new CBA. During those contract negotiations the parties bargained for a provision relating to the cameras. However, at no point did the Respondent state that it had rescinded the August 2020 decision to install the cameras, and it never agreed to bargain about the cameras prior to the negotiations for a new contract. (Tr. 32–33.)

### *C. Information Request and Bargaining Demand*

In January 2021, a unit member/steward at the Florence facility informed Montgomery that the Respondent was planning to install cameras in the trucks. Montgomery reacted by sending a letter, dated January 12, to Blackwell, which expressed Local 100's "demand to bargain on this matter . . . and that any steps toward implementation . . . cease." In addition, the letter had four numbered paragraphs requesting information about the cameras. (Jt. Exh. 4.) The only request to which the complaint alleges the Respondent failed to respond properly is request 4. That request reads:

> 4. Please state whether surveillance cameras are in use at any other Endurance Environmental facilities and, if so, which facilities. For each such facility, please provide a copy of any applicable policy, collective bargaining agreement provision, memorandum of understanding or other document discussing the use of such cameras.

Although the Respondent provided information in response to the other requests, the Respondent did not provide any documents at all in response to request 4. (Tr. 26, 112–113, 121–122.) The Respondent did not, it should be noted, even provide Local

[3] The full email chain is set forth in Respondent Exhibit Number(s) (R Exh. 3.) In the first email, dated August 4, 2020, Blackwell asks Ruckert "Is there any kind of notification that we need to give the union to let them know we will be putting cameras in trucks at some point?" Later that day, Ruckert responded, "Yes we have to run this by all of our union divisions . . . . This was a very hot topic last go around . . . ." In the next email, dated 12 days later on August 16, Blackwell writes to Ruckert, "That letter I sent last week"—

referring to the August 11 email to managers, Tr. 106—"should be enough to satisfy, right?" The next day, August 17, Ruckert responded: "Yes that should be fine. I called and left a message with the business agent and explained what's happening. He never called me back so I don't think it will be an issue."

[4] See *U.S. v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013) ("While properly authenticated emails may be admitted into evidence under the business record exception, it would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives emails, then *ergo* all those emails are business records falling within the ambit of Rule 803(6)(B)."), In re *Oil Spill*, 87 Fed. R. Evid. Serv. 492 (E.D. La. 2012), 2012 WL 85447 at * 3 ("[T]here is no categorical rule that emails originating from or received by employees of a producing defendant are admissible under the business records exception," but rather the party proffering the statement must show, inter alia, that it "had a policy or imposed a business duty on its employee to report or record the information within the email."), *United States v. Ferber*, 966 F.Supp. 90, 98 (D. Mass 1997) (holding that emails did not qualify for the business records exception where "while it may have been [the employee's] routine business practice to make such records, there was no sufficient evidence that [the employer] required such records to be maintained").

In this instance, the Respondent showed that Ruckert and Blackwell routinely communicated by email regarding business issues and that Blackwell stored the emails on his computer. However, the record does not show that the Respondent "had a policy or imposed a business duty" on Ruckert to report or record the information involved here, or that the Respondent required Blackwell to retain such communications. Moreover, it was not shown that Ruckert sent the email sufficiently close in time to the events his email purports to report. See Fed. R. Evid 803(6)(A) (business record exception does not apply unless "the record was made at or near the time"); see also In re *Oil Spill*, supra ("First of all, the email must have been sent or received at or near the time of the event(s) recorded in the email.")

100 with a copy of the announcement describing the cameras that it sent to managers by email on August 11, 2020, and which it now claims constituted notice of the change to "the entire workforce, including employees represented by Local No. 100." See R Br. at p. 5. Nor did the Respondent provide Local 100 with a statement claiming that one or more of the types of documents listed in request 4 did not exist.

Blackwell and Montgomery subsequently exchanged letters about the January 12 information request. although those communications did not specifically mention request 4 or the types of information identified in it. Blackwell's first letter to Montgomery about the request was dated February 4. (Jt. Exh. 5.) That letter stated that "In January, we began informing our drivers that [the Respondent] had begun the process of installing" the cameras. It went on to state, inter alia, that "[i]n an ongoing process, [the Respondent was] implementing cameras in 100 percent of our fleet," that "the primary function of the cameras is collection of footage in the event of an accident and coaching," and that "no collective bargaining has been deemed necessary up to this point." The letter did not include any statement that the Respondent was willing to accede to Local 100's demands that it bargain and cease any steps towards installing the cameras in the trucks driven by the unit employees. Indeed, Blackwell testified that his letter communicated that the decision to install the cameras had *already* been made. (Tr. 114.)

Montgomery responded to Blackwell in a letter dated February 12. (Jt. Exh. 6.) The letter stated that the Respondent failed to notify Local 100 about the change and that deciding to install the cameras without bargaining was a violation of the National Labor Relations Act. The letter also "demand[ed] that [the Respondent] immediately cease all attempts to implement this program at this location." It went on to argue that the installation of cameras was a mandatory subject of bargaining that has "the potential to affect job security and, secondarily, infringes on employee privacy." Montgomery's February 12 letter characterizes Blackwell's February 4 letter as a "partial response" to the January 12 letter and states that Local 100 "hereby requests answers to its remaining questions and again specifically demands to bargain."

Blackwell, in an email dated March 1, responded to Montgomery's February 12 letter. (Jt. Exh. 7.) Blackwell discussed some details of how the cameras would work and be used, and also contested the applicability of Board precedent that Montgomery had cited for the proposition that the installation of cameras was a mandatory subject of bargaining. In the letter's concluding paragraph, Blackwell stated: "Please advise how and when you would like to discuss further." In a rather strange quirk, the final paragraph of Blackwell's letter to Montgomery also includes the following sentence, which had a red line through it, but was still present and readable: "In closing, bargaining at the expense of safety cannot be a starting point." This letter, like Blackwell's previous one, did not state that the Respondent was willing to bargain or that it would cease steps to install the cameras pending bargaining.

Montgomery testified that he was seeking the information listed in request 4 so that he could see what other union locals had "agreed to and what they didn't agree to" regarding the cameras so that he could use that in his bargaining on behalf of Local 100. (Tr. 24–25.) The Respondent did provide Blackwell's August 11 message, which it claims was notice to the unit employees, with any management-rights provisions other unions had agreed to, or with a single other document sought in request 4. (Tr. 26–27.) Blackwell conceded both that Montgomery never withdrew request 4 and that the Respondent never answered that request directly; not even by representing that no responsive documents existed. (Tr. 112–113, 121–122.)

## ANALYSIS AND DISCUSSION

### I. UNILATERAL DECISION TO INSTALL CAMERA SYSTEM

The General Counsel presents alternative legal theories in support of its allegation that the Respondent violated Section 8(a)(5) and (1) of the Act when it unilaterally decided to purchase and install cameras in the trucks driven by Local 100 unit members, and refused Local 100's demand to bargain over the change. First, the General Counsel argues that under the "contract coverage" standard that the Board adopted in *MV Transportation*, 368 NLRB No. 66 (2019), the Respondent was wrong to conclude that Local 100 had, in the management rights provision of the CBA, waived bargaining over the installation of cameras. In the alternative, the General Counsel argues that the facts present here demonstrate the necessity of jettisoning the *MV Transportation* standard and returning to the prior Board standard that places the burden on the party asserting a contractual waiver to show such a waiver was explicitly stated, clear, and unmistakable. See *Metropolitan Edison Co.*, 460 U.S. 693, 708–709 (1983), *Quality Roofing Supply Co.*, 357 NLRB 789 (2011), *Provena St. Joseph Medical Center*, 350 NLRB 808, 810–811 (2007), *Johnson-Bateman*, 295 NLRB 180, 184 (1989). For the reasons discussed below, I find that the evidence shows that the Respondent did, in fact, unilaterally decide to purchase and install cameras, and that it refused Local 100's demand for bargaining over the decision and its effects. However, when the parties' CBA is analyzed under the current "contract coverage" standard, I find that the Respondent has shown that it was legally entitled to take those actions because the management rights clause in the CBA gave it authority to make "changes in equipment" unilaterally.

The question of whether to jettison the contract coverage standard and either return to the "clear and unmistakable waiver" standard or adopt another standard is for the Board to decide, not me. *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984) ("We emphasize that it is a judge's duty to apply established Board precedent which the Supreme Court has not reversed. It is for the Board, not the judge, to determine whether precedent should be varied."); see also *Austin Fire Equipment, LLC*, 360 NLRB 1176 fn. 6 (2014).

#### *A. Respondent's Section* 10(b) *Defense Fails*

The Respondent argues that it had no obligation to provide Local 100 with notice and an opportunity to bargain about the decision to install cameras, but also claims that it, in fact, gave Local 100 notice through the announcement that was forwarded to managers on August 11, 2020. In its answer to the complaint the Respondent asserted, as an affirmative defense, that the underlying charge was untimely because it was not filed until March 3, 2021—over 6 months after the August announcement, and therefore beyond the 6-month charge filing period allowed

by Section 10(b) of the Act.[5] This defense fails because the Respondent has the burden of proving the affirmative defense,[6] and, as discussed in the above statement of facts, the Respondent has failed to show that Local 100, or even any employee represented by Local 100, received the August 11, 2020, announcement to managers, or was otherwise advised of the Respondent's unilateral camera decision prior to January 2021.[7] Indeed, the evidence affirmatively shows that Local 100 did not discover that the Respondent had decided to make the change until January 2021—well within the charge filing period – when the Respondent informed unit employees that it would be installing the cameras, and one of those employees, a union steward,[8] conveyed the information to Montgomery.

*B. Respondent Failed to Give Local 100*

NOTICE AND AN OPPORTUNITY TO BARGAIN

Section 8(a)(5) of the Act requires an employer to give the employees' union timely notice and an opportunity to bargain before making a significant change to employees terms and conditions of employment. *NLRB v. Katz,* 369 U.S. 736 (1962); *NLRB v. Borg-Warner Corp*., 356 U.S. 342, 349 (1958). As Blackwell admitted at trial, the Respondent made the decision to purchase cameras and install them in its entire fleet of trucks in August 2020. Local 100 did not find out about this decision until January 2021, when a unit employee informed Montgomery about it. Montgomery responded to this revelation by demanding that the Respondent bargain over the decision. The Respondent's reaction was to acknowledge the change, but to decline to bargain over it. Specifically, the Respondent told Montgomery that it had started informing employees in January that it would be installing the cameras, and that the company had deemed that collective bargaining on the subject was not necessary. At best this was belated notice to Local 100 of a fait accompli that had already been announced to the affected employees and about which bargaining would be fruitless. This does not meet the Respondent's obligation to provide a collective bargaining representative with timely notice and a meaningful opportunity to bargain. *Cascades Containerboard Packaging*, 370 NLRB No. 76, at 1 fn. 1 and 15 to 16 (2021) (an employer does not meet its 8(a)(5) duty to bargain when it simply announces a final decision to the union under circumstances that make clear that bargaining would be fruitless), citing *Brannan Sand & Gravel Co.*, 314 NLRB 282 (1994); *Taft Coal Sales & Associates, Inc.*, 360 NLRB 96, 100 (2014) (notice was of a fait accompli, that did not allow meaningful bargaining, where the union was not notified until after the employer advised the affected employees), enfd. 586 Fed.Appx. 525 (11th Cir. 2014).

The Respondent argues that, even though it had no obligation to bargain over the decision to install cameras, it met any such obligation and that Local 100 through its actions waived its right to bargain over the decision. It is true that a non-contractual waiver may be demonstrated by a union's conduct. However, to establish such waiver the employer must show that it provided the union with a timely and meaningful opportunity to bargain and that the union did not attempt to do so. *Taft Coal Sales & Associates, Inc*., supra; see also *MV Transportation*, 368 NLRB No. 66, slip op. at 2 (in the absence of a contractual waiver, a waiver will still be found if the employer "demonstrates that the union clearly and unmistakably waived its right to bargain over the change"), and *Dodge of Naperville, Inc*., 357 NLRB 2252, 2272 (2012) ("Waiver of the right to bargain based on a union's failure to request bargaining will not be found where the union was not given advance notice of the change and/or where the notice presented the change as a fait accompli."), enfd. 796 F.3d 31 (D.C. Cir. 2015), cert. denied 577 U.S. 1217 (2016). The evidence here showed that the Respondent failed to provide Local 100 with a timely and meaningful opportunity to bargain. Moreover, when Local 100 discovered the change in January 2020, not only did it not waive bargaining, but rather it promptly and repeatedly demanded in writing that the Respondent bargain. The Respondent, did not agree to bargain,[9] but instead stated that it "deemed" that no bargaining was necessary and disputed Local 100's statement that placing the cameras in trucks was a mandatory subject of bargaining.[10] Under these facts, the Respondent's

[5] Sec. 10(b) provides in relevant part that "no complaint shall issue based upon any unfair labor practice occurring more than 6 months prior to the filing of the charge with the Board."

[6] *Midwest Terminals of Toledo*, 365 NLRB 1645, 1659–1560 (2017), enfd. 783 Fed.Appx. 1 (D.C. Cir. 2019); *NLRB v. Public Service Electric & Gas Co.*, 157 F.3d 222, 228 (3d Cir. 1998).

[7] Conveyance of the August 11 announcement is the only means by which the Respondent contends that Local 100 was notified beyond the charge filing period. The 6-month charge filing period does not begin to run until the charging party has clear and unequivocal notice of the acts alleged to constitute the unfair labor practice. *Castle Hill Health Care Center*, 355 NLRB 1156, 1191 (2010); *Ohio & Vicinity Regional Council of Carpenters*, 344 NLRB 366, 367–368 (2005); *Broadway Volkswagen*, 342 NLRB 1244, 1246 (2004); *Concourse Nursing Home*, 328 NLRB 692, 694 (1999); *Leach Corp*., 312 NLRB 990, 991 (1993).

[8] The record suggests that the steward himself did not receive notice until January 2021. Even assuming that the steward had received notice earlier, that would not change the analysis with respect to the Respondent's timeliness defense since a steward's knowledge of a unilateral change is not imputed to the union for purposes of triggering the 10(b) period. *Brimar Corp*., 334 NLRB 1035 fn. 1 (2001). Moreover, the CBA between the Respondent and Local 100 expressly limits the steward's authority to the investigation of grievances, the collection of dues, and the transmission of information authorized by the union or union officers. Joint Exhibit Number (Jt. Exh.) 1 at p. 4 (art. II, sec. 6). The CBA provision regarding stewards does not authorize them to receive notice from management about changes to terms or conditions of employment.

[9] As discussed earlier in this decision, on September 16, 2021, the parties began negotiating for a successor to the CBA, and as part of those discussions the parties negotiated over the installation of the cameras. That does not change the fact that the Respondent failed and refused to bargain prior to making the decision to purchase and install the cameras and prior to announcing that decision to the affected unit employees. Nor does the subsequent bargaining about the cameras in the context of the CBA negotiations close the period of any violation that might be found since the Respondent did not tell Local 100, or announce to unit employees, that management had rescinded its decision to install cameras in the trucks driven by unit employees. As the Board has noted, "A union must not be forced to commence bargaining from a disadvantageous position, or bargain from a hole, caused by the employer's unremedied unilateral changes." *CP Anchorage Hotel*, 370 NLRB No. 83, slip op. at fn. 32 (2021), citing *Covanta Energy Corp*., 356 NLRB 706, 730 (2011), and *Intermountain Rural Elec. Assn.*, 305 NLRB 783, 789 (1991), enfd. 984 F.2d 1562 (10th Cir. 1993).

[10] The Respondent's decision to install cameras that observe employees at work was a mandatory subject of bargaining. The Board has repeatedly affirmed that this is the case, especially where, as here, such observation may be used to discipline unit employees. *Roemer Industries*, 367 NLRB No. 133, slip op. at 8 (2019), enfd. 824 Fed.Appx. 396 (6th Cir. 2020); *National Steel Corp.*, 335 NLRB 747, 747–748 (2001), enfd. 324 F.3d 928 (7th Cir. 2003); *Nortech*, 336 NLRB 554, 568 (2001); *Colgate-Palmolive Co.*, 323 NLRB 515, 515 (1997), *Genesee Family Restaurant*, 322 NLRB 219, 225 (1996). The Respondent argues that the installation of its cameras was not a mandatory subject of bargaining

defense that it provided timely notice and an opportunity to bargain, but that Local 100 waived bargaining by failing to pursue it, is frivolous.

*C. Contract Coverage and the Management Rights Provision*

The decision to install cameras in trucks driven by unit employees was a mandatory subject of bargaining, and the Respondent did not provide Local 100 with timely notice or an opportunity to bargain about that decision. Nevertheless, as the Respondent argues, it will not be found to have failed to bargain in violation of Section 8(a)(5) if it shows that Local 100 contractually waived bargaining. In *MV Transportation*, the Board announced that it was adopting a "contract coverage" standard for application to cases "in which an employer defends against an 8(a)(5) unilateral-change allegation by asserting that contractual language privileged it to make the disputed change without further bargaining." 368 NLRB No. 66, slip op. at 11. "Where contract language covers the act in question, the agreement will have authorized the employer to make the disputed change unilaterally, and the employer will not have violated Section 8(a)(5)." Ibid. In the instant case, the Respondent asserts that its CBA with Local 100 included a management rights provision that privileged it to unilaterally decide to install the at-issue cameras in the trucks driven by bargaining unit employees. That management rights provision, which is set forth in its entirety earlier in this decision, does not mention cameras, but does state that the company has the authority to unilaterally "develop new processes, and implement changes in equipment." The Respondent argues that this language covers its decision to install the cameras unilaterally. The General Counsel counters that the Respondent takes the CBA language about changes in equipment out of context. Specifically, the General Counsel argues that the management rights provision contains language indicating that its application is limited to changes made "in the interest of improved methods and product" and that installing cameras does not concern improved methods and product.[11]

The Board stated in *MV Transportation* that in considering whether "contract language covers the act in question," Ibid., it will "examine the plain language of the collective-bargaining agreement to determine whether the action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally," Id. at 2. "In applying this standard," the Board stated, it "will be cognizant of the fact that 'a collective bargaining agreement establishes principles to govern a myriad of fact patterns," and that 'bargaining parties [cannot] anticipate every hypothetical grievance and . . . address it in their contract." Id. at 11. In this case, I find that these standards compel a finding that the Respondent was privileged by the CBA's management rights provision to "implement a change in equipment" by installing cameras in the trucks without bargaining. Trucks are "equipment" of a trucking company and the installation of cameras in those trucks falls within the plain meaning of making a change to that equipment.

The General Counsel's contention that this is not so because the contractual provision also mentions "improved methods and processes" is not in my view persuasive. First, the most reasonable reading of the entire sentence at issue is that "improved methods and product" refers only to the immediately prior item, from which it is not separated by punctuation. In other words, I read "or improvements brought about by the Company in the interest of improved methods and product" as a single item on the list of permissible changes. In the alternative reading suggested by the General Counsel, the phrase limiting the permissible changes to ones made "in the interests of improved methods and product," would apply not only to the language about improvements made by the company, but to the earlier types of changes listed in the same sentence, including the changes in equipment. That reading, however, would lead to nonsensical results. For instance, it would mean that the management rights clause gives the Respondent the right "to terminate employees for just cause," but *only* "in the interest of improved methods and product." Or that the Respondent could "transfer . . . employees from duty because of lack of work" but *only* "in the interest of improved methods and product." That cannot be what the parties intended.

At any rate, even assuming that the General Counsel is correct and that the changes in equipment that the management rights provision authorizes are limited to those that improve methods and product, I think the fairest reading would be that the cameras were installed "in the interest of improved methods and product." For a trucking services company, the operation of its trucks *is* product, and the installation of the cameras, and their use to improve safety is an improvement of its product. Moreover, the use of the cameras is in the interests of improving its "methods" for addressing accidents that occur in the course of its work.

The General Counsel supports its interpretation of the reach of the management rights provision by noting, inter alia, that "[t]he CBA does not include any language specific to the implementation or use of surveillance cameras in Unit employees' trucks." Brief of General Counsel at Page 12. However, in *MV Transportation*, the Board clearly stated that the failure of a contract to enumerate every specific circumstance that falls with a general grant of authority does not show that those specifics are not covered. Rather the Board stated "that 'a collective bargaining agreement establishes principles to govern a myriad of fact patterns,'" and therefore "we will not require that the agreement specifically mention, refer to or address the employer decision at issue." Id. at 11, quoting *NLRB v. Postal Service*, 8 F.3d 832, 838 (D.C. Cir. 1993).[12]

---

because they were not "surveillance" cameras. Assuming that such a distinction is more than a matter of semantics, and that the Board would be inclined to rely on it to determine whether cameras installed in the workplace are a mandatory subject of bargaining, I do not believe that the camera system at-issue here would reasonably be placed in the non-surveillance category. As discussed above, the uncontroverted evidence was that the cameras make video and audio recordings of drivers at work and that the Respondent plans to use those recordings as a basis for disciplining drivers. The Respondent also argues that the cameras were not used for improper surveillance. Brief of Respondent at p. 9. It is true that the record does not show that the cameras were used for unlawful surveillance of unit employees' protected activities, but whether the cameras discouraged protected activities in violation of Sec. 8(a)(1) is not an issue here. Rather the issue is whether the Respondent violated Sec. 8(a)(5) when it decided, without notifying or bargaining with Local 100, to install cameras that would significantly impact unit employees' terms and conditions of employment.

[11] In the posthearing briefing no party has asserted that there are CBA provisions, other than the one on management rights, that show that the Respondent had, or lacked, the authority to install the cameras.

[12] I find that bargaining over the effects of the decision to install cameras also falls within the scope of the management rights provision. Under the "clear and unmistakable" waiver standard applicable to contractual waiver cases prior to *MV Transportation*, the Board had held that an employer was required to bargain over the effects of a change if the management rights provision did not clearly and unmistakably waive effects bargaining. See, e.g., *New York University*, 363 NLRB 470, 474 (2015), *Good Samaritan Hospital*, 335 NLRB 901, 902–903 (2001). I am not

In reaching this conclusion about how the management rights provision should be applied here under the "contract coverage" standard, it is only fair to note that the parties signed the contract on September 25, 2018over a year before the Board's *MV Transportation* decision abandoned the "clear and unmistakable waiver" standard in favor of "contract coverage." Therefore, at the time Local 100 agreed to the management rights language it did not know that the Board would interpret that language using the contract coverage analysis, rather than the more restrictive clear and unmistakable waiver language. In *MV Transportation,* however, the Board acknowledged this concern but nevertheless ruled that the new standard would apply retroactively to contracts drafted while the prior Board precedent was in effect. The Board said that, in its view, retroactive application was appropriate because it would not "work a manifest injustice." Id. at 12.

For the above reasons, I must recommend dismissal of the complaint allegations that the Respondent violated Section 8(a)(5) and (1) by making a unilateral decision to install cameras in the trucks operated by employees represented by Local 100 and by refusing Local 100's requests to bargain over the installation of the security cameras and failing to provide Local 100 with a meaningful opportunity to bargain over the decision and its effects.

### II. RESPONDENT VIOLATED SECTION 8(A)(5) BY FAILING TO FURNISH INFORMATION REQUESTED BY LOCAL 100 REGARDING THE CAMERA SYSTEM

The General Counsel alleges that the Respondent violated Section 8(a)(5) and (1) of the Act by failing to properly respond to request 4 in the written information request that Local 100 made on January 12, 2021. In that request, Local 100 asked the Respondent to "state whether surveillance cameras are in use at any other [Respondent] facilities" and, if so, to state which facilities and for each such facility to "provide a copy of any applicable policy, collective bargaining agreement provision, memorandum of understanding or other document discussing the use of such cameras." As found above, the evidence shows that the Respondent did not provide any information at all in response to this request, even though it had at least some such information—e.g., the August 11, 2020, announcement and any management rights agreements with other union locals. Nor did the Respondent answer the request by making a contemporaneous representation to Local 100 that any of the information responsive to request 4 did not exist.

An employer's obligation to bargain in good faith under Section 8(a)(5) of the Act, includes the obligation to furnish the employees' union upon request, with information relevant to and necessary for the performance of the union's statutory duty as the employees' bargaining representative. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–436 (1967). Information about the unit employees' terms and conditions of employment is presumptively relevant, see *Beverly Health & Rehabilitation Services,* 328 NLRB 885, 888 (1999), *Samaritan Medical Center,* 319 NLRB 392, 397 (1995), but even if, as here, the requested information is not about unit employees, the employer must provide it upon a showing that the information "has even probable or potential relevance" to the union's representational duties, see *North Star Steel Co.*, 347 NLRB 1364, 1368 (2006), *Orthodox Jewish Home for the Aged*, 314 NLRB 1006, 1007–1008 (1994), *Pfizer Inc.*, 268 NLRB 916, 918 (1984), *Conrock Co.*, 263 NLRB 1293, 1294 (1982); see also *Acme Industrial*, 385 U.S. at 437 (The question is whether there is a "probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities.").

The record here shows that the Respondent was required to produce the information sought by Local 100 in Request 4 because, while that information was not directly about unit employees, it was of probable or potential relevance to Local 100's representational duties.[13] When the Respondent, by letter of February 4, notified Local 100 of its decision to install the cameras it specifically explained its action by stating that it was a companywide decision – for all 400 trucks in its 22-location operation, and not just for the five or six trucks driven by Local 100 unit members. Since the Respondent explained the decision to install the cameras at the unit employees' location by reference to the treatment of employees at other locations, the Respondent has itself made that treatment relevant and the particulars of the camera use at other facilities has at least "probable or potential" relevance to what Local 100 could hope to negotiate. Moreover, as the Respondent surely knew, its communication that Local 100 unit members were just a miniscule fraction of the employees affected by a corporate-wide decision, would tend to discourage employees about the prospects for altering the Respondent's chosen course. As noted in the General Counsel's brief, when an employer makes representations to a union regarding working conditions at its other facilities, that fact can demonstrate the relevance of union-requested information about those working conditions at other facilities. See *Kraft Foods*, 355 NLRB 753, 755 (2010), and *Caldwell Mfg.*, 346 NLRB 1159, 1159–1160 (2006). Here, Montgomery credibly testify that he hoped the information about other facilities, especially other unionized facilities, would help him understand the range of possibilities of what Local 100 could hope to achieve during bargaining regarding the cameras. In the letter requesting the information, Montgomery informed the Respondent that he was seeking information because the cameras had "the potential to affect job security and, secondarily, infringes on employee privacy."

In addition, the Respondent represented to Local 100 that it was installing the cameras "companywide . . . but no bargaining has been deemed necessary up to this point." J Exh. 5. The Respondent has contended, successfully here, that bargaining with Local 100 was not necessary because of the management rights clause in its CBA with Local 100. Local 100's representation of its members in the face of the Respondent's claim about the effect of the management rights provision in its CBA could, at least "potentially" have been assisted by receiving the CBAs that the Respondent had with the other unions. Did those other CBAs contain the same management rights provision as Local 100's CBA, or did they include no such provision, or did they include other provisions that expressly, or by implication, waived bargaining over the installation of cameras?

Finally, I note that despite my finding that the Respondent's decision to unilaterally install cameras was authorized by the management rights provision, the January 12, 2021, information

aware, however, of cases reaching the same result after the Board abandoned the clear and unmistakable waiver standard in favor of the contract coverage standard. I find that bargaining over those effects falls within the contract coverage of the waiver in the management rights provision.

[13] As previously noted, the Board has held than an employer's decision to install cameras that observe represented employees is a mandatory subject of bargaining. See, supra, fn. 10.

request is still relevant to Local 100's statutory duties because it was, at a minimum, relevant to Local 100's preparations to negotiate a successor CBA. It is undisputed that the Respondent and Local 100 not only could, but did, bargain about the cameras that year as part of negotiations for a successor CBA. The duty to provide information "extends to the provision of information that is relevant to contract negotiations." See *Whitesell Corp.*, 357 NLRB 1119, 1160 (2011).

For the reasons discussed above, I find that the Respondent violated Section 8(a)(5) and (1) of the Act since January 12, 2021, by failing to furnish, or inform Local 100 that it did not possess, the information requested by Local 100 in request 4 of its January 12, 2021 letter.

## Conclusions of Law

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. The Respondent violated Section 8(a)(5) and (1) of the Act since January 12, 2021, by failing to furnish, or inform Local 100 that it did not possess, the information requested by Local 100 in request 4 of its January 12, 2021, written information request.

4. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

5. The Respondent was not shown to have committed the other violations alleged in the complaint.

## Remedy

Having found that the Respondent engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended Order.[14]

## ORDER

The Respondent, Endurance Environmental Solutions, LLC, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to provide Teamsters Local No. 100, an Affiliate of the International Brotherhood of Teamsters, AFL–CIO (Local 100) with requested information, or stating that the Respondent did not possess requested information, relevant to and necessary for the performance of Local 100's statutory duty as the collective bargaining representative of employees in the following bargaining unit:

> All employees including drivers, mechanics and loaders employed by the Respondent at its Florence, KY facility, excluding office clerical employees and all professional employees, guards and supervisors as defined in the Act.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Provide Local 100 with all of the information responsive to request 4 in the January 12, 2021, letter from Timothy Montgomery to Kevin Blackwell.

(b) Within 14 days after service by the Region, post at its facility in Florence, Kentucky, copies of the attached notice marked "Appendix."[15] Copies of the notice, on forms provided by the Regional Director for Region 9, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 5, 2019.

(c) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C. February 8, 2022

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/09-CA-273873 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

[14] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[15] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

CASE NO.__________

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENDURANCE ENVIRONMENTAL SOLUTIONS, LLC,

*PETITIONER,*

V.

NATIONAL LABOR RELATIONS BOARD,

*RESPONDENT.*

---

**ON PETITION FOR REVIEW OF DECISION AND ORDER OF THE NATIONAL LABOR RELATIONS BOARD, 373 N.L.R.B. NO. 141, CASE NO. 09-CA-273873**

---

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT OF PETITIONER ENDURANCE ENVIRONMENTAL SOLUTIONS, LLC

---

DLA PIPER LLP (US)
JONATHAN BATTEN (DC BAR NO. 473733)
*JONATHAN.BATTEN@DLAPIPER.COM*
500 EIGHTH STREET NW
WASHINGTON, D.C. 20004
PHONE: (202) 799-4329

JOSEPH PIESCO, JR. (APPLICATION TO PRACTICE PENDING)
*JOSEPH.PIESCO@DLAPIPER.COM*
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
PHONE: (212) 335-4537

*Attorneys for Petitioner*
*Endurance Environmental Solutions, LLC*

Pursuant to Rule 26.1 of the Federal Rule of Appellate Procedure and Circuit Rule 26.1, Petitioner Endurance Environmental Solutions, LLC respectfully submits the following Corporate Disclosure Statement. Petitioner Endurance Environmental Solutions, LLC is 100% owned by EES Holdco, LLC. No publicly traded company owns more than 10% of Petitioner's stock. Petitioner is headquartered in Rosemont, Illinois and operates trucks that haul trash and refuse.

Respectfully Submitted,

DATED: December 20, 2024

**DLA PIPER LLP (US)**
JONATHAN BATTEN
JOSEPH PIESCO, JR.

*/s/ Jonathan Batten*
*Attorneys for Petitioner*
*Endurance Environmental Solutions, LLC*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 20, 2024, I caused to be filed one original and four copies of the foregoing Petition for Review of Decision and Order of the National Labor Relations Board ("Petition") and Rule 26.1 Corporate Disclosure Statement with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit. Further, I caused to be served by first-class mail the Petition and Corporate Disclosure Statement on the following parties participating in the underlying National Labor Relations Board proceeding.

Eric A. Taylor
Regional Director, Region 9
National Labor Relations Board
550 Main Street, Room 3-111
Cincinnati, OH 45202-3271

Daniel A. Goode, Esq.
Counsel for General Counsel
National Labor Relations Board
550 Main Street, Room 3-111
Cincinnati, OH 45202-3271

Julie C. Ford
Counsel for International Brotherhood of Teamsters, AFL-CIO, Local 100
Ford, Doll, Jansen & Ford
111 W First St., Suite 1100
Dayton, OH 45402

Tim Montgomery
International Brotherhood of Teamsters, AFL-CIO, Local 100
2100 Oak Rd
Cincinnati, OH 45241

In addition, I caused a file-stamped copy of the Petition and Corporate Disclosure Statement to be served both by hand delivery and by overnight delivery to:

Ruth E. Burdick
Deputy Associate General Counsel
Appellate and Supreme Court Litigation Branch
Office of General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570-0001

Respectfully Submitted,

*/s/ Jonathan Batten*
Jonathan Batten